**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>                        Plaintiff,<br><br>v.<br><br>RYAN BOYCE, in his official capacity as Director of the North Carolina Administrative Office of the Courts; MICHELLE BALL, in her official capacity as Clerk of Superior Court of Johnston County; RENEE WHITTENTON, in her official capacity as Clerk of Superior Court of Harnett County; and CLAUDIA CROOM, in her official capacity as Clerk of Superior Court of Wake County,<br><br>                        Defendants. | Case No.: 5:23-cv00280-FL<br><br>**COURTHOUSE NEWS SERVICE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

MEMORANDUM OF LAW .............................................................................. 1

    I.    INTRODUCTION ................................................................................ 1

    II.  ISSUES FOR THE COURT .............................................................. 4

    III. UNDISPUTED FACTUAL BACKGROUND ................................... 4

        A.  About Courthouse News Service ................................................ 4

        B.  Access to New Civil Complaints ............................................... 5

        C.  E-Filing in North Carolina Superior Courts .............................. 7

        D.  Access Delays in North Carolina Superior Courts .................... 10

        E.  Defendants' Post Litigation Actions .......................................... 11

        F.  More Expeditious Options Available for e-Filed Documents ...... 14

    IV. SUMMMARY JUDGMENT STANDARD ....................................... 15

    V.  ARGUMENT ..................................................................................... 15

        A.  The Public Enjoys a First Amendment Right of Access to Civil Complaints Upon Filing ........................................................................... 16

        B.  Defendants' Asserted Concerns Do Not Justify Delay .................. 18

            1.  That Clerks Might Reject an e-Filed Complaint Is No Justification ......................... 18

            2.  Policing Potential PII in Complaints Does Not Justify Delay ................................. 20

                i.   Automatic Filtering by Case Type, Document Type, and Filer Designation ...... 20

                ii.  Filers are Responsible for Redacting PII Before Submitting a Filing ................ 21

                iii.  Defendants Incorrectly Maintain Certain Laws Still Require Redaction ........... 22

            3.  Defendants' Post-Litigation Processing Rule Amendments Do Not Satisfy the First Amendment .......................... 25

        C.  CNS is Entitled to Declaratory Relief (and Potential Injunctive Relief) to Prevent Defendant from Denying Access Until Complaints Are Processed ................................ 27

    VI. CONCLUSION .................................................................................. 29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Humanist Ass'n v. Perry*,
303 F. Supp. 3d 421 (E.D.N.C. 2018) ................................................................. 28

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .............................................................................................. 15

*Biccum v. City of Watertown, NY*,
No. 7:16-CV-645, 2019 WL 4752927 (N.D.N.Y. Sept. 30, 2019) ....................... 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .............................................................................................. 15

*Courthouse News Serv. v. Cozine*,
No. 3:21-cv-680-YY, 2022 WL 1000775 (D. Or. Apr. 4, 2022) ..................... 6, 17

*Courthouse News Serv. v. Gabel*,
No. 2:21-cv-000132, 2021 WL 5416650 (D. Vt. Nov. 19, 2021) ................... 17, 19

*Courthouse News Serv. v. Jackson*,
No. H–09–1844, 2009 WL 2163609 (S.D. Tex. July 20, 2009) ........................... 19

*Courthouse News Serv. v. Jackson*,
No. 4:09–CV–01844, 2010 WL 11546125 (S.D. Tex. Mar. 2, 2010) ................... 17

*Courthouse News Serv. v. N.M. Admin. Off. of Cts.*,
53 F.4th 1245 (10th Cir. 2022) ....................................................................... 17, 19

*Courthouse News Serv. v. Omundson*,
No. 1:21-cv-00305-DCN, 2024 WL 4349112 (D. Idaho Sept. 30, 2024) ........................ 17, 19, 20, 22

*Courthouse News Serv. v. O'Shaughnessy*,
663 F. Supp. 3d 810 (S.D. Ohio 2023) ................................................................ 17

*Courthouse News Serv. v. Planet*,
947 F.3d 581 (9th Cir. 2020) ........................................................................ *passim*

*Courthouse News Serv. v. Planet*,
No. CV 11-8083-DMG (FFMx), 2021 WL 1605216 (C.D. Cal. Jan. 26, 2021) ................................. 17

*Courthouse News Serv. v. Schaefer*,
440 F. Supp. 3d 532 (E.D. Va. 2020) .................................................. 2, 19, 21, 27, 28

*Courthouse News Serv. v. Schaefer*,
2 F.4th 318 (4th Cir. 2021) ........................................................................... *passim*

ii

*Courthouse News Serv. v. Smith*,
    126 F.4th 899 (4th Cir. 2025) ................................................................................. 14

*Courthouse News Serv. v. Tingling*,
    No. 16 Civ. 8742 (ER), 2016 WL 8505086 (S.D.N.Y. Dec. 16, 2016) ................................ 17

*Courthouse News Serv. v. Yamasaki*,
    950 F.3d 640 (9th Cir. 2020) ................................................................................. 17

*Doe v. Public Citizen*,
    749 F.3d 246 (4th Cir. 2014) ................................................................................. 27

*Gibbons v. Gibbs*,
    99 F.4th 211 (4th Cir. 2024) ................................................................................. 27

*Holland v. Kohn*,
    12 F. App'x 160 (4th Cir. 2001) ................................................................................. 15

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ................................................................................. 20

*Meredith v. Stein*,
    355 F. Supp. 3d 355 (E.D.N.C. 2018) ................................................................................. 28

*Press-Enterprise Co. v. Sup. Ct. of Cal. for the Cnty. of Riverside ("Press-Enterprise II")*,
    478 U.S. 1 (1986) ................................................................................. 16, 17, 18

*Simmons v. Whitaker*,
    106 F.4th 379 (4th Cir. 2024) ................................................................................. 15

*Temkin v. Frederick Cnty. Comm'rs*,
    945 F.2d 716 (4th Cir. 1991) ................................................................................. 15

*Temkin v. Frederick Cnty. Comm'rs*,
    502 U.S. 1095 (1992) ................................................................................. 15

*Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*,
    386 F.3d 581 (4th Cir. 2004) ................................................................................. 27

**Rules and Statutes**

18 U.S.C. § 2265(d)(3) ................................................................................. 24

18 U.S.C. § 2721(a) ................................................................................. 23

18 U.S.C. § 2721(b)(4) ................................................................................. 23

42 U.S.C. § 405(c)(2)(C)(viii)(I) ................................................................................. 23, 24

42 U.S.C. § 1983 ................................................................................. 3, 28

42 U.S.C. § 1988 ................................................................................. 3

Fed. R. Civ. P. 5.2 ...................................................................................................... 24

Fed. R. Civ. P. 56 ....................................................................................................... 15

N.C. Gen. Stat. § 132-1.10 ......................................................................................... 22

N.C. Gen. Stat. § 132-1.10(d) ..................................................................................... 21

N.C. Gen. Stat. § 132-1.10(h) ..................................................................................... 24

N.C. Gen. Stat. § 132-1.4 ........................................................................................... 24

N.C. Super. Ct. & Dist. Ct. R. 5(b)(4) ....................................................................... 10

N.C. Super. Ct. & Dist. Ct. R. 5(b)(4)a ................................................................ 17, 18

N.C. Super. Ct. & Dist. Ct. R. 5(e) ............................................................................ 21

# MEMORANDUM OF LAW

## I.      INTRODUCTION

*Courthouse News Service v. Schaefer* determined that "the press and public enjoy a First Amendment right of access to newly filed civil complaints and mandated they be made publicly available "as expeditiously as possible."  2 F.4th 318, 329 (4th Cir. 2021). That decision was issued nearly four years ago. This Court repeatedly acknowledged that mandate in denying Defendants' motion to dismiss (D.E. 38). Yet, Defendants still withhold non-confidential, electronically filed civil Superior complaints until they have been fully "processed," and the "accept" button clicked.  When this case was filed in May 2023, the Defendant counties were each processing new e-filed civil complaints at monthly same day access rates averaging well below 50%, violating *Schaefer*. *See* Statement of Undisputed Material Facts ("SOF") ¶¶ 54-56, filed herewith. Defendants cling to their "no-access-before-processing" policy, eschewing tried and true technological solutions.

Instead, beginning a few months after this action commenced, they sped up processing rates as a litigation strategy to avoid court-imposed relief. Superior courts statewide often reach same-day access rates of 90% or above (like what occurred in *Schaefer* after suit was filed), but those numbers are not consistent.  Such 90% rates do, however, prove their earlier practices were not as "expeditious as possible" and those rates must be maintained at a minimum.  In fact, Defendant North Carolina Administrative Office of the Courts ("NCAOC") essentially acknowledges that 90%+ rates are the legal benchmark. (SOF ¶¶ 66-69, 71-72, 93-94). The below chart, created by CNS using raw data provided by NCAOC in this litigation, distills this general evolution.

| | Harnett Superior Court | Johnston Superior Court | Wake Superior Court | Mecklenburg Superior Court |
|---|---|---|---|---|
| **Feb 2023** | 25% | 18% | 12% | |
| **Mar 2023** | 40% | 23% | 62% | |
| **Apr 2023** | 14% | 37% | 59% | Complaint Filed |
| **May 2023** | 50% | 65% | 51% | |
| **Jun 2023** | 67% | 79% | 49% | |
| **Jul 2023** | 67% | 48% | 51% | |

1

| | | | | |
|---|---|---|---|---|
| **Aug 2023** | 78% | 90% | 87% | |
| **Sep 2023** | 94% | 88% | 93% | |
| **Oct 2023** | 86% | 90% | 93% | 92% |
| **Nov 2023** | 94% | 100% | 87% | 89% |
| **Dec 2023** | 92% | 97% | 92% | 92% |
| **Jan 2024** | 71% | 100% | 92% | 91% |
| **Feb 2024** | 88% | 92% | 97% | 87% |
| **Mar 2024** | 94% | 90% | 90% | 91% |
| **Apr 2024** | 93% | 85% | 94% | 91% |
| **May 2024** | 92% | 100% | 94% | 93% |
| **Jun 2024** | 100% | 92% | 94% | 87% |
| **Jul 2024** | 94% | 95% | 88% | 91% |
| **Aug 2024** | 93% | 94% | 92% | 86% |
| **Sep 2024** | 100% | 88% | 93% | 83% |
| **Oct 2024** | 93% | 96% | 94% | 91% |
| **Nov 2024** | 90% | 90% | 90% | 83% |
| **Dec 2024** | 83% | 83% | 89% | 82% |
| **Jan 2025** | 91% | 92% | 86% | 75% |
| **Feb 2025** | 94% | 97% | 91% | No Data |
| **Mar 2025** | 89% | 92% | 93% | No Data |
| **Apr 2025** | 100% | 82% | 91% | No Data |
| **May 2025** | 100% | 100% | 96% | No Data |

The chart, based on calendar days, shows how the Defendant counties, along with metropolitan Mecklenburg County, still stray from reaching minimum 90% same-day access rates. (SOF ¶ 64). And nothing prevents Defendants from backsliding to old ways once this litigation ends. While CNS maintains, as discussed below, there are narrower technological solutions available in the e-filing environment to permit clerks to process complaints without slowing public access at all, it only presently asks this Court to declare that Defendants' prior practices violated the First Amendment and a 90% daily access rate—defined as 90% of all total e-filed Superior Court complaints received on a given day—is the *minimum* rate to satisfy the First Amendment. This Court, like the affirmed *Schaefer* district court, should also retain time-limited jurisdiction requiring Defendants to report back six months post-litigation regarding whether they are meeting the terms of the declaratory judgment. *See CNS v. Schaefer*, 440 F. Supp. 3d 532, 561 (E.D. Va. 2020). If not, the Court should then consider imposition of injunctive relief forbidding any withholding for

processing given the technological solutions CNS has offered (which Defendants have at all turns resisted in favor of making clerk offices statewide just process quicker).

From increased processing rates, to multiple electronic recordkeeping rule amendments, to even (temporarily) mandating its own envisioned pre-acceptance public access terminals for failing counties, Defendants have thrashed every which way to avoid a court-imposed remedy. For example, NCAOC implemented eleventh-hour, toothless e-recordkeeping rules in October 2024 (further weakened last month) continuing post-processing access but stating clerks "should" meet certain "same day" processing rates that pay lip service to *Schaefer*. Those benchmarks employ a self-serving definition of "same day" access, reject technological access options, and enable clerks to be chronically out of compliance without consequence. The rules contain no First Amendment safeguards and implicitly condone access delays. This Court should grant summary judgment, and issue the following *Schaefer*-consistent relief:

1. Grant judgment under CNS' 42 U.S.C. § 1983 claim and find Defendants did not make new e-filed, non-confidential Superior Court civil complaints public as expeditiously as possible, violating the First Amendment;

2. Issue a declaratory judgment in line with First Amendment commands that making new e-filed complaints available "as expeditiously as possible" in the e-filing context means *minimum* 90% same-day access for *all* complaints received on a given day;

3. Retain limited jurisdiction for Defendants to report on compliance and impose injunctive relief forbidding withholding if they do not meet the declaratory judgment's terms; and

4. Award CNS its costs and incurred attorneys' fees pursuant to 42 U.S.C. § 1988.

Instead of aligning with jurisdictions, including the federal system, that provide contemporaneous and expeditious access to court records under an ever-growing body of case law, North Carolina has joined the ranks of the recalcitrant. They mainly invoke confidentiality concerns as justification for their steadfast "no-access-before-processing" policies that are impracticable to sustain and belied by the same rules Defendants will surely argue allay First Amendment concerns. Like many state courts before it, North Carolina must be required to maintain the national standards the First Amendment requires.

## II.    ISSUES FOR THE COURT

The following issues are for determination, all of which should be answered affirmatively:

1.    Whether CNS is entitled to a declaration that Defendants violated the First Amendment by failing to make new, nonconfidential, e-filed Superior Court civil complaints available as expeditiously as possible in line with *Schaefer*;

2.    Whether CNS is entitled to a declaration that a 90% access rate for all complaints filed on a given day is the *minimum* requirement for Defendants to be in compliance with *Schaefer*;

3.    Whether this Court should retain jurisdiction for six months after the conclusion of this litigation to ensure Defendants' compliance with any declaratory relief, and for potential imposition of injunctive relief if Defendants fail to do so; and

4.    Whether CNS is entitled to recoupment of its incurred attorneys' fees and costs from Defendants for the violation of its First Amendment rights.

## III.    UNDISPUTED FACTUAL BACKGROUND

### A.    <u>About Courthouse News Service</u>

Founded more than 30 years ago, CNS is a nationwide news service covering civil litigation. (SOF ¶ 1). It employs about 220 people, most of them editors and reporters, covering state and federal trial and appellate courts in all 50 states, and reporting on general news through its website.  (SOF ¶ 2).

CNS' website, www.courthousenews.com, is free to the public and read daily by roughly 23,000 people. (SOF ¶ 3). Its subscriber publications include New Litigation Reports, which contain staff-written reports on new civil litigation in a particular geographic region. New Litigation Reports are e-mailed to subscribers in the early evening each court day. (SOF ¶ 6). CNS' approximately 2,750 subscribers include law firms, libraries, non-profits, government entities, businesses, and universities such as UNC at Chapel Hill and Wake Forest University.  (SOF ¶ 4).

CNS functions as a pool reporter for news about civil litigation. It has many subscribing media outlets, including: The Associated Press, *The Atlanta Journal-Constitution*, *The Boston Globe*, *The Dallas Morning News*, *Detroit Free Press*, Fox Entertainment Group, *Honolulu Civil Beat*, International

Consortium of Investigative Journalists, *Las Vegas Review-Journal, Los Angeles Times*, *Pacific Coast Business Times, Portland Business Journal, St. Paul Business Journal, The Salt Lake Tribune*, *The San Jose Mercury News, San Antonio Express-News*, *Tampa Bay Business Journal*, *The Wall Street Journal*, and Walt Disney Company. (SOF ¶ 6).

New Litigation Reports covering North Carolina include the *Triangle Area Report*, the *Charlotte Report* (including Mecklenburg County)*,* and the *Greater North Carolina Report*. (SOF ¶ 7). Collectively, they cover state superior and federal courts in North Carolina and are emailed to subscribers weekday evenings. (SOF ¶ 7).

These reports cover new civil complaints, focusing on actions brought against businesses and public entities. (SOF ¶ 8). CNS does not cover family law matters, name changes, probate filings, most mortgage foreclosures, or collection actions against individuals unless the individual is well-known or otherwise notable. (SOF ¶ 8). CNS does not report on complaints that are statutorily confidential or filed with a motion to seal. (SOF ¶¶ 8, 117). Such complaints can be filtered out from public access by Defendants' software.  (SOF ¶¶ 101-02, 118).

**B.**     **Access to New Civil Complaints**

In the paper-records era, state and federal courts nationwide made new, non-confidential civil complaints available to reporters shortly after they were received, allowing reporters to see new complaints by the end of the day they were filed.  (SOF ¶¶ 9-10). Courts provided access by making complaints available after they crossed the intake counter, regardless of whether clerks had completed docketing or other clerical tasks. (SOF ¶¶ 9-10). This allowed the press to report on new civil actions while they were newsworthy and likely to capture the public's attention. (SOF ¶ 10).

When journalists faced access delays in paper-filing courts, it was because courts would not let them see newly filed complaints that were waiting to be "processed." (SOF ¶ 11); *see also, e.g.*, *CNS v. Planet*, 947 F.3d 581, 586 (9th Cir. 2020) ("*Planet III*") (describing the "seven-step procedure to process a new civil complaint" before access was permitted). When it resulted in unconstitutional delays, courts corrected it. (SOF ¶ 12). Despite inherent challenges with paper complaints (only one person can handle a

document at any one time), reporters and court staff worked cooperatively so everyone could do their jobs. (SOF ¶ 12).

Providing timely access in e-filing courts is even easier. E-filed complaints are simply .pdf documents uploaded, viewed, and downloaded and, unlike paper filings, multiple "hands" can simultaneously "touch" them. (SOF ¶ 13). Nothing prevents reporters reviewing new complaints before processing, or clerks processing concurrently while the public views them, or clerks from processing when their schedule permit, without impeding access. (SOF ¶ 14). Moreover, courts require filers to self-populate myriad information into the e-filing interface like party information and case/document types that automatically sort and filter new filings, including segregating confidential filings. (SOF ¶ 60).

As in the paper world, access in e-filing courts is delayed only if courts withhold complaints until *after* staff complete administrative processing. (SOF ¶ 16). Unfortunately, as state courts transitioned to e-filing, they have not always considered how new rules and procedures impact the press' ability to cover courts. (SOF ¶ 16). Some built delay into their systems, forbidding access to complaints until staff completed processing. (SOF ¶ 16); *see also CNS v. Cozine*, No. 3:21-cv-680-YY, 2022 WL 1000775, at *2 (D. Or. Apr. 4, 2022) ("after-submission review" for e-filings "mirror" the seven-step process in *Planet III*). Most courts struggle to complete such clerical tasks for all complaints on the day of filing, meaning post-processing access policies prevent the press from learning about a substantial percentage of new civil actions until at least the day after filing, when the public has moved on to tomorrow's news. (SOF ¶ 17).

Whatever mechanism, all e-filing courts conduct a form of clerical review/processing of new filings, and all have means for handling filer mistakes (*e.g.*, missing signatures, illegible pages). (SOF ¶ 18). Some courts, like this one, automatically accept e-filed documents, processing and addressing clerical issues after documents are in the case management system. (SOF ¶ 18). Other courts have clerks process on the front end, culminating with the document's manual "acceptance" into the case management system or return to the filer for correction. (SOF ¶ 18). Auto-accept and clerk-accept are equally capable of providing timely access to new e-filed complaints. (SOF ¶ 19). The key with clerk-accept is not to keep new complaints secret while they await processing. (SOF ¶ 19). Given the success of many courts,

processing and expeditious access are demonstrably not mutually exclusive. Federal district courts, for example, employ auto-accept. (SOF ¶ 20). State courts also use auto-accept, including in Connecticut and Hawaii (through internally developed systems), Alabama, Nevada, and Utah (through vendors). (SOF ¶ 21). Tyler Technologies, Inc. ("Tyler"), North Carolina's e-filing software vendor, can even configure its system to auto-accept complaints at no charge. (SOF ¶ 99).

Other courts choose to have a human clerk click "accept" ***but do not withhold access in the meantime***. (SOF ¶ 22). Some of these courts display both complaints that have not been "accepted" and complaints that have been in the same public portal. (SOF ¶ 22). Others make complaints that have not been "accepted" available through a separate portal or review queue, sometimes available to the public at large, sometimes limited to those credentialed by the court, sometimes for free, sometimes for a fee, sometimes through court-developed software, sometimes through vendor-provided solutions. (SOF ¶ 22). However implemented, systems that do not withhold access for processing allow new, non-confidential complaints to be reported on the day they are filed, when the lawsuit is still newsworthy and capable of commanding public attention. (SOF ¶ 23).

## C. E-Filing in North Carolina Superior Courts[1]

In 2019, NCAOC contracted with Tyler to transition from paper to e-filing. (SOF ¶ 24). NCAOC agreed to pay Tyler approximately $85 million over ten years. (SOF ¶ 24). North Carolina uses three interconnected Tyler products: (1) the e-filing system (branded "eFile North Carolina"), (2) the case management system, and (3) a public access portal. (SOF ¶ 26).

The e-filing system has three components: (1) the online electronic service provider solution or EFSP, where filers upload and submit filings, (2) the electronic filing manager or EFM, where documents and information are stored, and (3) the clerk review tool, which displays documents and information stored in the EFM for clerks to review and process. (SOF ¶ 28). Tyler's case management system is called Enterprise Justice. (SOF ¶ 29). Filings go there once they are "accepted," whether manually or by auto-

---

[1] CNS seeks access to certain types of Superior Court civil cases only.

accept. (SOF ¶ 30). Tyler software can be configured for either acceptance method, but North Carolina chose manual acceptance, with public access withheld until clerks manually accept filings. (SOF ¶ 30). Tyler currently provides North Carolina Superior Courts with a public access portal known as Odyssey. (SOF ¶ 31). Odyssey is connected to Enterprise Justice and displays certain configurable information from Enterprise Justice in read-only form on a platform available to the public or more limited sets of authorized users. (SOF ¶ 32).

*Submission*. After registering for an e-filing account, e-filers log into eFile North Carolina. (SOF ¶ 33). Filers select a "Location" (*e.g.*, Wake County Superior Court), a "Category" (*e.g.*, "Civil"), and a "Case Type" (*e.g.*, small claims, civil, divorce, etc.) from drop-down menus. (SOF ¶ 34). The next page prompts filers to input party information. (SOF ¶ 35). They then upload filings, selecting the type of document (*e.g.*, "Complaint" or "Petition") from a drop-down menu: [2] (SOF ¶ 36).



Once documents are uploaded, filers are offered the auto-redact feature, which scans the document for sensitive information, identifies information for redaction, and allows filers to accept or reject suggested redactions. (SOF ¶ 37-38). Filers then choose the document security level from a drop-down menu, which later determines who has access: (SOF ¶ 39).

---

[2] Images are from the e-filing walkthrough attached as Exhibit A to the Adam Angione Declaration.



The filer then enters payment information. (SOF ¶ 40).

Before the submission button is enabled, filers *must* accept North Carolina's submission agreements; two boxes acknowledging the *filer's* statutory obligation to redact personally identifying information ("PII") and promising they have done so: (SOF ¶¶ 40-43).



Some defects in an e-filing, like deficient filing fees, cause filings to be immediately and automatically rejected, without reaching court clerks. (SOF ¶ 44). Otherwise, once filers hit the "submit" button, the system transmits it to the EFM, where it is stored awaiting review in the Clerk Review Tool. (SOF ¶ 44). This is the point when a document is "filed" and in the court's possession. (SOF ¶ 45). E-filers can choose to receive one email notification that the document has been submitted, which advises the filer to "allow up to one business day for clerk office processing," and another on acceptance by the clerk. (SOF

¶ 46).

**Clerk Processing**. Clerks access documents from the EFM "when they choose to work those filings" and perform ministerial review through the Clerk Review Tool. (SOF ¶ 47). For new complaints, this review involves "checking for": (1) mislabeling of other documents as complaints, (2) PII; (3) whether the defendant resides in the county, (4) whether the document is properly named; (5) whether filing fees are fully paid; and (6) "false lien" filings and filings subject to "gatekeeper" orders. (SOF ¶ 48). If there is a document issue, clerks will "reject" and return the complaint to the filer for correction. (SOF ¶ 49). If a filing is a prohibited "false lien" against a public official, the filing will be permanently rejected. (SOF ¶ 49). Once "accepted," complaints are file-stamped, a copy is sent to the filer and to the case management system for docketing. (SOF ¶ 51). The stamp appearing on the *document* itself is the time the court *received* the filing. *See* Rule 5(b)(4), Gen. R. of Practice for Sup. & Distr. Cts.; SOF ¶ 52. The time and date appearing on the *docket* is the time it was processed and made available to the public. (SOF ¶ 52).

## D.  Access Delays in North Carolina Superior Courts

CNS covers non-confidential, e-filed civil complaints filed in North Carolina Superior Courts, the state's courts of general jurisdiction. (SOF ¶ 8). North Carolina does not permit public access to these complaints until *after* they have been processed and accepted. (SOF ¶ 53). As the Clerk Defendants testified, their "office policy [is] that the public cannot have access to new complaints prior to clerk acceptance" (SOF ¶ 53), meaning a complaint could be withheld from the public for hours or days.  Prior to this lawsuit, post-processing access resulted in pervasive delays. For example, from February 13, 2023, the date the three Clerk Defendants transitioned to e-filing, through May 25, 2023, the date this lawsuit was filed, CNS calculates the average monthly rate of same day processing was 46% for Wake County, 35.8% for Johnston County, and 32.3% for Harnett County. (SOF ¶ 54-55). Individual delays during that period were regularly worse, varying in degree by court and timeframe. (SOF ¶ 56). For example, the month before this lawsuit was filed, the Harnett County Superior Court made only 14% of new civil complaints available the same day they were filed. (SOF ¶ 56).

Complaints unavailable on the day of filing included a newsworthy action filed in April 2023

related to the death of a child in a Raleigh Christmas Parade, which received significant public attention due to the questions around safety and organization of the parade (delayed three calendar days). (SOF ¶ 57(b)). Other examples include the "Cabo Six" matter, an estate action against six individuals and the FBI alleging wrongful death, negligence, and civil conspiracy related to the death of a 25-year-old woman in Mexico (delayed one calendar day), an action filed in December 2024 by incoming Governor Joshua Stein and outgoing Governor Roy Cooper against, among others, the Speaker of the House, challenging a statute establishing the State Highway Patrol as a cabinet-level department (delayed one calendar day), and another filed in December 2024 by an employee against Rex Healthcare, part of the UNC Health Care System, over the denial of her religious exemption request and subsequent termination for failure to comply with a COVID-19 vaccination policy (delayed one calendar day). (SOF ¶ 57).

Since NCAOC first contracted with Tyler in 2019, CNS made multiple attempts to work with North Carolina officials to ensure timely access to non-confidential civil complaints. (SOF ¶ 58). Although NCAOC looked into a pre-processing press review queue option, it ultimately decided against it. (SOF ¶ 60). CNS then reached out to each Defendant about the delays in access that ensued once e-filing began; no improvement occurred. (SOF ¶ 61).

E.    **Defendants' Post-Litigation Actions**

In the six months following CNS filing suit, the Clerk Defendants dramatically increased their average processing speed. (SOF ¶¶ 62, 98). In September 2023, their average same day processing rate across the three counties was over 91% (up from less than 37% in April 2023). (SOF ¶ 62). Further, this improvement cannot be attributed to the need to become familiar with the eCourts platform: in October 2023, Mecklenburg County Superior Court—the first to transition to e-filing *after* this lawsuit—achieved a 92% same day access rate in its first month of e-filing. (SOF ¶ 63). This shows, at the onset of this suit, Defendants were not providing access *as expeditiously as possible*, as required under *Schaefer*. Nor are they always doing so now. Since numbers improved in September 2023, the Defendant counties fell below the 90% benchmark in 13 of the 57 months for which data was provided, with Mecklenburg County faring much worse. (SOF ¶ 64).

Then in late October 2024, after the close of discovery, NCAOC produced additional documents showing that it had been working to amend two eCourts Rules of Recordkeeping, Rules 1.5 and 1.8, governing records processing and redaction requirements. (SOF ¶ 65). The revised Rule 1.5 created a new standard for clerks to meet for the processing of new complaints which implicitly acknowledged access rates discussed in *Schaefer*. Specifically, Rule 1.5 stated that clerks "should" process civil complaints filed before 5 p.m. on days a clerk's office is open by 11:59 p.m. the same calendar day (*i.e.* "same-day acceptance"), or when "not practicable," on the next court day. (SOF ¶ 71). Although the amended eCourts Rule 1.5 facially set minimum aspirations of 90% same-day access, in actuality, it allowed clerks to delay access for the majority of any given year. (SOF ¶ 72). Only if a court failed to meet the 90% requirement for three *consecutive* months would NCAOC install a "pre-acceptance" review terminal in that courthouse to allow access to all *non-processed*, non-confidential complaints. (SOF ¶¶ 72, 74). This would include access to information listed in Rule 1.8 as PII that clerks redact. (SOF ¶ 74). Clerks could even choose to have a review terminal installed in lieu of meeting the 90% threshold. (SOF ¶ 73).

Further, as NCAOC calculates it, the percentage of filings accepted same day does not include filings that were returned or "rejected" for minor procedural errors *after* being filed and placed in the courts' possession. (SOF ¶ 85). Nor does it include filings delayed due to technical errors or system issues. (SOF ¶ 85). And despite the courthouse doors never closing in the e-filing world, "same-day" acceptance is calculated based on court "business" days and times, meaning processing obligations are tolled for any filings received after 5:00 p.m. on a court business day, and for weekends and any day a court is physically closed. (SOF ¶ 86). Thus, NCAOC's claim that the courts are meeting the *Schaefer* standard is based on a loose calculation that does not accurately present the percentage of new civil complaints that are actually made public the same day they are filed.

Even with this methodology, many North Carolina Superior Courts are not consistently processing at 90%. For example, Beaufort County met the 90% requirement under NCAOC's calculations in July 2024, but processed less than 82% of complaints the same day in August 2024 and approximately 85% in September 2024. (SOF ¶ 87). Durham County did not meet the threshold at all during the same period,

making only 77.67% of complaints available the same day in September 2024, 60.42% in August 2024, and 61.84% in July 2024. (SOF ¶ 88).

Mecklenburg County, which includes newsworthy Charlotte filings, is a prime example of how the 90% benchmark is not always met, and why this Court needs to order declaratory relief. It was meeting a 90% rate while employing temporary processing staff. (SOF ¶ 89). However, after losing temporary employees in June, the Mecklenburg Clerk expressed concern about maintaining that rate (SOF ¶ 89). Processing rates dropped significantly, from 91.37% in September 2024 to 76.65% in October, 72.49% in November, 84.03% in December, and 54.04% in January 2025. (SOF ¶ 90). As such, under that version of Rule 1.5, NCAOC said a pre-acceptance review terminal would be installed in Mecklenburg County. (SOF ¶ 91). But NCAOC admitted in deposition that a terminal wasn't even available to implement. (SOF ¶ 91). It could not enforce its own remedy.

The push to implement a rule with a paper tiger remedy was a superficial litigation strategy to avoid any court-imposed remedy. (SOF ¶¶ 68-69). In a September 6, 2024, meeting with the eCourts Rules of Recordkeeping Committee (the "RRK Committee"), NCAOC General Counsel Andrew Brown called federal law "as will be applied . . . by the federal courts against us" the "bad guy" and stated the October 2024 Rule 1.5 amendment was "to prevent the federal courts from forcing all 100 counties to do the press review queue". (SOF ¶ 68). Other NCAOC counsel explained the "urgency" being they wanted the amended rules "in place before we do our summary judgment briefing in the case," which was then due in November. (SOF ¶ 69).

But Rule 1.5 was amended again (unilaterally by Director Boyce) in April 2025, eliminating the 90% acceptance benchmark and pre-acceptance review terminal remedy if the rate wasn't met. (SOF ¶ 92). Instead, it now states NCAOC will provide clerks with "same day acceptance and next court date acceptance rates" on a monthly basis via a dashboard for each county to monitor its own "compliance." (SOF ¶ 92). Now, the 90% acceptance rate is just a "guideline" or "reference point" – not a requirement – for clerks to use to evaluate their performance. (SOF ¶ 93). If they fall below that baseline, NCAOC claims it has no "authority to force compliance of the rule." (SOF ¶ 95).

13

Rule 1.5 (be it the October 2024 or current version) is simply not *Schaefer* in rule form, nor does it account for how *Schaefer* should be applied in the e-filing context. For example, it permits withholding access to complaints on non-court days (despite courts being open for e-filing 24/7), the same-day access cutoff is 5:00 p.m., and it (now) allows clerks to delay access without NCAOC penalty. Moreover, the NCAOC Director can unilaterally further water down Rule 1.5 on a whim. (SOF ¶ 96). NCAOC admits a rule could potentially change at the conclusion of this litigation. (SOF ¶ 97).

### F.    More Expeditious Options Available for e-Filed Documents

Given the uncertain future of access rates in North Carolina, this section discusses available technical solutions that allow clerks to review e-filed complaints without delaying public access. CNS has presented Defendants with these solutions. It has rejected them all. As discussed, Tyler provides a free "auto-accept" software option included with the File and Serve product. (SOF ¶ 99). When utilized, new filings meeting certain configurable criteria are automatically accepted and added to the case management system without being held up for clerk processing. (SOF ¶¶ 101-03). When auto-accept filings meet separate qualifications governing which documents are publicly viewable, they become available almost immediately, mirroring how the federal PACER system operates. (SOF ¶¶ 101-03).

Tyler also offers a Press Review Tool product. (SOF ¶ 105). This tool links directly to File and Serve, rather than the case management system, and allows authorized users to view filed documents that have not yet been processed and formally accepted in a unique, dedicated queue, indicating to users that the document they are viewing had not yet been formally "accepted.". (SOF ¶ 106). This too allows filings meeting configurable criteria to become available almost immediately. (SOF ¶ 107). It also preserves clerks' ability to manually process those filings in their own queues as their schedules allow. (SOF ¶ 107). A Press Review Tool can be made available over the internet (*e.g.*, Arizona) or through a designated terminal at a physical location (*e.g.*, Maryland)[3] (SOF ¶ 108).

Finally, Tyler offers application programming interfaces ("APIs"), which create free access

---

[3] CNS does not assert a freestanding First Amendment right to remote, online access to court records. *See, e.g.*, *CNS v. Smith*, 126 F.4th 899, 907 (4th Cir. 2025).

mechanisms to allow courts to create their own version of a press review tool. (SOF ¶¶ 109-10).

## IV. SUMMMARY JUDGMENT STANDARD

Under Rule 56, a movant is entitled to summary judgment if there is no genuine issue as to any material fact such that he is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial burden of establishing the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *Holland v. Kohn*, 12 F. App'x 160, 165 (4th Cir. 2001). Upon that showing, burdens shift to the non-moving party to produce facts sufficient to create a triable issue. *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 718-19 (4th Cir. 1991), *cert. denied*, 502 U.S. 1095 (1992).

When evaluating evidence, courts should draw all reasonable inferences in favor of the non-movant. *Simmons v. Whitaker*, 106 F.4th 379, 384-85 (4th Cir. 2024). Summary judgment is appropriate when the non-moving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex*, 477 U.S. at 322-23. A non-moving party must satisfy this burden by offering more than a mere "scintilla of evidence" supporting their position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## V. ARGUMENT

This Court has already recognized *Schaefer* governs this case. There, the Court examined whether delaying access to newly filed paper complaints until clerks completed administrative processing violated the First Amendment. *Schaefer*, 2 F.4th at 328. Before that lawsuit, 22% of complaints in one county and 41.5% in another were only publicly available two or more court days after filing. After CNS sued, the *Schaefer* clerk defendants vastly improved access, making upwards of 90% of new complaints available the same day of filing. *Id.* at 322-23. The Fourth Circuit affirmed that it was clearly "possible and practicable" to provide same day access. It thus held that, prior to reaching the 90% benchmark, the defendants violated the First Amendment by not providing access to new complaints "as expeditiously as possible" in the context of paper filings. *Id.* at 328-29.

15

Importantly, *Schaefer* involved *paper* complaints, not *e-filed* ones. Thus, the Court noted that the First Amendment required "contemporaneous" access and allowed limited wiggle room in the standard when same-day access was not practicable. *Id.* at 328. In the e-filing age, filings occur around-the-clock and it is even easier to make complaints available the same day of filing as barriers inherent in paper filing do not exist. It is both "possible and practicable" to provide contemporaneous access to new e-filed complaints. Defendants have demonstrated they can. But they failed to do so prior to and periodically after the filing of this action. The Court should declare those delays violated the First Amendment *Schaefer* standard and declare a 90% *minimum* as the constitutional floor that satisfies First Amendment access rights. Injunctive relief would be proper forbidding any withholding of complaints for processing if Defendants do not maintain such rates post-litigation.

A.      **The Public Enjoys a First Amendment Right of Access to Civil Complaints Upon Filing**

After analyzing *Press-Enterprise Co. v. Sup. Ct. of Cal. for the Cnty. of Riverside*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"), the Fourth Circuit held that "the press and public enjoy a First Amendment right of access to newly filed civil complaints." *Schaefer*, 2 F.4th at 328. Defendants concede this. *See* D.E 29 at 8 (Defendants' Memorandum in Support of Motion to Dismiss). That right is a national standard based on federal constitutional requirements. *See Id.* at 326. It thus attaches to the Superior Court civil complaints at issue.

In addition to relying on *Planet III*, *Schaefer* recognized that access rights attach upon receipt because of the "immediate consequences precipitated by filing a complaint, consequences that the public must promptly understand" including that "a complaint instantaneously invokes a court's jurisdiction," and "jurisdictional questions often implicate 'the public's confidence' in judicial power." *Schaefer*, 2 F.4th at 327-28. *Schaefer* further explained that the First Amendment right of access "requires courts to make newly filed civil complaints available *as expeditiously as possible*." *Id.* at 329 (emphasis added). Defendants do not dispute this either. Indeed, NCAOC General Counsel advised the RRK Committee at the September 6, 2024, meeting that federal courts have rejected the very arguments Defendants have made here—that a complaint is not a "filing" until it is accepted. (SOF ¶ 66). Rather, counsel explained the right attaches "as

16

soon as it's submitted, whether or not it's accepted as a filing, it's—they've got a First Amendment right of access. That's what the case law is saying." (SOF ¶ 67). This Court has already held, "'a qualified First Amendment right of public access attaches to' a complaint upon its filing." D.E. 38 at 7.

The Fourth Circuit is aligned with courts nationwide. *See CNS v. N.M. Admin. Off. of Cts.*, 53 F.4th 1245, 1262-68 (10th Cir. 2022) ("right of access attaches to complaints when they are submitted to the court"); *CNS v. Yamasaki*, 950 F.3d 640 (9th Cir. 2020); *Planet III*, 947 F.3d at 590, and, on remand, *CNS v. Planet*, No. CV-11-8083-DMG (FFMx), 2021 WL 1605216, at *1 (C.D. Cal. Jan. 26, 2021) (same); *CNS v. Omundson*, No. 1:21-cv-00305-DCN, 2024 WL 4349112, at *10 (D. Idaho Sept. 30, 2024) (word "'filed' is best understood to mean when the complaint is submitted to the respective e-filing system, *not* to mean once the documents are reviewed/accepted/processed by a clerk"); *Cozine*, 2022 WL 1000775, at *2 (same); *CNS v. Gabel*, No. 2:21-cv-000132, 2021 WL 5416650, at *13 (D. Vt. Nov. 19, 2021) (same); *CNS v. Tingling*, No. 16 Civ. 8742 (ER), 2016 WL 8505086, at *20 (S.D.N.Y. Dec. 16, 2016); *CNS v. Jackson*, No. 4:09–CV–01844, 2010 WL 11546125, at *1-2 (S.D. Tex. Mar. 2, 2010); *CNS v. O'Shaughnessy*, 663 F. Supp. 3d 810, 817-18 (S.D. Ohio 2023) (same). This accords with North Carolina court rules, which provide that a document is filed "when it is received by the court's electronic-filing system, as evidenced by the file stamp on the face of the document." N.C. R. Super. & Dist. Cts. 5(b)(4)a.

There is no real debate that First Amendment access rights attach when a complaint is received by a court, *i.e.*, when it is filed, and Defendants' speeding up processing of complaints only confirms this recognition. The question under *Press-Enterprise II* and *Schaefer* thus becomes: Are Defendants able to make an evidentiary showing proving their blanket withholding for processing policy—however long complaints are withheld—is narrowly tailored and necessary to serve an overriding interest? *See Schaefer* 2 F.4th at 328. While the Court need not presently consider this second prong if it were to grant CNS' requested declaratory relief, CNS nonetheless briefly addresses why even a 90% same-day access rate is not the narrowest solution.

Still, the answer is a thunderous no. Clerks throughout North Carolina, including the Defendant Clerks, demonstrated, like the *Schaefer* clerks who were further hampered by paper, they can provide access

to 90% or more of complaints on the day of filing. For now, the Court need go no further. While there is room to quibble with the methods and whether more expeditious rates of access are practicable, a declaration that 90% day of filing access rates are a constitutional floor will suffice. Nonetheless, while the Court need not presently consider whether Defendants' policies are narrowly tailored and necessary to serve an overriding interest, CNS briefly addresses why Defendants cannot satisfy their evidentiary standard.

**B.**    <u>**Defendants' Asserted Concerns Do Not Justify Delay**</u>

While the qualified right of access to nonconfidential civil complaints does not require "immediate," access to newly e-filed complaints, Defendants must prove "delays in access [are] 'content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice.'" *Schaefer*, 2 F.4th at 328 (quoting *Planet III*, 947 F.3d at 585). Accordingly, to survive the tailoring prong of *Press-Enterprise II*, they "must demonstrate first that there is a 'substantial probability' that [the asserted] interest … would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect' that government interest." *Press-Enterprise II*, 478 U.S. at 14. Defendants assert two primary reasons why they cannot provide pre-processing access: the possibility of rejections and protecting PII.

**1.**    **That Clerks *Might* Reject an e-Filed Complaint Is No Justification**

Defendants' concern regarding "rejections" is not backed by data nor any legitimate reason why the mere possibility of a rejection causes harm or impairs the judicial process. Rather, they simply advised such a policy exists to "avoid confusion." (SOF ¶ 111). This concern apparently stems from the (mistaken) belief that complaints are not court records until they have been "accepted." (SOF ¶ 111). This ignores that complaints are "filings" upon court *receipt* and this Court's finding that First Amendment rights attach upon filing. *See* DE 38 at 7; N.C. R. Super. & Dist. Cts. 5(b)(4)a.

North Carolina court rejection data shows the reasons for returning new complaints to filers for correction are overwhelmingly minor clerical issues. (SOF ¶¶ 112-13). Tyler-generated data produced by Defendants reflects that out of the more than 4,067 new civil complaints e-filed in the Defendant Superior Courts from the time they transitioned to e-filing in February 2023 through July 31, 2023, only 91, or 2.23%

were rejected. (SOF ¶ 112). Of those, 16 were rejected without comment or explanation and the remainder were rejected for clerical errors such as missing pages or for filing in the wrong court or category. (SOF ¶ 112). Clerical and patronizing confusion concerns do not rise to the level of interests sufficient to overcome First Amendment interests in contemporaneous/expeditious access. Further, there is also no substantial evidence that a complaint was rejected as a false lien or due to a gatekeeper order.[4] (SOF ¶¶ 112-14). The presence of PII in a complaint is *not* a reason to reject a complaint either. (SOF ¶ 115).

As *Schaefer* requires, Defendants cannot show their purported concerns were the reason for delays in processing, particularly where processing numbers have improved without material changes to staffing. *See Schaefer*, 440 F. Supp. 3d at 560), *affirmed*, 2 F.4th at 329 (clerks "failed to offer facts establishing that any of these explanations did actually cause delays."); *see also Gabel*, 2021 WL 5416650, at *15 ("Defendant[] offer[s] no evidence that staff review of signatures, filing fees, and filing codes is necessary to protect the orderly administration of justice."); *Omundson*, 2024 WL 4349112 at *13 ("The Court agrees with CNS that it does not undermine the process if simple errors are corrected after the documents become public rather than before."); *Planet III*, 947 F.3d at 597 (finding no evidence that immediate access resulted in "accounting issues[,]" "compromised the quality and accuracy of information logged into the [case management system,]" "created efficiency problems[,]" or "resulted in loss, destruction, or mutilation of, or otherwise compromised the 'integrity' of, case files"); *CNS v. Jackson*, No. H–09–1844, 2009 WL 2163609, at *4 (S.D. Tex. July 20, 2009) (finding twenty-four to seventy-two hour delays to verify correct case number, proper court, accurate title, and proper filing category were not narrowly tailored).

In fact, if someone views a complaint that is not ultimately "accepted," discovers no corresponding case was opened, and wonders why, *that would be an example of the system working as it should*. *See Omundson*, 2024 WL 4349112 at *14 ("public trust actually increases when errors are corrected because that provides assurances the system is working"); *N.M. Admin. Off.*, 53 F.4th at 1268-69 (argument that

---

[4] Defendants cite no specific instance in which this occurred or provide any data to support such occurrences. (SOF ¶ 114). They also do not track or have any evidence to show how frequently (or infrequently) filers have withdrawn complaints or filing errors are made. (SOF ¶ 114).

"providing access to complaints that may be rejected or withdrawn only invites confusion as to what is happening in a state's courts… overlooks the fact that the withdrawal or rejection of a complaint might itself be a matter of public interest that the press deems newsworthy").

The First Amendment is not subordinate to administrative technicalities or clerical process as "the prime objective of the First Amendment is not efficiency." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

### 2. Policing Potential PII in Complaints Does Not Justify Delay

Defendants contend that their no-access-before-processing policy is necessary to protect against the public disclosure of PII. This is another speculative, tail-wagging-the-dog argument. And it again bears repeating CNS is *not* seeking statutorily confidential case types, which are most likely to contain PII.[5] *See* D.E. 1 (Complaint) at 11, ¶ 36. Moreover, CNS does "not cover family law matters, name changes, probate filings, most mortgage foreclosures, or collection actions." (SOF ¶¶ 8, 117). Accordingly, the justification that processing is required to ensure that no confidential information is made public is nonsensical, as "[t]here should not be any confidential information in these types of filings to begin with as they are, by nature, nonconfidential civil cases." *Omundson*, 2024 WL 4349112, at *13. Even so, the exceedingly small number of confidential e-filed case initiating documents can be automatically filtered out and segregated from the public record.

### i. *Automatic Filtering by Case Type, Document Type, and Filer Designation*

North Carolina's e-filing system can automatically filter and protect e-filed documents by case type, document type, or the filer's own designation as confidential. (SOF ¶ 118). That is, an e-filed document can be automatically secured from public view, without any action by filer or clerk, if (1) the document is confidential by rule or statute; (2) the document is filed in a case that is confidential by rule or statute; or (3) the filer designates the document as confidential. (SOF ¶ 119). The filer chooses case and document types and designates a document confidential by choosing "confidential" rather than "public" in the drop-down menu appearing when uploading a document for filing. (SOF ¶¶ 34, 36, 39).

---

[5] Within case categories, certain case types are confidential by rule or statute, such as juvenile cases and special proceedings. (SOF ¶ 118).

Moreover, the EFM can be configured to further filter and sort additional case types, including family case, domestic violence, and criminal, providing pre-processing access only to the Complaints at issue in this case, filtering out false liens and the cases in which confidential information is most likely to appear. (SOF ¶ 102). Thus, concerns about inadvertent access to documents exempt from disclosure by rule or law cannot justify Defendant's policy of withholding Complaints until after processing.

### ii.    *Filers are Responsible for Redacting PII Before Submitting a Filing*

North Carolina law expressly places the burden of excluding certain PII, such as social security and financial account numbers, on the *filer*, not the clerk. N.C. Gen. Stat. § 132-1.10(d) provides:

> No person preparing or filing a document to be recorded or filed in the official records of the register of deeds, the Department of the Secretary of State, or of the courts may include any person's social security, employer taxpayer identification, drivers license, state identification, passport, checking account, savings account, credit card, or debit card number, or personal identification (PIN) code or passwords in that document, unless otherwise expressly required by law or court order, adopted by the State Registrar on records of vital events, or redacted. … Any person who violates this subsection shall be guilty of an infraction, punishable by a fine not to exceed five hundred dollars ($500.00) for each violation.

 (*See also* SOF ¶¶ 120-121). Further, the General Rules of Practice for the Superior and District Courts have the same filer mandate: "A person should omit or redact nonpublic and unneeded sensitive information in a document **before filing** it with the court." *See* Rule 5(e) (emphasis added). As the *Schaefer* district court concluded, filer responsibility suffices to protect confidential information. *See Schaefer*, 440 F. Supp. 3d at 560 ("Defendants claim that their interests in the orderly administration of their office and protecting confidential information outweigh the public's First Amendment right to contemporaneous access. The Court first observes that under Virginia law, the filer is responsible for redacting confidential information...Defendants are currently ensuring that confidential information is protected while maintaining contemporaneous access.").

Additionally, as mentioned above, filers are unable to submit any filing through eFile North Carolina without first checking two boxes warning filers of their legal obligation to remove PII from a filing before submission and requiring them to affirm they understand the warning and will comply under risk of penalty. (SOF ¶¶ 41-43).

Filers are also prompted to use a free auto-redact feature prior to submitting a filing. (SOF ¶ 37). This feature scans the document and highlights potentially sensitive information, and all filers have to do is click a button to initiate the scan. (SOF ¶ 37). Highlights are then shown to the filer, who can review them and make any edits to the automated redaction selections. (SOF ¶ 38). Clerks are also statutorily mandated to post this filer redaction requirement conspicuously throughout their offices for public viewing, which Defendants have admitted they do. (SOF ¶ 121). The NCAOC's own documents reference these rules and inform clerks around the state that the filer has the responsibility to redact and that clerks are not the "PII police." (SOF ¶ 122).

The Clerk Defendants admit there is no statutory or other legal mandate that it perform redactions before making filings available to the public. (SOF ¶ 122). They can point to no actual data on how frequently PII allegedly appears in complaints occurs because the clerks' offices do not track it. (SOF ¶ 123). They also are unaware of instances in which filers have actually submitted complaints containing unredacted PII. (SOF ¶ 124).

Defendants also have no substantial evidence that any purported instances of identity theft or financial fraud have resulted from PII being available in public documents. (SOF ¶ 125).

Given safeguards already in place, the supposed need to review every page of every new civil complaint for PII cannot justify withholding access. *See Planet III*, 947 F.3d at 597 ("no-access-before-process policy bears no real relationship to…concerns about privacy and confidentiality" where a court rule "requires the filer – not the court – to exclude or redact private information from publicly filed judicial documents."); *see also Omundson*, 2024 WL 4349112 at *13.

### iii.  *Defendants Incorrectly Maintain Certain Laws Still Require Redaction*

Rule 1.8 notes two instances in which a clerk is now supposedly still *required* to redact:

(1) When federal laws and state laws (other than G.S. 132-1.10) regulate the disclosure of PII in court records (a disingenuous position given NCAOC's willingness to install pre-acceptance review terminals under the October 2024 version of Rule 1.5); and

(2) Upon written request of a person identified by PII appearing on the Portal (inapplicable here as it concerns documents already made public).

(SOF ¶ 122).

The first instance stated above is the crux of Defendants' argument that processing prior to public access is required in order for clerks to comply with the law. Each is briefly addressed below.

(A)    Driver's Privacy Protection Act, 18 U.S.C. 2721, *et seq.* ("DPPA")

18 U.S.C. § 2721(a) prohibits "a State department of motor vehicles, and any officer, employee, or contractor thereof" from disclosing personal information about an individual "obtained by the department in connection with a motor vehicle record." The section does not apply to the court system because clerks are not officers or employees of the DMV. Moreover, subsection (b) of the statute provides an express exception to the prohibition, permitting the use of personal information "in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal State, or local court or agency or before any self-regulatory body." 18 U.S.C. § 2721(b)(4). Accordingly, such references within court records are expressly permitted and therefore cannot serve as a basis for the Defendants to withhold access for processing.

(B)    Social security numbers under 42 U.S.C. § 405(c)(2)(C)(viii)

This statute provides that "[s]ocial security account numbers and related records that are *obtained or maintained* by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record." 42 U.S.C. § 405(c)(2)(C)(viii)(I) (emphasis added). This federal law is inapplicable because clerks are specifically not in the business of obtaining and maintaining social security numbers in complaints. As discussed, they take myriad steps to avoid receiving it. They don't want it and a law designed to restrain persons with an actual need to collect and store such data has no application here.

Moreover, if the Court were to credit this position the federal auto-accept PACER system, which has operated for decades with a federal court rule just as allergic to the inclusion of social security numbers

in filings (FRCP 5.2), would be potentially violating federal law. This is an absurd conclusion but one that follows from Defendants' logic.

Finally, no private right of action exists for alleged violations 42 U.S.C. § 405(c)(2)(C)(viii)(I), *see, e.g.*, *Biccum v. City of Watertown, NY*, No. 7:16-CV-645, 2019 WL 4752927, at *6 (N.D.N.Y. Sept. 30, 2019), which like North Carolina General Statute 132-1.10(h) provides clerks immunity from claims arising out of the publication of a social security number on the public record.

(C)    <u>G.S. 132-1.4, regarding criminal investigative information not being public record, including SBI identifiers</u>

G.S. 132-1.4 provides that certain criminal investigative information held by law enforcement agencies is not public record. The new Rule 1.8 adds that such information includes State Bureau of Investigation identifiers, which are fingerprint information stored in the state's central repository for criminal history information. This information arises in criminal cases, a non-issue as CNS does not seek access to criminal cases. (SOF ¶ 81)

(D)    <u>Violence Against Women's Act ("VAWA"), 18 U.S.C. § 2265</u>

VAWA provides that a state "shall not make available publicly on the Internet any information regarding the registration, filing of a petition for, or issuance of a protection order, restraining order, or injunction in either the issuing or enforcing [jurisdiction], if such publication would be likely to publicly reveal the identity or location of the party protected under such order." 18 U.S.C. § 2265(d)(3). The purpose is to protect the association of an individual with a protective order, not to protect that individual's name and address in every document in any case online. (SOF ¶ 79)

Rule 1.8 provides that VAWA protections apply *only* in filings arising under Chapter 50B (domestic violence cases), 50C (civil no-contact orders stemming from abuse, sexual misconduct, or stalking), and 50D (human trafficking injunctions). (SOF ¶ 77). The only instances in which protected VAWA information arise outside these case types are in criminal cases, such as in a "no contact" provision of a release order or judgment, and family and non-criminal cases, such as divorce complaints. (SOF ¶ 78). Accordingly, VAWA is not an issue in the types of civil cases CNS seeks.

Outside of the Rule, AOC's guidance to clerks confirms the limited instances in which VAWA protections are even implicated. In a PowerPoint presentation created by the NCAOC Office of the General Counsel, the only examples provided are in family matters, specifically support, child custody, or visitation provisions, and in divorce complaints. (SOF ¶ 76). The presentation also indicates the following case types raise confidentiality issues: juvenile, SPC, adoptions, False Claims Act, juvenile transfers, expunctions, juror information, and confidential documents. (SOF ¶ 76).

Again, CNS is *not* seeking access to family or domestic violence cases, which not only can be filtered out of any review queues by Tyler, but already have automatic application of case-level security, which prevents them from being placed on the public Portal. (SOF ¶ 82).

Finally, the VAWA statute limits *only* what can be publicly available on the internet. Defendants have expressly acknowledged that it does not otherwise make that information confidential or prevent it from being distributed to the public in other forms, such as hard copy or via an on-site terminal (SOF ¶ 80). Indeed, Defendant NCAOC has prepared guidance expressly instructing clerks that if a member of the press or public requests access to these case files in person, "the clerk *should* provide them *without* any VAWA-specific redactions. (SOF ¶ 80).

Given the above, VAWA cannot be used legitimately to withhold access to the complaints at issue here. CNS has repeatedly emphasized it does *not* seek the very limited, specific cases that VAWA information may appear in, and those cases may be easily segregated from others. The protections already in place to prevent such information from being publicly released serve the Defendants' interest in maintaining this information. And they can continue to do so without delaying *all* civil complaints based on the purported application of VAWA.

### 3. Defendants' Post-Litigation Rule Amendments Do Not Satisfy the First Amendment

In a blatant attempt to avoid the relief sought in this lawsuit—and in recognition of their First Amendment violations with respect to access—Director Boyce advised in September 2024 that Rule 1.5 would be revised to change the processing requirements for clerks. The Committee voted unanimously on these revisions. As modified, Rule 1.5 (both the October 2024 and April 2025 versions) encourages clerks,

absent extenuating circumstances, to process civil complaints that are filed before 5 p.m. on a business day by 11:59 p.m. on the same calendar day (which the rule gratuitously defines as "same day acceptance"), and when not practicable, on the next court date. The April 2025 version eliminated the 90% same-day acceptance rate required of clerks and any real remedy for failures.

The rule was adopted for litigation strategy: as the general counsel for NCAOC stated at the RRK Committee meeting, "we would like this [rule] in place before we do our summary judgment briefing in the case." (SOF ¶ 69). But the new rule creates a host of constitutional issues. At any rate, declaratory relief like in *Schaefer* remains appropriate. As discussed above, and as already established by this Court, the First Amendment standard established in *Schaefer*, "does not depend upon a specific time frame," but rather "in all cases requires 'courts to make newly filed civil complaints available *as expeditiously as possible*.'" Order, ECF 38, p. 11 (citing *Schaefer*, 2 F.4th at 329) (emphasis added). And while *Schaefer* noted under its specific facts that the "contemporaneous" access standard was "flexible" and next day access was okay if same day was not "practicable," such flexibility only came into play there when, unlike here, it was not "practicable" to provide same-day access in a paper environment. *See id.* at 328.

Here, the new policy outlined in Rule 1.5, though appearing to parrot *Schaefer*, in practical effect does the opposite of what is permitted: it sets an arbitrary time limit for processing based on when the physical courthouse is open while disregarding the realities of 24/7 e-filing and the easier and more efficient technical options providing more expeditious access to civil complaints. Even though a minimum 90% day of filing access standard (as previously articulated) would be acceptable to CNS, the work-arounds embedded in the rule cannot satisfy CNS, much less the First Amendment. Under the rule, for example, complaints filed after 5:00 p.m. can languish in a review queue until clerks get to them at some point the next day. And if a complaint is filed at 5:02 p.m. on the Friday before a Monday court holiday, for example, it will only be processed on the next court date, which would be a Tuesday, causing a multi-day delay. Under NCAOC's definitions, in such a scenario, that processing would be considered "same day." (SOF ¶ 86). Such delays will be continuing violations of the First Amendment. As the Fourth Circuit has eloquently explained:

> Because the public benefits attendant with open proceedings are compromised by delayed disclosure of documents, we take this opportunity to underscore the caution of our precedent and emphasize that the public and press generally have a contemporaneous right of access to court documents and proceedings when the right applies. 'Each passing day may constitute a separate and cognizable infringement of the First Amendment.'

*Doe v. Public Citizen*, 749 F.3d 246, 272 (4th Cir. 2014).

That the October 2024 version of Rule 1.5 allowed a terminal to provide immediate, pre-processing access undercuts previously stated concerns regarding fixing filer mistakes and protecting PII. They were willing to make the complaints available pre-processing at the courthouse.

**C.      CNS is Entitled to Declaratory (and Potential Injunctive) Relief to Prevent Defendant from Denying Access Until Complaints Are Processed.**

Despite controlling Fourth Circuit authority and an explicit decision from this Court earlier in this case, the Defendants continue to take the position that they must withhold access until after processing has occurred. And they have attempted to craft a new recordkeeping and processing rule at the eleventh hour to circumvent any declaratory judgment here. As noted, the new rule still fails to meet constitutional muster.

Foremost, North Carolina's rule framework is no guarantee of constitutional compliance. Rule 1.1 of the RRK permits the NCAOC Director "to amend the eRRK *unilaterally*." (SOF ¶ 84). Accordingly, without declaratory relief instituting a same-day access floor of 90% for new complaints (along with the a post-judgment compliance report to the Court and potential sanction for failure) NCAOC is free to change the rules at any time, and the Defendants are free to return to previous *laissez faire* public access practices that result in significant harm to the public and the press.

When exercising its discretion to issue declaratory judgment,[6] a court should consider:

(1) whether the judgment 'will serve a useful purpose in clarifying the legal relations in issue;' (2) whether the judgment 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding;' (3) considerations of federalism,

---

[6] The Court has jurisdiction to award declaratory relief here because "(1) the complaint alleges an 'actual controversy' between the parties of 'sufficient immediacy and reality to warrant issuance of a declaratory judgment;' (2) the court possesses an independent basis for jurisdiction over the parties (*e.g.*, federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004). As in *Schaefer*, all conditions have been met here. *See Schaefer*, 2 F.4th at 324, n.1; *see also Gibbons v. Gibbs*, 99 F.4th 211, 214 (4th Cir. 2024) (affirming declaratory judgment against state officials in their official capacity).

efficiency, and comity; (4) 'whether the declaratory judgment action is being used merely as a device for procedural fencing—that is, to provide another forum in a race for <u>res judicata</u> or to achieve a federal hearing in a case otherwise not removable.' "

*Schaefer*, 440 F. Supp. at 561, *affirmed*, 2 F.4th at 329; *see also Meredith v. Stein*, 355 F. Supp. 3d 355, 366 (E.D.N.C. 2018) (entering declaratory judgment where sex offender law violated plaintiff's procedural due process rights); *Am. Humanist Ass'n v. Perry*, 303 F. Supp. 3d 421, 432-33 (E.D.N.C. 2018) (entering declaratory judgment that defendant violated Equal Protection Clause).

As in *Schaefer,* CNS has shown it is entitled to declaratory judgment as a matter of law on its section 1983 First Amendment claim. There, the evidence showed that clerks had made available only 19% of newly filed complaints the same day of filing, and 22% available until two or more court dates after filing. *Schaefer*, 2 F.4th at 322. But after the lawsuit was filed, the clerks "significantly improved access to documents in their courts without hiring any new employees or changing employee or court hours," making 92.3% of newly filed complaint available on the day of filing and 100% available within one court day. *Id.* at 322-23. The District Court determined that declaratory relief was appropriate because the complaint alleged an actual controversy involving deprivation of rights protected by the federal Constitution: "Although Plaintiff is no longer experiencing unconstitutional delays, this case still presents an actual controversy of 'sufficient immediacy,' because Defendants voluntarily reduced their unlawful conduct and have not provided assurances that they will not resume it." *Schaefer*, 440 F. Supp. 3d at 561-62. And the Fourth Circuit, explaining that the clerks' prior processing violated the First Amendment because the evidence showed "it was both possible and practicable to provide same-day access to most newly filed complaints." *Schaefer*, 2 F.4th at 329.

The evidence here establishes the very same thing as in *Schaefer*. Since CNS filed this lawsuit, the Clerk defendants processing of complaints has improved from roughly 50% same-day availability to over 90% same-day availability. (SOF ¶ 62). However, Defendants do not consistently maintain those numbers. (SOF ¶ 64). Similarly, the Clerk Defendants have achieved these results both before and after both revisions to Rule 1.5 without increasing personnel, court hours, or processing speed. (SOF ¶ 98). It is therefore evident that the Clerks were not making complaints accessible as expeditiously as possible. And here, in

the electronic filing world, the paper-filing limitations present in *Schaefer* do not exist, so it is even more "possible and practicable" to provide faster access. A declaratory judgment should be entered against Defendants. Further, as previously noted, this Court should reserve the ability to enter injunctive relief forbidding withholding complaints for processing should Defendants fail to meet the declaratory judgment's terms.

## VI. CONCLUSION

As CNS' editor and publisher William Girdner explained, "[t]his litigation and the litigation that has preceded it stems from a conviction that the foundation stone of the American courts is their open and public nature." Girdner Decl., ¶ 87. Technology makes it easier for the press to watch the flow of each day's new complaints so it can report the news it finds. But North Carolina has made access so much harder. CNS has presented technology solutions to Defendants. They have rejected them and done everything possible to ward off court action. And while the pattern is clear—Defendants' purposefully speeding up same-day access during this litigation to *Schaefer*-like levels—that pattern may not continue and has proven at best inconsistent. This is why the requested declaratory relief, with a later option, if necessary, to impose an injunction forbidding withholding given the technology solutions CNS has shown are the true narrowly tailored solutions in the e-filing context, is required.

There is also no question that at the time of this lawsuit's filing, and for months after, Defendants violated CNS' First Amendment rights by not making e-filed civil complaints available "as expeditiously possible." It is thus entitled to declaratory relief and its attorneys' fees and costs.

Accordingly, CNS respectfully asks the Court to grant its motion for summary judgment.

## <u>CERTIFICATION</u>

Pursuant to Local Rule 7.2(f)(2)(B) and (3)(B), the undersigned certifies that this memorandum of law complies with the font, page and/or word limits under the Rule.

Respectfully submitted this **16th** day of **May**, **2025**.

THOMAS & LoCICERO PL

*/s/ Carol Jean LoCicero*
Carol Jean LoCicero (FBN 603030)
Mark R. Caramanica (FBN 110581)
601 South Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
clocicero@tlolawfirm.com
mcaramanica@tlolawfirm.com
tgilley@tlolawfirm.com
jvanderhorst@tlolawfirm.com

Daniela B. Abratt (FBN 118053)
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Telephone: (954) 703-3418
dabratt@tlolawfirm.com

- and -

Michael J. Tadych (NC Bar No. 24556)
mike@smvt.com
Kathleen O'Malley (NC Bar. No. 51654)
komalley@smvt.com
STEVENS MARTIN VAUGHN &
TADYCH, PLLC
6300 Creedmoor Road, Suite 170-370
Raleigh, NC 27612
Telephone: (919) 582-2300
Facsimile: (866) 593-7695

*Counsel for Courthouse News Service*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned this **16th** day of **May, 2025** has caused the foregoing to be electronically filed using the CM/ECF system, which will send notification of such filing to all the counsel of record for the parties who participate in the CM/ECF system.

<u>*/s/ Carol Jean LoCicero*</u>
Attorney