**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, <br><br> Plaintiff, <br><br> v. <br><br> RYAN BOYCE, in his official capacity as Director of the North Carolina Administrative Office of the Courts; MICHELLE BALL, in her official capacity as Clerk of Superior Court of Johnston County; RENEE WHITTENTON, in her official capacity as Clerk of Superior Court of Harnett County; and CLAUDIA CROOM, in her official capacity as Clerk of Superior Court of Wake County, <br><br> Defendants. | Case No.: 5:23-cv00280-FL <br><br> **COURTHOUSE NEWS SERVICE'S CORRECTED[1] STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Local Rule 56.1(a)(1), Plaintiff Courthouse News Service ("CNS") respectfully submits this statement of undisputed material facts in support of its Motion for Summary Judgment.

## About Courthouse News Service

1.    CNS is a nationwide news service founded more than 30 years ago to cover civil litigation. *See* Declaration of William Girdner ("Girdner Decl.") ¶¶ 5-6.

2.    CNS employs about 220 people, most of them editors and reporters, covering state and federal appellate courts in all 50 states, and reporting on general news through its website. Girdner Decl. ¶¶ 7, 12.

---

[1] This Corrected Statement of Facts is filed only to correct inadvertent citation errors in paragraphs 41, 49, and 52. No other changes have been made.

3.	CNS publishes a news website (www.courthousenews.com), which is free to the public and read daily by roughly 23,000 people. Girdner Decl. ¶¶ 8, 12.

4.	CNS has approximately 2,750 subscribers for its subscription-based publications. These subscribers include law firms, news media, libraries, non-profits, government entities, businesses, and universities such as the University of North Carolina at Chapel Hill and Wake Forest University. Girdner Decl. ¶¶ 12-14.

5.	CNS' subscription-based publications include its New Litigation Reports, which contain original, staff-written reports on new civil litigation in a particular geographic region, e-mailed to subscribers in the early evening each court day. Girdner Decl. ¶ 9.

6.	CNS functions as a pool reporter for news about civil litigation. It has many subscribing media outlets, including Twitter, *The Los Angeles Times*, *San Jose Mercury News*, *The Wall Street Journal*, *The Boston Globe*, *The Denver Post*, *Las Vegas Review Journal*, *The Salt Lake Tribune*, *The Dallas Morning News*, *St. Paul Business Journal*, and CNN. CNS reporting is frequently credited as the source for news stories, including by newspapers (*e.g.*, *The New York Times*, *The Wall Street Journal*), magazines (*e.g.*, *New York Magazine*, *U.S. News and World Report*), television news (*e.g.*, ABC News, Fox News), online-only publications (*e.g.*, *The Daily Beast*, *Politico*), and radio (*e.g.*, NPR). Girdner Decl. ¶ 8.

7.	The New Litigation Reports covering North Carolina courts include the *Triangle Area Report* (which covers state and federal courts in the Triangle Area of North Carolina, including Wake County Superior Court and Johnston County Superior Court), the *Charlotte Report*, and the *Greater North Carolina Report* (which includes Harnett County Superior Court). Girdner Decl. ¶ 24.

2

8.     CNS' New Litigation Reports cover civil complaints, focusing on actions brought against business institutions and public entities. CNS reporters do not cover family law matters, name changes, probate filings, most mortgage foreclosures, or collection actions against individuals unless the individual is well-known or otherwise notable. CNS does not report on civil complaints that are statutorily confidential or accompanied by a motion to seal. Girdner Decl. ¶ 18; *see also* Deposition of William Girdner, taken June 21, 2024 ("Girdner Depo.") at 17:15-20, 18:1.

### Press Access to New Civil Complaints

9.     When CNS was formed in the 1990s, it visited federal and state courts throughout the country and observed a tradition of access to newly-filed civil complaints as they had crossed the intake counter, and on the day they were filed. Girdner Decl. ¶¶ 6, 26-28.

10.     Each court had its own method of providing such access—some courts placed newly-filed, unprocessed complaints on carts or in bins or boxes where the press could review them; other courts allowed the reporters to go behind the counter to review newly-filed complaints. Girdner Decl. ¶ 28. This allowed the press to report on new civil actions while they were newsworthy and likely to capture the public's attention. Girdner Decl. ¶¶ 28-29.

11.     When journalists faced access delays in paper-filing courts, it was because courts would not let them see newly filed complaints that were waiting to be "processed." Girdner Decl. ¶ 34.

12.     When this resulted in unconstitutional delays, courts corrected it. *See* Girdner Decl. ¶ 34. However, despite inherent challenges with paper complaints (only one person can handle a document at any one time), reporters and court staff generally worked cooperatively so everyone could do their jobs. Girdner Decl. ¶ 33.

13.     Providing timely access to new civil complaints in an e-filing court is even easier than doing so in a paper filing court. Girdner Decl. ¶ 35. An e-filed complaint is simply a .pdf document to be viewed or downloaded locally or remotely by whoever has permission. Girdner Decl. ¶ 35. Filers prepare and submit their .pdf documents, which are then received by courts into their e-filing systems. Once received by the courts, the .pdf documents reside in virtual queues or in-boxes. Girdner Decl. ¶ 35.

14.     Nothing prevents a clerk from processing a complaint at the very moment members of the press or public are reading it or, depending on the clerk's schedule, well after public access. Girdner Decl. ¶ 35.

15.     Moreover, courts can and regularly do require filers to enter into the e-filing interface whatever information the court needs to automatically sort and filter new filings into categories based on that information, including the automatic segregation of confidential filings. Girdner Decl. ¶ 35.

16.     As was the case in the paper world, access in e-filing courts is delayed only if courts withhold new civil complaints until after court staff complete clerical processing. Girdner Decl. ¶ 35. Unfortunately, as state courts transitioned to e-filing, they have not always considered how new rules and procedures impact the press' ability to cover courts. Some built delay into their systems, forbidding access to complaints until staff completed processing. Girdner Decl. ¶ 37.

17.     Most courts struggle to consistently complete such clerical tasks for all complaints on the day of filing, meaning post-processing access policies prevent the press from learning about a substantial percentage of new civil actions until at least the day after filing. Girdner Decl. ¶ 38.

18.     Whatever the mechanism, all e-filing courts conduct a form of clerical review and processing of new filings and have a means for handling filer mistakes (e.g., missing signatures,

illegible pages, etc.). Some courts, like this one, automatically accept e-filed documents, processing and addressing clerical issues after documents are in the case management system. *See* Girdner Decl. ¶¶ 36, 48. Other courts have clerks process on the front end, culminating with the document's manual "acceptance" into the case management system or return to the filer for correction. *See* Girdner Decl. ¶ 49.

19.     Auto-accept and clerk-accept systems are equally capable of providing timely access to new e-filed complaints. *See* Girdner Decl. ¶¶ 48-49. State and federal courts provide pre-processing access to new e-filed civil complaints through a variety of methods, including: (i) automating the acceptance of new filings through "auto-accept" functionality; (ii) providing pre-acceptance access to new filings on the court's public access system; and (iii) providing pre-acceptance access through press review queues. Girdner Decl. ¶¶ 48-49. The key with clerk-accept systems is not to keep new complaints secret while they await processing. Girdner Decl. ¶ 49.

20.     The vast majority of federal courts automatically accept e-filed complaints and make access available through PACER and CM/ECF. Girdner Decl. ¶¶ 36, 48, 53. The federal system for e-filing provides the press and public access to new filings as soon as they are received by the court. Girdner Decl. ¶¶ 36, 48, 53.

21.     Many state courts have also implemented auto-accept systems, including Connecticut and Hawaii (through homegrown systems developed in-house) and Alabama, Nevada, and Utah (through software from vendors OLIS, Tyler, and Tybera, respectively). Girdner Decl. ¶¶ 51-52, Exh. 13.

22.     Other courts choose to have a human clerk process a new filing before clicking "accept" but do not withhold access in the meantime. Girdner Decl. ¶ 49. Some of these courts display both complaints have been "accepted" and those that have not yet been "accepted" together

in the same public portal. *See* Girdner Decl. ¶ 52, Exh. 13. Others make complaints that have not yet been "accepted" available through a separate portal or review queue, sometimes for free, sometimes for a fee, sometimes through court-developed software, sometimes through vendor-provided solutions. Girdner Decl. ¶¶ 49, 52, Exh. 13.

23.     However implemented, systems that do not withhold access for processing allow new, non-confidential complaints to be reported on the day they are filed, when the lawsuit is still newsworthy and capable of commanding public attention. *See* Girdner Decl. ¶ 26, 38.

### E-Filing in North Carolina Superior Courts

24.     On June 7, 2019, Defendant NCAOC contracted with Tyler Technologies ("Tyler") to provide Software-as-a-Service (SaaS) consisting of system administration, system management, and system monitoring activities, including the capability to use Tyler's suite of software applications. *See* Exh. 2 to Deposition of Bradley D. Fowler, Rule 30(b)(6) designee of the North Carolina Administrative Office of the Courts ("Fowler Depo."); *see also* Answer ¶ 8; Girdner Decl. ¶ 40. NCAOC agreed to pay Tyler approximately $85 million over ten years. *See* Press Release, Tyler Technologies, "North Carolina Courts Agreement Marks 15th Statewide Odyssey Contract" (July 25, 2019), https://investors.tylertech.com/news/news-details/2019/North-Carolina-Courts-Agreement-Marks-15th-Statewide-Odyssey-Contract-07-25-2019/default.aspx.

25.     The Superior Courts in the first four pilot counties, including the three Defendant clerks, launched e-filing programs on February 13, 2023. *See* Fowler Depo 33:1-7; Answer ¶ 6.

26.     Tyler currently provides three interconnected products to the North Carolina Superior Courts: the e-filing system, the case management system, and a public access portal. *See* Deposition of Terry Derrick, Rule 30(b)(6) designee of Tyler Technologies, Inc., taken Sept. 24, 2024 ("Derrick Depo.") at 11:21-12:10.

6

27.     The e-filing system provided by Tyler is known as "E-File and Serve." Derrick Depo. 11:21-12:10. It allows filers in North Carolina Superior Courts that have transitioned to e-filing to file through a single online site known as eFile North Carolina. *See* Answer ¶ 7; Derrick Depo. at 24:13-22 & Exh. 3.

28.     It has three components: the online electronic service provider solution or EFSP, where filers upload and submit filings; the electronic filing manager or "EFM," where documents and information are stored; and the clerk review tool, which displays documents and information stored in the EFM for clerks to review and process. Derrick Depo. 24:8-28:19, 31:2-33:21.

29.     Tyler also provides a case management system to the North Carolina Superior Courts called Enterprise Justice Case Management. Derrick Depo 12:25-13:5.

30.     Once filings through the e-filing system are "accepted," they go to the case management system. Fowler Depo. 72:6-9. While Tyler's software can be configured as either an auto-accept or manual-accept system, North Carolina's system is currently configured for manual acceptance, meaning documents are not added to the case management system until they have been reviewed and processed by an employee in the clerk's office. *See* Fowler Depo. 83:6-14.

31.     Tyler provides the North Carolina Superior Courts with a public access product known as the Odyssey portal system. Derrick Depo. 14:13-15:2.

32.     The Odyssey portal is connected to the case management system and displays certain configurable information from the case management system in read-only format on a platform that is available to the public or a more limited set of authorized users. Derrick Depo. 15:3-15, 143:17-144:25.

33.     After registering for an e-filing account, an e-filer logs into North Carolina's File & Serve system. Derrick Depo. at 24:13-22 & Exh. 3; Angione Decl. ¶ 4(A-B). Once signed in,

the filer will see a "Start filing" option. Angione Decl. ¶ 4(C). They then have the option select either "Start new case" or "File into existing case." *Id.*

34.     If the filer selects "Start new case," they are then taken to the "Case Information" page, where they must select a "Location" (e.g., Wake County Superior Court), a "Category" (e.g., "Civil"), and a "Case Type" (e.g., small claims, civil, divorce, etc.) from drop-down menus. Derrick Depo. 51:19 – 51:13; Angione Decl. ¶ 4(D).

35.     The next page prompts the filer to input information about the parties. Derrick Depo. 53:5-21; Angione Decl. ¶ 4(E).

36.     The filer then uploads the documents to be filed, selecting the type of document (e.g., "Complaint"), represented by a filing code, from a drop-down menu. Derrick Depo. 54:1 – 55:22, 53:11-14, 56:25 – 57:3; Angione Decl. ¶ 4(F).

37.     Filers can then choose to utilize an auto-redact feature, which automatically scans the document for potentially sensitive information with a click of a button. Derrick Depo. 65:2-12, 66:8-25; Angione Decl. ¶ 4(F).

38.      Highlights are then shown to the filer, who can review them and make any edits to the automated redaction selections. Derrick Depo. 67:1-22; Fowler Depo. 49:13-22.

39.     The filer is then presented with a drop-down menu to select the document security level, which allows the filer to choose what they believe the document's security level should be, i.e. "Confidential" or "Public." Derrick Depo. 71:12 – 72:9; Angione Decl. ¶ 4(F).

40.     The filer then inputs service contact information for the parties and enters payment information. Angione Decl. ¶ 4(G-H); Derrick Depo. 80:1-20

41.     Before the submission button is enabled, the filer must then click and accept two boxes in which the filer acknowledges that filers have a duty to redact personal identifying

information and have done so. Derrick Depo. 83:1-18, Exh. 3 at 20; Ball Depo. at 82:16 - 83:5; Fowler Depo. 56:11 – 58:7; Angione Decl. ¶ 4(I-K).

42.     The first notice provides as follows:

> IMPORTANT NOTICE: It is prohibited for any person preparing or filing a document in the official records of the North Carolina courts to include any of the following personal identifying information (PII) in that document unless expressly required by law or court order or redacted: Social security numbers; employer identification numbers; drivers' license numbers; state identification numbers; passport numbers; checking account numbers; savings account numbers; credit card numbers; debit card numbers; personal identification (PIN) codes; and passwords. Violation of this prohibition may be prosecuted as an infraction, punishable by a fine of up to $500.00 per violation. N.C.G.S. 132-1.10(d). https://www.ncleg.gov/EnactedLegislation/Statutes/PDF/BySection/Chapter_132/GS_132-1.10.pdf

Fowler Depo. 56:18-58:7; Angione Decl. ¶ 4(J).

43.     The second box requires filers to again affirmatively acknowledge that they have read the above notice and have a duty to comply with the filing and redaction requirements of N.C.G.S. 132-1.10(d). Angione Decl. ¶ (4)(K).

44.     Some defects in an e-filing, such as insufficient funds to cover the filing fee, will cause the filing to be immediately and automatically rejected, without ever reaching court clerks. Derrick Depo. 82:1-24. Otherwise, once the filer hits the "submit" button, the filing is transmitted to the E-Filing Manager ("EFM"), where it is stored and awaits review in the Clerk Review Tool. Derrick Depo. 84:19-24.

45.     At this point, the filing has been filed and is in the possession of the court, regardless of whether it is later rejected or returned by a clerk. Derrick Depo. 31:15 – 32:21.

46.     On submission, the e-filer can choose to receive an email notification that the document has been submitted, which would advise the filer to "allow up to one business day for

clerk office processing," and another once it is accepted by the clerk. Derrick Depo. 87:22 – 88:5 & Exh. 13 at 10.

47.    North Carolina Superior Court clerks access e-filed documents from the EFM "when they choose to work those filings" and perform a ministerial review of them through the Clerk Review Tool. Derrick Depo. 32:1-6.

48.    For a new complaint, this review involves "checking for" the following: (1) mislabeling documents as a complaint; (2) personally identifying information ("PII"); (3) the defendant resides in the county; (4) the document has a proper name; and (5) filing fees are paid and paid in the correct amount. *See* Deposition of Blair Williams, Rule 30(b)(6) designee of Wake County Clerk of Court, taken on June 26, 2024 ("Williams Depo."), at pp. 42-52.

49.    If there is an issue with a document, the clerk will then return the complaint to the filer for correction (also known as "rejecting" the complaint). Fowler Depo. 72:18 – 73:4, 83:15-23. If a filing is a "false lien" against a public official prohibited by a gatekeeper order, the filing will be permanently rejected. Whittenton Depo. 39:5-8.

50.    Once correction is made, or if there are no issues, the clerk "accepts" the submission. Derrick Depo. 32:1-17.

51.    Once "accepted," the complaint is file stamped, a copy is sent back to the filer, and another copy is sent to the case management system for docketing. Derrick Depo. 32:6-13

52.    The file stamp that appears on the complaint reflects the time the court received the filing in the EFM, not the time it was processed. Fowler Depo. 60:11-20. The filing date, which is the date of receipt, appears on the docket. The "created" time and date, which corresponds to the time processing was completed, also appears on the docket. *See* Ivey Decl. ¶ 7 (describing specific examples of discrepancy between "filed" stamp and "created" date).

## Delays in Access in North Carolina Superior Courts

53.     Under the North Carolina courts' current policy and practice, public and press access to new e-filed civil complaints is restricted until after court clerks complete processing and "accept" them. *See* Answer ¶¶ 9, 52; Fowler Depo. 83:6-14; Williams Depo. 116:9-12 117:11-17. The Clerk Defendants testified that their "office policy [is] that the public cannot have access to new complaints prior to clerk acceptance." *See* Williams Depo. 116:9-12 117:11-17.

54.     From February 13, 2023, the date the Defendant counties transitioned to e-filing, through May 25, 2023, the date this lawsuit was filed, the data produced by Defendants indicates that the Superior Courts in the three Defendant counties each provided same day access to newly e-filed civil complaints at rates of, on average, less than 50%. *See* Declaration of Adam Angione ("Angione Decl.") ¶ 13-14, Exh. B.

55.     Specifically, for each of the four calendar months from February through May 2023, Harnett County Superior Court averaged 32.3% same day access, Johnston County averaged 35.8%, and Wake County averaged 46%. *See* Angione Decl. ¶ 13-14, Exh. B.

56.     Individual delays during that period were regularly worse, varying from month to month and court to court. For example, in April 2023, the month before this lawsuit was filed, only 14% of new civil complaints filed in Harnett County Superior Court were available to the public the same day they were filed. *See id.* In March 2023, only 23% of new civil complaints filed in Johnston County Superior Court were available the same day. *See* Angione Decl. ¶ 13, Exh. B.

57.     Examples of complaints unavailable on the day of filing included the following:

    a.  In December 2024, incoming Governor Joshua Stein and outgoing Governor Roy Cooper filed suit against, among others, the Speaker of the House, challenging a statute establishing the State Highway Patrol as a

cabinet-level department. The Complaint indicates it was filed on December 12, 2024, but it was not made publicly available until December 13, 2024. The case is *Stein v. Moore*, No. 24CV039723-910 (Wake County). *See* Declaration of Rich Ivey ("Ivey Decl.") ¶ 7(a).

b.  In April 2023, a lawsuit was filed in Wake County Superior Court over the death of a child in the Raleigh Christmas Parade. The time stamp on the Complaint indicates that it was filed on April 14, 2023. However, the Complaint did not become publicly available until April 17, 2023. The case is *Estate of Hailey Kaye Brookes v. Glass*, No. 23CV008736-910 (Wake County). *See* Ivey Decl. ¶ 7(b).

c.   In December 2024, an estate action was filed against six individuals (the "Cabo Six") and the FBI alleging wrongful death, negligence, and civil conspiracy related to the death of a 25-year-old woman in Mexico. The Complaint indicates it was filed on October 28, 2024. However, the Complaint did not become publicly available until October 29, 2024. The case is *Estate of Shanquella Robinson v. U.S. Dep't of State, Fed. Bureau of Investigation, et. al.*, No. 24CV050336-590 (Mecklenburg County). *See* Ivey Decl. ¶ 7(c).

d.  In December 2024, an employee filed a lawsuit against Rex Healthcare, part of the UNC Health Care System, over the denial of her religious exemption request and subsequent termination for failure to comply with a COVID-19 vaccination policy. The time stamp indicates the Complaint was filed on December 15, 2024, but it was not made publicly available under December

16, 2024. The case is *Wallin v. Rex Healthcare, Inc., d/b/a NC Health*, No. 24CV039915-910 (Wake County). *See* Ivey Decl. ¶ 7(d).

e.  In March 2023, the producer of a local politics show Front Row, which allegedly was not renewed for "slipping farther and farther to the Right," sued PBS North Carolina under the state's public records law seeking documents involving the show. The time stamp on the Complaint indicates that it was filed on March 20, 2023. However, the Complaint did not become publicly available until March 21, 2023. The case is *Old School Productions, LLC v. PBS North Carolina*, No. 23CV006379-910 (Wake County). *See* Ivey Decl. ¶ 7(e).

f.  Also in March 2023, a Raleigh resident filed a class action on behalf of current and former employees against Pepsi Bottling Ventures over a data breach. The time stamp on the Complaint indicates that it was filed on March 7, 2023. However, the Complaint did not become publicly available until March 8, 2023. The case is Roy *Baldwin v. Pepsi Bottling Ventures LLC*, No. 23CV005042-910 (Wake County). *See* Ivey Decl. ¶ 7(f).

g.  In May 2023, a fraud action was filed against a Wyoming business called Dragonfly Alliance for inducing plaintiff to invest $200,000.00 in a scheme involving a new "plasma technology" process to extract gold quickly so plaintiff could obtain 400 ounces of gold bars at extremely low cost. The time stamp on the Complaint indicates that it was filed on May 5, 2023. However, the Complaint did not become publicly available until May 8,

2023. The case is *Spear v. Dragonfly Alliance LLC*, No. 23CV010964-910 (Wake County). *See* Ivey Decl. ¶ 7(g).

58.     CNS attempted numerous times to prevent the delays that ensued by encouraging the NCAOC to adopt a press review queue upon learning of its contract with Tyler. Girdner Decl. ¶¶ 42-43.

59.     NCAOC did not provide a response. Girdner Decl. ¶ 44.

60.     Although NCAOC considered implementing a pre-processing press review queue as part of the transition to e-filing, it ultimately decided against it. *See* Fowler Depo. 135:19-139:14, 145:3-146:2.

61.     After eFile North Carolina went live in the first four pilot counties, CNS renewed its request for contemporaneous access to new e-filed civil complaints through a press review queue through a letter to the new Director of NCAOC, Ryan Boyce, dated April 6, 2023, and to the clerks of the e-filing pilot counties, including the three Clerk Defendants, dated April 7, 2023. Girdner Decl. ¶ 45. No improvement in access occurred prior to CNS filing this lawsuit. *See* Girdner Decl. ¶ 45, Exh. 9; Angione Decl. ¶ 13, Exh. B (showing access rates).

**Defendants' Post-Litigation Actions**

62.     In the six months following CNS filing suit, the Clerk Defendants dramatically increased their same day processing rates. *See* Angione Decl. ¶ 13-14, Exh. B. In September 2023, their average same day processing rate across the three counties was over 91% (up from less than 37% in April 2023). *See id.* Specifically, 94% of civil complaints filed in Harnett County Superior Court in September 2023, 88% of those filed in Johnston County Superior Court, and 93% of those filed in Wake County Superior Court were made available the same day. *See id.* By comparison,

the same day processing rates for April 2023 were 14% for Harnett County, 37% for Johnston County, and 59% for Wake County. *See id.*

63.    Mecklenburg County was the first county to transition to e-filing after this lawsuit was filed, in October 2023. *See* Angione Decl. ¶ 15. In its first calendar month using the platform it made 92% of new e-filed civil complaints available to the public the same day they were filed. *See* Angione Decl. ¶ 13, 15, Exh. B. It continued to process at rates around 90% for the next few months: 89% same day access in November 2023, 92% in December 2023, and 91% in January 2024. *See* Angione Decl. ¶ 13, 15, Exh. B.

64.    Since numbers improved in the immediate months following the commencement of this lawsuit, the Defendant counties nonetheless failed to consistently process at rates of 90% or higher. *See* Angione Decl. ¶ 13, 16, Exh. B. For the nineteen-month period from October 2023 through April 2025, Harnett County failed to meet the 90% threshold for five months, Johnston County for four months, and Wake County for four months. *See* Angione Decl. ¶ 13, 16, Exh. B. The Defendant counties therefore fell below the 90%+ benchmark in a combined 13 of 57 months. *See* Angione Decl. ¶ 16. For the same time period, Mecklenburg County fell below the 90% benchmark for at least eight out of sixteen months (no data was available for February-April 2025). *See* Angione Decl. ¶ 13, Exh. B; Declaration of Bernie Brennan ("Brennan Decl.") ¶ 9, Exh. I (Video 3:11 – 3:12); Exh. 4 (lines 736-739) of Deposition of Emily Mehta, Rule 30(b)(6) designee of North Carolina Administrative Office of the Courts, taken on May 2, 2025 ("Mehta Depo.").

### *Revision of Rules*

65.    In late October 2024, after the close of discovery, NCAOC produced additional documents showing that it had been working to amend two relevant eCourts Rules of Recordkeeping, Rules 1.5 and 1.8, governing records processing and redaction requirements. *See*

Brennan Decl. ¶¶ 6-9. Specifically, on September 6, 2024, the Rules of Recordkeeping Committee held a meeting at which amendments to two eCourts Rules of Recordkeeping ("eRRK"), Rules 1.5 and 1.8, governing records processing and redaction requirements, were discussed. *See* Mehta Depo. Exh. 4 at pp. 48-58; Brennan Decl. ¶ 9, Exh. I (Video at 2:55 – 3:29).

66.     During that meeting, NCAOC Assistant Counsel Corrine Lusic advised the Committee that federal courts have rejected the very arguments Defendants have made here in this litigation—that a complaint is not a "filing" until it is accepted:

> Courthouse News Service has sued all the court systems that have gone onto the system and not done press review queue nationwide, and those were the exact kinds of arguments that have been made and federal courts don't care. They say as soon as it's submitted, whether or not it's accepted as a filing, it's, they've got a First Amendment right of access. That's what the case law is saying.

*See* Mehta Depo. Exh. 4 at lines 753-754.; Brennan Decl. ¶ 9, Exh. I (Video at 3:14:11 – 3:14:50).

67.     Rather, counsel explained the right attaches "as soon as it's submitted, whether or not it's accepted as a filing, it's—they've got a First Amendment right of access. That's what the case law is saying." *See* Mehta Depo. Exh. 4 at lines 753-754.; Brennan Decl. ¶ 9, Exh. I (Video at 3:14:11 – 3:14:50).

68.     NCAOC General Counsel Andrew Brown also called federal law "as will be applied . . . by the federal courts against us" the "bad guy" and stated the October 2024 Rule 1.5 amendment was "to prevent the federal courts from forcing all 100 counties to do the press review queue". *See* Mehta Depo. Exh. 4 at lines 757-761; Brennan Decl. ¶ 9, Exh. I (Video at 3:15:26 – 3:15:57)

69.     Counsel Lusic further explained the "urgency" with the amendments being they wanted the amended rules "in place before we do our summary judgment briefing in the case,"

which was then due in November 2024. *See* Mehta Depo. Exh. 4 at line 699; Brennan Decl. ¶ 9, Exh. I (Video at 2:55:48 – 2:56:04, 3:03:08 – 3:03:27).

70.     The Committee voted unanimously to adopt the proposed revisions. *See* Brennan Decl. ¶ 9, Exh. I (Video at 3:21:3 – 3:21:46); Mehta Depo. Exh. 4 at lines 782-785.

## **Rule 1.5**

71.     The revised Rule 1.5, effective October 2, 2024, created a new standard for clerks to meet for the processing of new complaints. Specifically, Rule 1.5 stated:

> Absent extenuating circumstances and insofar as practicable, clerks should accept electronically-filed initiating documents for civil matters…into the ICMS on the same business day, meaning that such documents filed before 5:00 PM on a day that the clerk's office is open to receive filings are accepted into the ICMS by 11:59pm on the same calendar day ("same day acceptance"), and when not practicable, on the next court date.

Mehta Depo. Exh. 2 at p. 3, Exh. 3 at p. 4.

72.     The October 2024 version of Rule 1.5 further provided that clerks meet a standard of 90%-same day acceptance rate. If such a standard was not met for three consecutive months, the NCAOC would provide the clerk's office with a computer terminal equipped with the functionality to display all non-confidential complaints in civil matters before the clerks reviewed them:

> If a clerk's office is at least six months post-ICMS implementation and exhibits same day acceptance rates below 90% for three consecutive months, NCAOC will provide that clerk's office with a computer terminal equipped with functionality to display all non-confidential, initiating documents in civil matters…that have been filed in that county but not yet accepted by the clerk's office ("pre-acceptance terminal")

Mehta Depo. Exh. 2 at p. 3, Exh. 3 at p. 4.

73.     Under this version of the rule, clerks could choose to have the pre-acceptance review terminal in lieu of meeting the 90% same-day access threshold. *See* Mehta Depo. at 70:22 – 71:13.

74.     The pre-acceptance review terminal would provide the public with access to non-processed, non-confidential complaints. This would include access to information listed within Rule 1.8 of the eRRK, which governs what personal identifying information clerks must review filings for and redact. *See* Mehta Depo. at 69:5-12, 71:14 – 72:25.

**<u>Rule 1.8</u>**

75.     Rule 1.8 of the eRRK was amended to "aggregat[e] the legal responsibilities that clerks have under federal and state law with respect to redacting personal identifying information (PII) and implementing confidentiality obligations under the Violence Against Women Act (VAWA)." Mehta Depo. Exh. 3 at p. 5.

76.     With respect to general confidentiality concerns, a PowerPoint presentation created by the NCAOC Office of the General Counsel indicates the following case types raise confidentiality issues: juvenile, SPC, adoptions, False Claims Act, juvenile transfers, expunctions, juror information, and confidential documents. Brennan Decl. ¶ 10, Exh. K at AOC-068059, ¶ 9, Exh. I (Video at 2:18:00 – 2:20:00 (giving example of protective order in a divorce case, issued in response to a claim in a complaint, and condition of release in a criminal case)).

77.     With respect to VAWA, Rule 1.8 provides that VAWA protections apply only in filings arising under Chapter 50B (domestic violence cases), 50C (civil no-contact orders stemming from abuse, sexual misconduct, or stalking), and 50D (human trafficking injunctions). Brennan Decl. ¶ 8, Exh. G at AOC-066798 - 99.

78.     The only instances in which protected VAWA information arise outside these case types are in criminal cases, such as in a "no contact" provision of a release order or judgment, and family and non-criminal cases, such as divorce complaints, child support and custody, or visitation provisions. Brennan Decl. ¶¶ 8-10, Exh. G at AOC-066799, Exh. I (Video at 2:18:00 – 2:20:00), Exh. K at AOC-067837, Exh. L at AOC-068054 - 57; Mehta Depo. Exh. 4 at lines 526-527.

79.     The purpose of VAWA is to protect the association of an individual with a protective order, not to protect that individual's name and address in every document in any case online. Brennan Decl. ¶ 9, Exh. I (Video at 2:14:10 – 2:15:10); Mehta Depo. Ex. 4 at line 518.

80.     NCAOC's guidance on VAWA indicates that VAWA limits what information can be made public online, but it may—and in fact should—be distributed to the press or public in other forms, such as a hard copy or via an on-site terminal, without any VAWA-specific redactions. Brennan Decl. ¶ 10, Exh. K at AOC-067838, Exh. M at AOC-068211.

81.     VAWA is not an issue in the types of civil cases CNS seeks. Girdner Decl. ¶ 18.

82.     Enterprise Justice already is configured so that all Chapter 50B, 50C, and 50D cases and other confidential cases types are automatically not available on Portal and visible to the public. Brennan Decl. ¶ 10, Exh. M at AOC-068210.

83.     Rule 1.8 confirms that "G.S. 132-1.10(d) places the obligation for redaction of PII on the filer, not the clerk. Clerks do not have a legal obligation to perform redactions on behalf of filers (whether that be attorneys, pro se litigants, or law enforcement), and clerks do not have a legal obligation to police or enforce compliance with G.S. 132-1.10(d)." Mehta Depo. Exh. 3 at p. 5.

**Rule 1.1**

84. Rule 1.1 of the eRRK was also revised in October 2024 to provide that any rule of the eRRK may be unilaterally revised by the NCAOC Director at any time, and eliminated the caveat that such discretion be exercised only where emergency action was required:

> Amendments to the eRRK will generally be initiated through a proposal made for consideration during a regular meeting of the Rules of Recordkeeping Committee (RRK Committee). However, the NCAOC Director may exercise his or her discretion under G.S. 7A-109 to amend the eRRK unilaterally.

Mehta Depo. Exh. 3 at p. 2; Brennan Decl. ¶ 8, Exh. G at AOC-066793.

85. Under the October version of the eRRK, as NCAOC calculates it, the percentage of filings accepted same day does not include filings that were returned or "rejected" for minor procedural errors *after* being filed and placed in the courts' possession. Brennan Decl. ¶ 12, Exh. O at AOC-069234. Nor does it include filings delayed due to technical errors or system issues. Brennan Decl. ¶ 8, Exh. H at AOC-066563-65.

86. Despite e-filing being available 24/7, the eRRK calculates "same-day" acceptance based on court "business" days and times, meaning processing obligations are tolled for any filings received after 5:00 p.m. on a court business day, and for weekends and any day a court is physically closed. Mehta Depo. at 22:2-6, 100:1 – 101:10.

87. Even with this methodology, many North Carolina Superior Courts are not consistently processing at 90%. For example, NCAOC calculated that Beaufort County met the 90% requirement in July 2024, but processed only 81.78% of new filings the same business day in August 2024 and 85.32% in September 2024. Brennan Decl. ¶ 7, Comp. Exh. F (AOC-066742).

88. Durham County did not meet the threshold at all during the same period, making only 76.67% of civil complaints available the same business day in September 2024, 60.42% in August 2024, and 61.84% in July 2024. Brennan Decl. ¶ 6, Exh. E at AOC-066764.

89. Mecklenburg was meeting a 90% rate while employing temporary processing staff. *See* Brenann Decl. ¶ 6, Exh. E at AOC-066787. However, after losing temporary employees in June, the Mecklenburg Clerk expressed concern about maintaining that rate. *See* Mehta Depo. at 19:8-25, 33:4-15, 132:20 – 133:12; Brennan Decl. ¶ 9, Exh. I (Video at 3:11 – 3:12).

90. Processing rates dropped significantly, from 91.37% in September 2024 to 76.65% in October, 72.49% in November, 84.03% in December, and 54.04% in January 2025. Brennan Decl. ¶¶ 11, 13, Exhs. N & P (AOC-069111; AOC-069562).

91. As such, under the October 2024 version of Rule 1.5 of the eRRK, NCAOC said a pre-acceptance review terminal would be installed in Mecklenburg County. Mehta Depo. at 42:7-14, 133:1-12. But NCAOC admitted in deposition that a terminal wasn't even available to implement at that time. Mehta Depo. at 42:7-23.

**Second Amendment to Rule 1.5**

92. In April 2025, NCAOC Director Boyce unilaterally amended Rule 1.5, eliminating the 90% acceptance benchmark and pre-acceptance review terminal remedy if the rate wasn't met. Mehta Depo. at 79:5-9, Exh. 7.

93. Instead, the version of Rule 1.5 now in effect states that NCAOC will provide clerks with "same day acceptance and next court date acceptance rates" on a monthly basis via a dashboard for each county to monitor its own "compliance." Mehta Depo. at 85:17-25.

94.     Now, the 90% acceptance rate is still encouraged, but is just a "guideline" or "reference point" – not a requirement – for clerks to use to evaluate their performance. Mehta Depo. at 88:1-18.

95.     If they fall below that baseline, NCAOC claims it has no "authority to force compliance of the rule." Mehta Depo. at 90:20 – 91:3.

96.     Moreover, the NCAOC Director can unilaterally further water down Rule 1.5 on a whim. Mehta Depo. 75:17-20, 80:6-11, Exh. 3 at 2.

97.     NCAOC admits a rule could potentially change at the conclusion of this litigation. Mehta Depo. at 79:10-15, 80:6-11.

98.     The Clerk Defendants have achieved significantly higher rates of access to new complaints since this lawsuit was filed, before and after both revisions to Rule 1.5, without increasing personnel, court hours, or processing speed. *See* Deposition by Written Questions of Renee Whittenton, taken May 1, 2025, at 14:5-9, 29:4-20; Deposition by Written Question of Michelle Ball, taken on April 30, 2025, at 20:3-10, 37:5-20; Deposition by Written Questions of Claudia Croom, taken on April 30, 2025, at 25:19-24, 26:4-10.

## Alternative Methods for Providing Access to New E-Filed Complaints

99.     Tyler offers the option to configure its e-filing and case management systems to automatically accept new filings as an "out of the box" e-filing function at no additional cost, an option currently available for the version of File & Serve used by the North Carolina courts. Derrick Depo. 90:13-91:21, 92:7-16, 118:8-119:1.

100.     More than twenty state courts or jurisdictions currently use Tyler's auto-accept configuration for their e-filing and case management systems. Derrick Depo. 92:21-93:5.

101.     Tyler's auto-accept configuration allows clerks to choose to automatically accept all filings or only filings that match locally configured criteria (conditions), such as the identity of the filer, the type of case, the type of document, whether the filing includes a filing fee, or whether the filer is an attorney or a self-represented litigant.  Derrick Depo. 91:6-92:5.

102.     The EFM can be configured to further filter and sort additional case types, including family case, domestic violence, and criminal, providing pre-processing access only to the Complaints at issue in this case, filtering out false liens and the cases in which confidential information is most likely to appear. *See* Derrick Depo. 93:10-19, 140:1-9; Fowler Depo. 96:12-15; Deposition of Renee Whittenton, Rule 30(b)(6) designee of Harnett County Clerk of Court, taken on June 26, 2024 ("Whittenton Depo.") at 33:8-11, 34:18 – 35:1.

103.     Filings that match criteria not set to auto-accept are held in the EFM pending manual clerk review and acceptance. Derrick Depo. 97:5 – 98:4.

104.     Confidential labels can be changed in the case management system post-acceptance. Fowler Depo. 55:5-56:5.

105.     Tyler also offers a product known as a Press Review tool. Derrick Depo. 120:2-11; Girdner Decl. ¶ 49.

106.     This tool links to the File and Serve product and allows authorized users to view documents that have been filed but not yet been processed and formally accepted. Derrick Depo 120:2-11, 132:21-133:4.

107.     This, too, would allow filings that meet configurable qualifications to become available almost immediately after being filed. At the same time, it would preserve the clerks' ability to manually process the filings and indicate to users that the filed document they were viewing had not yet been formally accepted. Derrick Depo. 120:2 – 121:6.

108.     A press review tool can be made available over the internet (*e.g.*, Arizona) or through a designated terminal at a physical location (*e.g.*, Maryland). See Girdner Decl. ¶ 52, Exh. 13.

109.     Alternatively, Tyler offers application program interfaces ("APIs"), which create an access mechanism for filings in the File and Serve system in order to allow courts to create their own version of the Press Review tool, either using their own staff or a different service provider, that can connect to Tyler's File and Serve product. Derrick Depo. 136:1-14, 137:23-138:16.

110.     These APIs are provided as part of the File and Serve product at no additional cost. Derrick Depo. 137:19-22.

### Defendants' Claimed Reasons for Post-Processing Access

111.     Defendants justify withholding newly e-filed civil complaints until after processing based on the possibility the complaint might be rejected for various reasons. Fowler Depo. 87:1-13; Deposition of Michelle Ball, Rule 30(b)(6) designee of Johnston County Clerk of Superior Court, taken July 28, 2024 ("Ball Depo.") at 152:2-7. This argument is not backed by any evidence of significant harm or impairment to the judicial process; rather, the clerks argue that it is necessary to "avoid confusion." Fowler Depo. 87:1-13; Ball Depo. 152:2-7. This argument appears based on a mistaken belief that complaints are not court records until they have been "accepted" by a clerk. *See* Williams Depo. at 112: 9-17, 117:11-17; Whittenton Depo. 80:16-19; Ball Depo. at 108:18 – 109:6; Fowler 87:8-11.

112.     With respect to rejections of complaints, data produced by the NCAOC shows that the reasons for returning new complaints to filers for correction are overwhelmingly minor clerical issues, such as missing signatures, mislabeling documents, selecting a wrong filing code, illegible

documents, and fee issues. *See* Angione Decl. ¶¶18-19; Williams Depo. at pp. 42-52; Whittenton Depo. at 36:4-9.

113.    North Carolina court rejection comments show the reasons for returning new complaints to filers for correction are overwhelmingly minor clerical issues. *See* Angione Decl. ¶¶ 18-19. Tyler-generated data produced by Defendants reflects that out of the more than 4,067 new civil complaints e-filed in the Defendant Superior Courts from the time they transitioned to e-filing in February 2023 through July 31, 2023, only 91, or 2.23% were rejected. Angione Decl. ¶ 18; Brennan Decl. ¶ 2, Exh. A (Civil & SP Initial Filings Pilot Counties by Month Reviewed). Of those, 16 were rejected without comment or explanation and the remainder were rejected for clerical errors such as missing pages or for filing in the wrong court or category. Angione Decl. ¶ 19. There is no substantial evidence to show that a complaint was rejected as a false lien or due to a gatekeeper order. *See* Whittenton Depo. 39:23 – 40:17; Ball Depo. 66:18 – 68:1; Angione Decl. ¶ 19.

114.    Defendants do not track how frequently (or infrequently) filers have withdrawn complaints or filing errors are made. *See* Whittenton Depo. at 78:2-20, 81:14 – 82:7. They cite no specific instance in which a complaint was rejected as a false lien or due to a gatekeeper order. *See, e.g.*, Whittenton Depo. 39:23 – 40:17; Ball Depo. 66:18 – 68:1.

115.    The presence of PII in a complaint is not a reason to reject a complaint either. Brennan Decl. ¶ 10, Exh. L at 11 (AOC-068045); Ball Depo. 70:15-17.

116.    Defendants further justify post-processing access on a supposed need to prevent the disclosure of PII. *See* Williams Depo. 100:4-25; Ball Depo. 26:19 – 28:19, 118:2 – 119:9; Whittenton Depo. 36:1-3, 63:10 – 64:20.

117.   CNS does not seek access to case categories that are confidential by rule or statute, such as juvenile cases and special proceedings, or that would other be likely to include PII. Girdner Decl. ¶ 18; Mehta Ex. 3 at 8-9.

118.   Defendants admit that North Carolina's e-filing system can automatically filter and protect e-filed documents by case type, document type, or the filer's own designation as confidential. Whittenton Depo. 33:8-11, 34:18 – 35:1; Fowler Depo. 49:25 – 50:13. Within case categories, certain case types are confidential by rule or statute, such as juvenile cases and special proceedings. *See* Brennan Decl. ¶ 8, Exh. G at AOC-066800.

119.   An e-filed document can be automatically secured from public view, without any action by filer or clerk, if (1) the document is confidential by rule or statute; (2) the document is filed in a case that is confidential by rule or statute; or (3) the filer designates the document as confidential. *See* Mehta Depo. Exh. 3 at p. 9; Fowler Depo. 54:21-25. *See also* Brennan Decl. ¶ 8, Exh. G (Rule 1.8 of eCourts Rules of Recordkeeping, AOC-066799).

120.   The burden to remove or redact certain PII, such as social security and financial account numbers, is on the *filer*, not the clerk. *See* N.C. Gen. Stat. § 132-1.10(d); Mehta Depo. Exh. 3 at p. 5. Mehta Ex. 4 at E. Mehta_142; Brennan Decl. ¶ 8, Exh. G (Rule 1.8, AOC-066796).

121.   The Clerk Defendants admit that they post this filer requirement conspicuously throughout their offices for public viewing in accordance with N.C. Gen. Stat. § 132-1.10(h). Williams Depo. at 105:11 – 106:5; Whittenton Depo. at 66:22 – 67:16; Ball Depo. at 128:6 – 129:17; Brennan Decl. ¶ 10, Exh. J (AOC_067835).

122.   The Clerk Defendants admit there is no statutory or other legal mandate that they perform redactions before making filings available to the public. *See* Williams Depo. 90:4-8, 93:15-19, 97:7 – 98:6; Whittenton Depo. at 59:7-11; Ball Depo. at 85:16 – 86:2, 95:3-11, 116:14-

19. The NCAOC's own documents further inform clerks that the filer has the responsibility to redact and that clerks are not the "PII police." *See* Exh. 11 to Williams Depo. p. 5-8.; Brennan Decl. ¶¶ 8, 10, Exh. J (AOC_067831), Exh. L (AOC_068045), Exh. G (AOC-066796). Rule 1.8 notes only two instances in which a clerk is now allegedly required to redact: (1) when federal laws and state laws (other than G.S. 132-10) regulate the disclosure of PII in court records (a disingenuous position given NCAOC's willingness to install pre-acceptance review terminals under the October 2024 version of Rule 1.5); and (2) upon written request of a person identified by PII appearing on the Portal (inapplicable here as it concerns documents already made public). *See* Brennan Decl. ¶ 8, Exh. G (AOC-066796).

123.    The Clerk Defendants have no data to show how frequently filer errors occur, such as labeling a document a "complaint" that is not a complaint. Whittenton Depo. at 81:14 – 82:7; Williams Depo. 42:22 – 43:4 (recalling only filers labeling a document a "complaint" that was not actually a complaint has occurred "more than a handful" of times since 2020).

124.    The Clerk Defendants also are unaware of instances in which filers have actually submitted complaints containing unredacted PII. *See* Whittenton Depo. at 38:20 – 39:1 ("I know that it can occur. To tell you that it has occurred, I cannot tell you.") (emphasis added); Ball Depo. at 71:1-9, 81:9 – 82:8 (testifying that she doesn't know how often PII appears inside a complaint or any instance where a complaint was filed as "public" and had to be changed to "confidential"); Williams Depo. 46:3-9 (testifying that "it's not that big of a percentage" of instances in which the clerk's office identifies PII in a complaint).

125.    Defendants also have no substantial evidence that any purported instances of identity theft or financial fraud have resulted from PII being available in public documents. Fowler Depo. 91:17 – 92:4; Whittenton Depo. at 78:24 – 79:4 (clerk "not aware" of any "instance of

27

identity theft that's resulted from the release of PII" in court records"); Ball Depo. at 101:17 –

105:23 (giving only two examples of PII being released occurring, one in a domestic dispute—

which CNS does not seek access to—and another with a filing under the Service Members Civil

Relief Act, a document filed with a complaint, but not the complaint itself).

     Respectfully submitted this **23rd** day of **May**, **2025**.

THOMAS & LoCICERO PL

*/s/ Carol Jean LoCicero*
Carol Jean LoCicero (FBN 603030)
Mark R. Caramanica (FBN 110581)
601 South Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
clocicero@tlolawfirm.com
mcaramanica@tlolawfirm.com
jvanderhorst@tlolawfirm.com

Daniela B. Abratt (FBN 118053)
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Telephone: (954) 703-3418
dabratt@tlolawfirm.com

- and -

Michael J. Tadych (NC Bar No. 24556)
mike@smvt.com
Kathleen O'Malley (NC Bar. No. 51654)
komalley@smvt.com
STEVENS MARTIN VAUGHN &
TADYCH, PLLC
6300 Creedmoor Road, Suite 170-370
Raleigh, NC 27612
Telephone: (919) 582-2300
Facsimile: (866) 593-7695

*Counsel for Courthouse News Service*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned this **23rd** day of **May, 2025** has caused the foregoing

to be electronically filed using the CM/ECF system, which will send notification of such filing to

all the counsel of record for the parties who participate in the CM/ECF system.

*/s/ Carol Jean LoCicero*
Attorney
