# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
Case No.: 5:23-cv00280-FL

COURTHOUSE NEWS SERVICE,

                                    Plaintiff,

v.

RYAN BOYCE, in his official capacity as
Director of the North Carolina
Administrative Office of the Courts;
MICHELLE BALL, in her official capacity
as Clerk of Superior Court of Johnston
County; RENEE WHITTENTON, in her
official capacity as Clerk of Superior Court
of Harnett County; and CLAUDIA
CROOM, in her official capacity as Clerk
of Superior Court of Wake County,

                                    Defendants.

DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT

## INTRODUCTION

Plaintiff Courthouse News Service (CNS) filed this lawsuit during the earliest stages of North Carolina's transformative shift from a paper-filing environment to eCourts. CNS anchored its claims to a narrow window of initial implementation– one that no longer resembles the current state of access or operations—and now seeks declaratory relief that is legally unsupportable.

The record shows that the Clerk Defendants are providing access to newly filed civil complaints at a rate that meets and exceeds constitutional requirements. CNS admits as much, conceding that the Clerk Defendants have achieved sustained same-day access rates of

1

more than 90% or more, which it characterizes as constitutionally sufficient. That alone should end the case.

CNS's suit no longer presents a live controversy. CNS's first request for declaratory relief is retrospective in nature, and its second – seeking a rigid, numerical benchmark – has no basis in the Constitution or controlling precedent. The Eleventh Amendment bars such claims, and the *Ex parte Young* exception does not apply. Moreover, CNS's requested injunctive relief would require this Court to supervise day-to-day clerk operations, an exercise barred by the abstention doctrine articulated in *O'Shea v. Littleton*, 414 U.S. 488 (1974). North Carolina's eCourts system provides more access to court records than ever before – more than CNS has historically enjoyed in this state – and does so in a constitutionally sound and operationally responsible manner. Summary judgment for CNS should be denied.

## FACTUAL BACKGROUND

Courthouse News Service cannot demonstrate that it ever received on-receipt access to newly filed civil complaints in North Carolina.[1] Historically, CNS reporters accessed civil complaints one business day after filing, at the end of the day.[2] Despite this delay, CNS operated its business in North Carolina for years without objection – raising no concerns and filing no lawsuit.

As North Carolina prepared to launch eCourts, CNS began a pressure campaign for North Carolina judicial officials and AOC to implement its preferred method of access: a Press Review Queue.[3] After extensive study and consultation, the AOC concluded that

---

[1] Defendant's Statement of Facts (Def. SOF) ¶ 3.

[2] *Id*. ¶¶ 6-7.
[3] Def. SOF ¶ 171; Pls. SOF ¶¶ 58

deploying "Portal," – a free, web-based access system that makes public court records available 24/7 to any member of the public– best balanced the legal and policy issues at play.[4] Accordingly, it declined to implement Press Review Queue as an additional feature.[5] CNS concedes that access to newly-filed civil complaints has improved under eCourts, with faster availability than under the paper-based system and expanded coverage across more counties than it previously maintained.[6]

The implementation of eCourts in North Carolina marked a significant transformation.[7] As with any system-wide modernization, the initial rollout present a steep learning curve for clerks adapting to new workflows and technology. Despite early growing pains, the record demonstrates that as proficiency increased, their processing times and access improved substantially.[8] Today, the Clerk Defendants consistently make over 98% of newly filed civil complaints available through the statewide Portal on the same business day as filing, well within the bounds of applicable constitutional standards and far surpassing the access CNS previously received under the legacy system.[9]

## STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[4] Def. SOF ¶¶ 171-176

[5] *Id.*

[6] *Id.* ¶¶ 10, 15

[7] *Id.* ¶¶ 47-52

[8] *Id.* ¶¶ 148-152
[9] *Id.*

Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986). Once the moving party satisfies this burden, the nonmoving party must come forward with specific facts, supported by affidavits or other admissible evidence, demonstrating the existence of a genuine issue for trial. *McLean v. Patten Communities, Inc.*, 332 F.3d 714, 718–19 (4th Cir. 2003). In evaluating a summary judgment motion, the court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## ARGUMENT

In its complaint, CNS asked the Court to declare that that clerk review prior to public access is *per se* unconstitutional regardless of the length of any delay or the reason for the review. [DE 1, p 19] CNS also sought a permanent injunction prohibiting Defendants from continuing review practices. [Id. p 20]

CNS now shifts course. Rather than pursue the relief pled, it asks the Court to issue two new declaratory rulings: first, that Defendants violated the First Amendment in the past by failing to provide access "as expeditiously as possible;" and second, that the First Amendment requires at least 90% of newly e-filed, non-confidential civil complaints to be made available the same day they are filed. [DE 77, pp 1-2]  Neither request is justified by the evidentiary record, necessary to resolve an ongoing controversy, or within the scope of the claim asserted in the complaint. CNS has acknowledged that Defendants' current practices are functioning effectively. That acknowledgement should bring this case to a close – not prolong it through pursuit of invented constitutional benchmarks and advisory declarations.

4

## I. Defendants Provision of Access to Newly Filed Civil Complaints Satisfies The First Amendment.

### A. The First Amendment Standard of Access to Civil Complaints.

The Fourth Circuit has held that the First Amendment provides the public and press a co-extensive,[10] qualified, "contemporaneous" right of access to newly filed civil complaints, *Courthouse News Serv. v. Smith*, 126 F.4th 899, 907 (4th Cir. 2025), and "requires courts to make newly filed civil complaints available as expeditiously as possible." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 329 (4th Cir. 2021). This standard "is satisfied when access is provided 'the same day on which the [document] is filed, insofar as is practicable[,] and when not practicable, on the next court date.'"[11] *Courthouse News Serv. v. Smith*, 126 F.4th 899, 907 (4th Cir. 2025) (quoting *Schaefer* at 328). *Schaefer*'s analysis simply leaves no room to contend that "as expeditiously as possible" means "immediate." Instead, scrutiny of acceptance rates under *Schaefer* must consider (1) whether acceptance rates are sufficiently high to constitute "contemporaneous," and (2) if not, are the policies and practices that preclude "contemporaneous" access "content-neutral, narrowly tailored and necessary to preserve the court's important interest[s]." *Smith* at 908; *see also Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 606-7 (1982).

No court has endorsed specific quota or numerical standards for what constitutes "contemporaneous access." The Tenth Circuit recently rejected a proposal by CNS to adopt a "five-business-hour" rule. *Courthouse News Service v. New Mexico Administrative Office of the*

---

[10] The rights of the news media do not exceed those of the general public. *In re Greensboro News Co.*, 727 F.2d 1320, 1322 (4th Cir. 1984)

[11] CNS mischaracterizes Defendants' position as arguing that the contemporaneous access right announced in *Schaefer* does not attach until a filing is accepted by the Clerk. That is incorrect; Defendants have not advanced that position in this litigation. For purposes of summary judgment, Defendants do not contest that the First Amendment right of contemporaneous access to newly filed civil complaints attaches when the system receives the complaint.

*Courts*, 53 F.4th 1245, 1274 (10th Cir. 2022). The court firmly declined to impose a rigid time standard, explaining it would "fail[] to accommodate the state's interests in the fair and orderly administration of its courts," such as "judicial administration interests in extraordinary circumstances." *Id.*, 53 F.4th at 1274.

CNS' Motion proposes a standard of 90% same-day access that is unsupported by *Schaefer* or any binding precedent. Indeed, the district court in *Schaefer* determined that, based on the clerks' specific circumstances, that "a reasonable expectation is that 85-90% of the new civil filings will be accessible to the public and press" on the date of filing. *Courthouse News Service v. Schaefer*, 440 F. Supp. 3d 532, 563 (E.D. Va. 2020). Yet it would be incomplete simply to note that *Schaefer* eschews a concrete, numerical benchmark; rather, *Schaefer*'s standard incorporates flexibility to accommodate practical limitations, competing obligations, exigent circumstances, and the reality that administrative capacities differ among clerks' offices. *See Schaefer*, 2 F.4th at 328.

For example, clerks' offices experience workload and staffing fluctuations and technology interruptions that can affect acceptance rates. Clerks' offices must also balance processing filings against other critical duties—many of which directly implicate constitutional rights. North Carolina clerks, for example, also adjudicate emergency matters like mental health commitments, domestic violence orders, and guardianships, as well as provide essential support for criminal court, estate administration, foreclosures, and adoptions.[12] These are time-sensitive, legally complex responsibilities that demand attention

---

[12] *See, e.g.* North Carolina General Statutes Chapter 35A (clerks appoint interim guardians when emergencies threaten the ward's welfare or estate); Chapter 50B (clerks are tasked with processing and issuing emergency protective orders in 50B domestic violence proceedings); N.C. Gen. Stat. §§ 122C-261 (clerks issue immediate custody orders for individuals posing imminent harm); § 7A-109.1

and discretion. As such, the *Schaefer* standard's flexibility is both prudent and essential to *Schaefer*'s core logic. Adoption of a concrete benchmark would be a fundamental departure.

To be clear, Defendants' objection to a 90% standard is not because they cannot currently meet it; as noted in Section I.B, below, Clerk Defendants have been providing same day access to over 90% of newly filed civil complaints and since August 2023. Rather, a rigid benchmark is simply unsupported by law or precedent and it functions to deprive clerks of necessary discretion to address multiple duties of constitutional and practical import and jeopardizes due process, public safety, and access to justice.

It also disregards the day-to-day technical and operational challenges clerk offices face, such as software issues, script errors, server outages, and delays in the ICMS system.[13] Clerks must simultaneously manage these technical hurdles while assisting attorneys, supporting self-represented litigants, and serving the public.[14] A bright-line standard would not appropriately consider the Clerks other duties and is inappropriate. *See Courthouse News Service v. Schaefer*, 440 F. Supp. 3d 532, 563 (E.D. Va. 2020) (declining to issue an injunction because "the Clerks may be put in a position of disproportionately endeavoring to comply with this Court's order, rather than responding to the many demands of their offices."). As *Schaefer* correctly adjudged, a fixed quota fails to reflect the dynamic realities of a functioning

---

(clerks must supply judges with current lists of prisoners showing charges, bail, release terms, and next court appearances), § 7A-180(5) (clerks issue arrest warrants, conduct initial appearances, and prepare other criminal processes), Chapter 45 (clerks preside over foreclosure hearings and make findings before authorizing sales); Chapter 48 (adoptions – clerks oversee special adoption proceedings, enter decrees, and manage post-decree documentation).

[13] Def. SOF ¶ 67; Ex. 6 Whittenton Decl. ¶¶ 21, 23-24; Ex. 2 O'Neal Decl. ¶¶ 27, 32, 34-35; Ex. 7 Ball Decl. ¶¶ 37

[14] Def. SOF ¶¶ 46, 63, 208

7

courthouse; the Court should rejected CNS's request for a rigid 90% same-day access mandate.

### B. Clerks are Providing Contemporaneous Access Under *Schaefer*, and therefore No Analysis of Interests or Tailoring is Necessary.

Under a correct interpretation of the *Schaefer* standard, CNS' Motion fundamentally fails because Defendants are providing contemporaneous access to newly filed civil complaints, and have been for nearly two years. As such, this Court need notreach questions of governmental interests or tailoring.

Since the sixth month following their transition to eCourts, more than 90% of the newly-filed civil complaints filed in Clerk Defendants' offices were processed and made publicly accessible on Portal on the same business day they were filed.[15] With three, negligible exceptions (the lowest of which was 95.06%), same-day acceptance rates in each of the Clerk Defendants' counties have exceeded 97% since December 2023. These same-day acceptance rates (blue lines) and the next business day acceptance rates (tan lines) are reflected in the following graphs and provided in Defendants' SOF at ¶¶ 149-150:

*(remainder of page left blank intentionally)*

---

[15] Def. SOF ¶¶ 148-152



Harnett County File and Serve Acceptance Rates Within One Business Day
February 2023 through May 2025

|  | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | | | | | 2023 | | | | | | | | | | 2024 | | | | | | | | | | 2025 | | | |
| Same Business Day | 28.6% | 54.1% | 58.4% | 51.5% | 71.9% | 71.8% | 92.5% | 98.7% | 98.0% | 95.0% | 98.3% | 97.8% | 100.0% | 99.5% | 99.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 99.4% | 99.7% | 100.0% | 99.6% | 100.0% |
| Within One Business Day | 70.0% | 84.5% | 87.9% | 80.7% | 95.1% | 96.1% | 99.0% | 99.6% | 99.6% | 100.0% | 100.0% | 99.6% | 100.0% | 100.0% | 100.0% | 99.6% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |



Johnston County File and Serve Acceptance Rates Within One Business Day
February 2023 through May 2025

|  | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | | | | | 2023 | | | | | | | | | | 2024 | | | | | | | | | | 2025 | | | |
| Same Business Day | 37.8% | 41.3% | 45.9% | 64.4% | 66.8% | 68.1% | 91.7% | 99.8% | 97.6% | 93.6% | 98.2% | 97.8% | 99.1% | 99.0% | 99.2% | 98.7% | 98.8% | 99.2% | 99.3% | 99.8% | 99.8% | 95.1% | 99.5% | 98.8% | 99.2% | | | |
| Within One Business Day | 69.3% | 64.8% | 67.0% | 91.8% | 91.3% | 93.1% | 97.5% | 100.0% | 99.6% | 100.0% | 100.0% | 99.8% | 100.0% | 100.0% | 100.0% | 100.0% | 99.4% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 99.8% | | | |

9



Wake County File and Serve Acceptance Rates Within One Business Day
February 2023 through May 2025

| | Feb 2023 | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan 2024 | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan 2025 | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Same Business Day | 12.5% | 62.7% | 69.2% | 70.4% | 68.0% | 74.6% | 96.0% | 99.6% | 98.3% | 99.4% | 99.6% | 99.6% | 99.7% | 99.3% | 99.7% | 99.5% | 99.9% | 99.6% | 99.8% | 98.5% | 98.9% | 99.3% | 98.6% | 99.7% | 99.4% | | | |
| Within One Business Day | 33.4% | 94.7% | 99.5% | 99.3% | 99.0% | 99.5% | 100.0% | 100.0% | 100.0% | 99.9% | 99.7% | 99.8% | 99.9% | 100.0% | 99.9% | 99.9% | 99.9% | 99.9% | 100.0% | 100.0% | 100.0% | 100.0% | 99.8% | 100.0% | 100.0% | 100.0% | 100.0% | |

These statistics are based on data derived directly from eFile and formulas that reflect the days and business hours that clerks' offices are actually open for business and the case types that fall within *Schaefer*'s ambit (not CNS' latest retooling of its request). Notably, CNS has admitted, purportedly based on these statistics, that the Defendant Clerks have demonstrated the ability to meet the 90% same day access standard it proposed,[16] all while conducting pre-access clerk review. [DE 79, p 16]

Nevertheless, CNS proffers its own numbers, which portray the Clerk Defendants' acceptance rates in a worse light. (DE 79 at 6-7, DE 78 at 11-15) Defendants dispute both the accuracy of CNS' numbers and the validity of the picture they suggest. These numbers are inapposite to the case because they are based on calendar days and do not account for business days or hours.[17] Clerks could only succeed under CNS's calculations if they accepted documents on nights, weekends, and holidays. Processing documents outside of business

---

[16] Pls' Memo Supp. MSJ at 11, 17–18; Pls' SOF ¶¶ 43, 49, 67.
[17] Def. SOF ¶¶ 153-155.

hours is not practicable or required under *Schaefer*. Accordingly, CNS's calculated rates are not calibrated to applicable First Amendment standards, and thus inapposite to this Court's analysis of its Motion.

Further, CNS complains both that eRRK 1.5 (which tracks the *Schaefer* standard) sets an arbitrary time limit for processing during court hours and that Defendants acceptance rates "are tolled for any filings received after 5:00 p.m. on a court business day, and for weekends and any day a court is physically closed."[18] CNS argues instead that the press must be granted access to newly e-filed complaints outside court business hours – including at night, on weekends, and on court holidays – merely because e-filing is available 24/7.  CNS cites no legal authority that conditions the scope of First Amendment rights upon technological capabilities.

Indeed, the Fourth Circuit has made clear, and CNS has conceded,[19] that the First Amendment does not give rise to a freestanding right to online or remote access to court records merely because such technology exists. *Smith*, 126 F.4th at 912.  The Fourth Circuit had the opportunity in *Smith* to declare that that technological availability or feasibility like Virginia's OCRA system heightened the press's First Amendment rights or spawned a new constitutional obligation to provide remote, online access. The court declined to do so. Instead, it found that to access tor ecords at the courthouse during court hours satisfied the First Amendment despite the availability of remote technology. *Smith*, 126 F.4th at 916.

---

[18] Pls' Memo Supp. MSJ at 12. This complaint is not accurate as Defendants' acceptance rates do not account for any physical closure of the court and instead only account for state holidays.  *See* Def. SOF ¶¶ 147(b).

[19] Pls' Memo Supp. MSJ at 14, n. 3 (citing *Smith* at 907).

Undeterred by *Smith*, CNS asks this Court to break new constitutional ground, advocating for a heightened constitutional standard for electronically filed complaints; that because e-filing systems allow for around-the-clock submission, the First Amendment morphs to requires instantaneous access to all such filings, regardless of when they are received and irrespective of other significant legal and policy ramifications. This theory would transform *Schaefer's* flexible standard into a rigid, technology-driven mandate – one that would require states adopting electronic filing systems either to reallocate resources and staffing to match the 24/7 nature of e-filing or to abandon their important government interests in reviewing and processing complaints prior to public release.

As such, CNS's proposed standard may actually create a disincentive for court systems to leverage technological advances in the service of their citizens if doing so requires them to violate other legal requirements or compromise other valid policy objectives, such as data privacy laws. Alternatively, the Constitution does not require a state actor to procure or implement new technologies merely due to availability; as such, a rigid standard like the one proposed by CNS may even force states to make counterintuitive and otherwise unnecessary configuration decisions, such as limiting an electronic filing system to accept new filings only during the hours that clerks' offices are open.

Fortunately, the Fourth Circuit has concluded repeatedly that the Constitution does not require such a fundamental restructuring of judicial administration; the scope of the First Amendment is not contingent on technology. If the Constitution were interpreted to require real-time, on-receipt access solely because technology makes it possible, there would be no logical stopping point. By that logic, courts would be obligated to operate around the clock, judges would need to be on duty 24 hours a day to hear emergency motions the moment they

12

are filed – the entire judicial apparatus would be forced to conform to the technological availability of filing platforms rather than the practical realities of courthouse operations.

The First Amendment does not command such outcomes. Instead, processing newly filed civil complaints and making them available to the public Portal during regular clerk office hours on court business days constitutes a reasonable time, place, and manner restriction – just as the Fourth Circuit upheld in *Smith*.

## II. Even if First Amendment Scrutiny Applies, Clerk Defendants' Process is Narrowly Tailored to Serve Important Government Interests

Even if this court were to conclude that Clerk Defendants are failing to provide contemporaneous access, Defendants acceptance policies and practices are narrowly tailored to achieve important governmental interests.

### A. Defendants Have Two Important Interests in Protecting Confidential Documents and PII.

Defendants have an interest in protecting confidential documents and PII from public dissemination, especially when the court records are published on internet.[20] The Fourth Circuit has made clear that "safeguarding sensitive personal information in court records is an important governmental interest." *Courthouse News Serv. v. Smith*, 126 F.4th 899, 910 (4th Cir. 2025).

CNS concedes in its opening brief in the *Smith* case that "all courts share an interest in preventing harm caused by misuse of personal identifiers." *Id*. Similarly, CNS recognizes the importance of restricting access to confidential case types—it contends it does not request or report on statutorily confidential case types.[21] Yet CNS now minimizes the importance of PII

---

[20] Def. SOF ¶¶ 116-124.
[21] DE 80-5, ¶ 18.

review, calling it a "nonsensical" and "speculative, tail wagging the dog argument." [DE 79 at 25]

CNS's rhetoric and mischaracterization cannot diminish the Fourth Circuit's recognition of the government interest at issue here, and Defendants have been consistent and steadfast about their commitment to protecting this interest. As the *Smith* court recognized, this interest is weighty, and courts have a legitimate basis for ensuring that civil filings do not expose individuals to identity theft, fraud, exploitation, or other harms arising from the disclosure of PII. *Smith* at 910.

### B. Defendants Also Have Important Interests in Ensuring Accurate Court Records for the Public.

Defendants also have an interest in maintaining an accurate court record for the public and for Judicial Branch users accessing documents in the ICMS, such as judges. The Fourth Circuit has recognized this important interest in the efficient and orderly administration of justice. *Smith*, 126 F.4th at 910; *Schaefer* at 328. The orderly and transparent administration of justice depends on accurate, complete, and legally compliant court records. The State has an interest in ensuring that filings are appropriately reviewed, categorized, and correct.

### C. The Clerk Defendants' Review is Narrowly Tailored to These Important Government Interests.

The Clerk Defendants' processing practices are narrowly tailored to satisfy their important governmental interests. The press and public receive access via Portal once Clerk processing is complete.[22] Clerks are processing to: (1) review complaints to protect PII from dissemination, (2) correct case security information , and (3) make minor clerical corrections

---

[22] Def. SOF ¶ 85.

to ensure an accurate record is provided to the public on Portal and Judicial Branch users in ICMS, and because certain corrections cannot be made in the ICMS or are significantly more time consuming to make.[23] This review only takes a few minutes, the bulk of which is spent reviewing for PII.[24] The narrow tailoring requirement is satisfied because the Clerk Defendants' review directly advances their important government interests with minimal restriction on the public's access.

CNS has not presented evidence of another option that is effective in addressing these three issues. AOC has investigated solutions for expediting these review tasks beyond the minutes-long process currently is, but the technology simply is not yet capable of automatically identifying and shielding protected information. Auto-redact tools are unreliable in practice.[25] They also do not prevent filer errors that impact security settings. The temporary withholding of a complaint until a clerk verifies that no social security numbers, driver's license numbers, or other protected details are exposed is a narrowly tailored means to serve a compelling interest in confidentiality.

The several arguments CNS present on narrow tailoring are unsubstantiated. First, CNS questions whether the presence of PII in newly filed civil complaints is actually a widespread problem that warrants pre-review by clerks. To the contrary, courts are rightly cautious when it comes to personal data, as reflected in various state and federal privacy laws.[26] And although North Carolina law places the onus on filers to omit PII, it is naive to

---

[23] *Id.* ¶¶ 93-103.

[24] *Id.* ¶ 103.

[25] *Id.* ¶ 119.
[26] Indeed, eRRK 1.8 summarizes some of these state and federal law and demonstrates that the clerks' review is part of a comprehensive regime to protect sensitive information in all judicial proceedings.

assume unerring compliance by every filer. Self-represented litigants and attorneys can accidentally (or intentionally!) include birth dates, financial account numbers, or other private data in a complaint, and Defendants have documented many such instances.[27] Likewise, self-represented litigants and attorneys can and do make mistakes in their filing code selections that incorrectly label a confidential case type as a public case type, with the result of disclosing confidential and legally-protected information.[28]

If the clerks were to release filings without review, such mistakes would exposure public f information that the law seeks to keep confidential – an irreparable breach of privacy that cannot be undone. And those who stand to suffer most from these errors are often innocent third parties, not the filers themselves. North Carolina's clerks, as elected constitutional officers, take very seriously their responsibilities to safeguard their constituents on matters like PII.

CNS's suggestion that Defendants should ignore this important governmental interest unless and until a breach occurs is troublesome. The very nature of cyber identity theft makes it difficult to trace the source of compromised information. The absence of documented instances linking identity theft to unredacted court filings does not demonstrate that the risk is nonexistent. It is a matter of sound public policy and responsible public service for clerks to

---

CNS devotes an outsized portion of its briefing to eRRK 1.8, but its emphasis is misplaced. eRRK 1.8 governs the handling of confidential information in court records broadly – it is not limited to newly filed civil complaints at all; it applies across the board to many types of filings and information. CNS's attempt to portray eRRK 1.8 as a post-hoc excuse for PII review in this litigation is a red herring. Defendants have never argued that every confidentiality provision in eRRK 1.8 bears directly on the First Amendment question presented here.

[27] Def. SOF ¶¶ 121-22.

[28] *Id.* ¶¶ 17, 179.

maintain a process that reduces the risk of inadvertent disclosure of PII, particularly in a digital environment where information can be instantly disseminated.

Nor does narrow tailoring require that Defendants provide CNS with pre-processing access to the unique subset of civil filings that it seeks—civil complaints filed in Superior Court. CNS asserts that these complaints are not confidential and do not have PII, and therefore, do not need to be reviewed to protect these interests. This argument fails for two reasons. First, as detailed above, filer errors can and do result in unredacted PII in documents and confidential documents labeled as public. Second, this would be an impermissible content-based restriction. Civil complaints subject to First Amendment access requirements encompasses a wide variety of case types beyond the general civil matters CNS targets in its reporting. These include foreclosures, guardianships, incompetency proceedings, and non-confidential name changes.[29] Applying a rule that provides access to some of these and not others is the opposite of a content-neutral restriction.

The Clerks' uniform, content-neutral pre-access review applies to all civil case-initiating documents, regardless of subject-matter, party identity, or perceived newsworthiness. This policy furthers multiple important government interests – including the protection of PII and confidential documents and the orderly administration of justice. The temporary nature of access delay and its consistent content-neutral application to all case types ensures that the restriction is narrowly drawn and no broader than necessary to serve those interests.

III.   **Defendants' eCourts Implementation Effort Was Narrowly Tailored to Serve an Important Interest, Even If It Temporarily Delayed Access.**

---

[29] Def. SOF ¶¶ 89, 145, 186, 200.

Defendants acknowledge that there were delays in access to civil complaints during the initial months of the eCourts implementation. However, these delays did not violate the First Amendment because: (1) the initial months of eCourts implementation is an extraordinary circumstance; and (2) the initial access delays were narrowly tailored to meet Defendants' important government interest of effectuating a transformational change to the North Carolina courts to improve the administration of justice.

## A. The Initial Launch of eCourts Constituted an Extraordinary Circumstance That Justifies Temporary Delays in Public Access.

CNS's contention that public access to newly filed civil complaints during the initial launch of eCourts was constitutionally deficient ignores both the practical reality of a large-scale technological overhaul and the Fourth Circuit's flexible standard. The First Amendment does not require perfection, nor does it impose rigid metrics. Rather, it mandates that access be provided "on the same day on which the document is filed, insofar as is practicable, and when not practicable, on the next court date — excepting inconsequential deviations and extraordinary circumstances which may, without violating the constitution, delay access." *Schaefer* at 328.

Defendants present ample evidence that the rollout of eCourts, a seismic operational shift, constituted an extraordinary circumstance.[30] While CNS attempts to shift focus on just a small slice of court operations, eCourts fundamentally changed not only the functioning of the Clerk's offices, but also the operations of the District and Superior Courts that the Clerk's Offices support.[31] The eCourts platform – comprising a suite of software applications provided

---

[30] Ex. 6 Whittenton Decl. ¶¶ 12-30; Ex. 7 Ball Decl. ¶¶ 18-39; Ex. 2 O'Neal Decl. ¶¶ 13-17, 28-36; Def. SOF ¶ 206.

[31] *Id.*, Def. SOF ¶ 47-48, 59-63.

by Tyler Technologies – replaced the state's prior systems with new modules for electronic filing, case management, and public access.[32]

Every process, system, and task in the Clerk's Office was affected.[33] Staff were required to relearn their jobs from the ground up, including new workflows, system navigation, and entirely revised rules for recordkeeping.[34] Clerks were tasked with simultaneously learning, implementing, and troubleshooting unfamiliar software while continuing to process thousands of filings under newly established workflows.[35] Clerks also had to field increased questions from the public regarding how the new system operated.[36] Finally, Clerks had to spend extensive time scanning paper files into the new system to ensure that court sessions could run as scheduled.[37]

Defendants also provide ample evidence that technological issues occurred in the initial months of eCourts that negatively impacted the Clerk Defendants' ability to process civil complaints.[38] This included system outages and latency, system errors, and internet outages in Harnett County.[39]

---

[32] Def. SOF ¶ 48.

[33] Def. SOF ¶ 60.

[34] Ex. 6 Whittenton Decl. ¶¶ 12-30; Ex. 7 Ball Decl. ¶¶ 18-39; Ex. 2 O'Neal Decl. ¶¶ 13-17, 28-36; Def. SOF ¶ 206.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] Def. SOF ¶¶ 67-73.

[39] *Id.* ¶ 70; Ex. 4 Fowler Decl. ¶ 54.

Defendants worked hard to overcome these circumstances as quickly as possible—employing temporary staff, working nights and weekends, and making system changes.[40] Access steadily improved throughout the first six months of eCourts as the Clerk Defendants became proficient with the new system and technological issues were resolved. Delays in access during this limited period of extraordinary circumstances do not violate the contemporaneous access standard. *Schaefer* at 328.

### B. Initial Delays in Access were Narrowly Tailored to Served Defendants' Important Government Interest in Implementing eCourts.

The AOC transitioned to eCourts upon the recommendation of North Carolina Commission on the Administration of Law and Justice ("NCCALJ")—a sixty-five member, multidisciplinary commission that undertook a comprehensive and independent review of North Carolina's court system to make recommendations for improving the administration of justice in North Carolina.[41] The NCCALJ recommended transitioning to electronic filing and an electronic integrated case management system to improve the administration of, and access to, justice.[42] Defendants' adoption of new technology to enhance the administration of justice is an important governmental interest. *See Smith*, 126 F.4th at 910 (recognizing important interest in the administration of justice).

As with any major technological advancement, the eCourts implementation included a steep learning curve and technology glitches. AOC planned for these circumstances by choosing to implement eCourts in tracks—starting with only four counties that included the

---

[40] Def. SOF ¶¶ 75-78.

[41] *Id.* ¶ 47.

[42] *Id.*

Clerk Defendants.[43] The role of these counties was to identify system issues for correction before subsequent tracks launched. AOC minimized the learning curve by providing training to Clerks, other judicial branch officials and employees, and the public.[44] AOC minimized operational impacts of the learning curve by providing additional resource to the Clerks—specifically extensive overtime allowances and additional temporary employees to assist in the transition.[45] Accordingly, to the extent that the technology glitches and the learning curve delayed access, these delays were minimized through AOC's mitigation efforts, and thus, narrowly tailored to satisfy Defendants' important government interest of implementing eCourts.

The Constitution does not require perfection on day one. If courts treat initial system limitations as constitutional violations despite good faith efforts to improve, governmental actors will be deterred from innovation for fear that temporary inefficiencies will be weaponized as First Amendment claims. This would chill modernization, creating a harmful precedent where litigation risk outweighs benefit. The judiciary must be allowed to implement reforms without fear that temporary growing pains – will be weaponized as a constitutional defect.

## IV. Plaintiff's Proposed Technology Solutions Do Not Address Defendants' Significant Government Interests.

CNS claims that the Clerk Defendants' policies are not the "narrowest" solution to satisfy their important government interests because they can implement the Press Review Queue or Auto Accept to provide faster access. But that is not the legal standard. As an initial

---

[43] *Id.* ¶ 52.

[44] Def. SOF ¶ 53-55.

[45] *Id.* ¶¶ 75-77.

matter, Defendants access restrictions are not subject to any constitutional test because they are meeting the *Schaefer* standard-- there is no violation to measure for sufficient interest or tailoring.

Even if Defendants were not meeting the *Schaefer* standard, however, Defendants restrictions on public access to court records are content-neutral, time, place, and manner restriction that serve an *important* governmental interest and are narrowly tailored to achieve that interest. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986); *Smith* at 908. A content-neutral time, place, or manner regulation is not invalid merely because the government's interest "could be adequately served by some less-restrictive alternative." *Ross v. Early*, 746 F.3d 546, 557 (4th Cir. 2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 n.6 (1989)). Rather, a regulation is sufficiently tailored so long as it "'promotes a substantial government interest that would be achieved less effectively absent the regulation'" and does not "'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id*. at 552-53 (quoting *Ward*, 491 U.S. at 799).

Defendants can demonstrate that they have significant government interests in pre-access processing, that their policies are narrowly tailored to those interests, and that do not satisfy their interests .

### A. The Press Review Queue and Auto Accept technology cannot meet Defendants' Significant Government Interests

#### 1. CNS's Proposed Alternatives Were Carefully Considered and Reasonably Rejected by AOC.

In 2019, CNS contacted the NCAOC to advocate for implementation of the PRQ.[46] AOC responded by conducting a comprehensive evaluation.[47] It reached out to Tyler Technologies to understand technical aspects of PRQ and contacted other jurisdictions using Tyler systems to assess their experiences.[48]

To guide broader configuration choices, AOC established an eCourts Advisory Committee, which included representatives from all key stakeholder groups in the Judicial Branch—clerks, judges, prosecutors, defenders, and court staff.[49] The Committee reviewed written materials provided by CNS's counsel, attended demonstrations of PRQ and Portal, and discussed legal standards including the Virginia district court's decision in *Courthouse News Service v. Schaefer*.[50]

At multiple meetings in 2020, the Advisory Committee debated whether PRQ or Auto-Accept should be included in North Carolina's eFiling rollout. Ultimately, the Committee recommended against PRQ, and AOC determined not to implement it.[51] This decision was not reflexive or uninformed. It reflected a deliberate and reasoned conclusion that Portal,

---

[46] Def. SOF ¶ 171

[47] *Id.* ¶¶ 171-176.
[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

combined with Clerk Review Queue, would satisfy constitutional standards while better serving court administration and public protection.

### 2. Clerk Defendants Reasonably Concluded that PRQ and AA Would Not Meet the Needs of Their Offices.

Separate from AOC's statewide evaluation, the individual Clerk Defendants themselves have independently assessed the feasibility of implementing a PRQ or AA configuration and determined that neither is compatible with their constitutional duties or operational realities.

The Clerk Defendants explain that the auto-acceptance and Press Review Tool pose unacceptable risks to confidentiality, accuracy, and court operations.[52] Pre-acceptance review ensures that confidential filings, sealed materials, or case types involving minors are not mistakenly released to the public.[53] It also prevents abusive or erroneous filings, such as false liens or submission violating gatekeeper orders, from entering the official record.[54] Clerk review enables clerks to assist filers in correcting mistakes early, and preserves judicial resources by avoiding burdensome post-acceptance corrections that can disrupt ICMS and court operations.[55]

In sum, the Defendant Clerks' firsthand accounts make clear that North Carolina's pre-access review process is not an arbitrary delay, but a well-justified, narrowly tailored safeguard that ensures compliance with law, protects the public, and promotes the integrity

---

[52] Def. SOF ¶¶ 194-199; Ex. 1 Croom Decl. ¶¶ 4-13; Ex. 6 Whittenton Decl. ¶¶ 45-58; Ex. 7 Ball Decl. ¶¶ 57-70.

[53] *Id.*

[54] *Id.*

[55] *Id.*

of the court's official records. The system chosen by NCAOC and the Clerk Defendants reflects a deliberate and informed choice—not indifference to press access, but a reasonable and constitutionally sound alternative to the proposals advanced by CNS.

### 3. Portal Provides Broader, Safer, and Constitutionally Adequate Access.

Defendants' decision to prioritize clerk review and post-acceptance publication through Portal is not only operationally sound—it is also constitutionally sufficient. Portal makes newly filed complaints available to the public online, for free, without a login or subscription, 24 hours a day.[56] That access occurs promptly after the brief clerical review required to ensure legality, accuracy, and confidentiality.

Unlike a PRQ, which benefits only credentialed press, Portal serves all members of the public. It expands access far beyond the courthouse walls, enabling the public to monitor civil litigation from anywhere. That commitment to transparency exceeds what the First Amendment requires. As the Fourth Circuit recognized in *Smith*, the First Amendment does not demand immediate access or any particular technological method—only that access be timely and not unduly delayed.

## V. Jurisdictional Bars and Prudential Limits Preclude the Relief CNS Seeks

### A. CNS' Claim Is Moot: Defendants Have Been Providing Contemporaneous Access Consistent With The First Amendment For Almost Two Years And There Is No Evidence That Lesser Access Will Be Provided In The Future.

"A pending lawsuit is rendered moot 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Any ruling by

---

[56] Def. SOF ¶ 175(a)

this Court on claims rendered moot "would constitute an impermissible advisory opinion." *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 162 (4th Cir. 2021).

Ordinarily, a defendant's voluntary cessation of challenged activity will justify a finding of mootness only if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Porter*, 852 F.3d at 363 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.* (TOC), Inc., 528 U.S. 167, 189 (2000)). This exception "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001). "The exception seeks to prevent a manipulative litigant from immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *Porter*, 852 F.3d at 364 (internal quotations omitted).

The Fourth Circuit has found that, "[f]or there to be a reasonable expectation that the challenged conduct will recur, the recurrence must appear to be 'probable,' not 'merely possible....'" *Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir. 2006); *see also Eden,* 36 F.4th at 172 (noting that mere ability to reimpose challenged restrictions is not enough to show a reasonable chance of recurrence); *Reyes v. City of Lynchburg*, 300 F.3d 449, 453 (4th Cir. 2002) (affirming summary judgment on grounds that repeal of parade ordinance rendered claims moot where no reasonable expectation existed that city would reenact it); *Am. Legion Post 7 v. City of Durham*, 239 F.3d 601, 605-06 (4th Cir. 2001) (finding challenge to a repealed ordinance moot when there was no indication that government would reenact it, even though it was free to do so).

When a governmental entity voluntarily ceases the challenged practice, courts grant considerable credibility to the government's indication that it will not repeat the challenged conduct. *See, e.g., Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 947 (7th Cir. 2006) ("'[W]hen the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will not recur ....'" (quoting *Troiano v. Supervisor of Elections in Palm Beach Cnty.*, 382 F.3d 1276, 1283 (11th Cir. 2004)) (cleaned up); *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005) (per curiam) ("[G]overnmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities." (quotation omitted)); *Prowse v. Payne*, 984 F.3d 700, 703 (8th Cir. 2021) (explaining that the standard for mootness is less onerous when a government defendant has ceased the challenged conduct). In *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 349 (4th Cir. 2017), for example, the Fourth Circuit affirmed a grant of summary judgment to a fire department chief who repealed the challenged social media guidelines and code of conduct, issued revised policies that contained none of the challenged provisions, and swore his intention to operate under the new policies.

Although not yet applied within the Fourth Circuit, the standard used by other federal circuits to determine whether a case against a government defendant is moot is nevertheless instructive and is consistent with Fourth Circuit precedent. *See, e.g., Keohane v. Florida Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020); *Prowse*, 984 F.3d at 703. The three-factor test articulated in *Koehane* examines: (1) whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate the court's jurisdiction; (2) whether the defendants' shift can be fairly viewed as permanent; and (3) whether defendants have consistently maintained a commitment to the new policy. *Keohane*, 952 F.3d at 1268.

Under this test, Defendants have demonstrated their unwavering commitment to providing access consistent with the First Amendment, even through considerations separate and apart from this lawsuit. Before this lawsuit was filed, when eCourts was first implemented, Defendants committed to providing access under the *Schaefer* standard by providing access as soon as possible, but no later than 24 hours after filing.[57] Clerk Defendants refined this policy during the first six months of eCourts to require their staff to accept and provide access to all complaints filed by 5:00 PM before leaving for the day.[58] Clerk Defendants worked hard to overcome initial, temporary processing delays inherent in the fundamentally transformative change that eCourts entailed. Clerk Defendants have provided constitutionally compliant, contemporaneous, same day access at a rate of 90% or higher since August 2023, and have been above 97% since December 2023.[59] In sum, the record demonstrates that Defendants have not wavered in their commitment to providing access to civil complaints consistent with the First Amendment, while also protecting their important government interests.

Against this evidentiary backdrop, it is wholly unsubstantiated to conclude that the improvements in complaint processing were motivated by this lawsuit. In particular, AOC's October 2024 amendment to eRRK Rule 1.5, and the desire to have it in place for this court's consideration in summary judgment, does not support finding that Defendants are attempting to manipulate the court's jurisdiction. Rather, this rule merely memorialized and formalized

---

[57] Def. SOF ¶ 86.
[58] *Id.* ¶ 88.

[59] *Id.* ¶¶ 149-151.

the approach that Clerk Defendants had taken for more than a year before the amendment.[60] Indeed, Clerk Defendants did not need to change any of their practices in response to the amendment.[61] The Rule 1.5 amendment was no different than the myriad of other eRRK amendments made in the first two years of eCourts in response to lessons learned through implementation, as technology considerations and business practices stabilized.[62]  As such, the amendment was not intended to manipulate this Court and Defendants should not be penalized for responsive initiatives aimed at ensuring constitutional compliance.  *See Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006).

With respect to the remaining *Keohane* factors, the record demonstrates the permanent and consistent nature of Defendants' actions.  Defendants were committed to providing access consistent with the First Amendment since the inception of eCourts and have provided contemporaneous access to civil complaints, without interruption, for just shy of two years. Defendant Boyce has testified that he has no intention of removing the *Schaefer* constitutional standard from the eRRK.[63] The Clerks have testified about the extreme lengths that they went to improve access as quickly as possible during the rollout—working overtime and incurring

---

[60] *Id.* ¶ 86.

[61] *Id.* ¶ 92.

[62] *Id.* ¶ 55.

[63] Ex. 5 Boyce Decl. ¶ 5.

extreme stress to meet their obligations. Further, there has already been one Clerk transition—in Wake County[64]—and that county experienced no change in access rates.[65]

CNS' contention the Clerk Defendants will regress is wholly speculative, contrary to the record evidence, and inconsistent with legal presumptions concerning constitutional compliance by governmental entities. In sum, on the record evidence, CNS' First Amendment claim is moot and should be dismissed.

### B. The Eleventh Amendment Bars Retrospective Declaratory Relief.

The Eleventh Amendment generally shields states and state officials sued in their official capacity from federal lawsuits seeking retrospective relief for past conduct. From the outset, the only basis for this Court's jurisdiction over the Defendants has been the narrow exception to Eleventh Amendment immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908). That exception permits suits against state officials in their official capacities "*only* for prospective injunctive relief from a continuing violation of federal law, and not for declaratory relief for a past violation of federal law." *Int'l Coal. for Religious Freedom v. Maryland*, 3 F. App'x 46, 50 (4th Cir. 2001) (per curiam) (unpubl.) (emphasis in original). The Supreme Court has cautioned that courts must not interpret the exception too broadly. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 105 (1984). In fact, the Supreme Court's decisions have consistently emphasized that this exception to Eleventh Amendment immunity is a narrow one and must be applied with restraint. *Id*. at 114, n. 25; *see also Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011) ("Indeed, the history of our *Ex parte Young* jurisprudence has largely been focused on ensuring that this narrow exception is "narrowly construed.")

---

[64] Ex. 1 Croom Decl. ¶ 2.

[65] Def. SOF ¶ 149(c).

Declaratory relief that merely adjudicates the lawfulness of past conduct is barred. The Supreme Court made this principle explicit in *Green v. Monsour*, 474 U.S. 64 (1985), holding that the Eleventh Amendment bars federal courts from issuing declaratory judgments against state officials where the alleged violation is no longer ongoing. *Green*, 474 U.S. at 68. If the challenged government conduct has ended and no continuing violation or imminent threat remains, it is not an appropriate exercise of judicial power to issue a declaratory judgment pronouncing that state officials violated federal law in the past. *Id*.

Applying that principal to this case, if CNS cannot establish ongoing and continuous unconstitutional access delays in the Defendant Clerk counties, and cannot demonstrate an imminent threat remains, it cannot obtain a federal declaration that the past delays were unconstitutional. Here, CNS seeks precisely the kind of retrospective relief that *Green* and *Ex parte Young* forbid. The request is retrospective, and, as explained above, there is no ongoing violation or credible threat of future violations.

### C. The Declaratory Judgment Act is Discretionary and Provides No Independent Basis for Jurisdiction.

Even if the Court were to conclude that the Eleventh Amendment is not a complete bar, the Declaratory Judgment Act still provides no independent basis for jurisdiction and should not be exercised here. The Declaratory Judgment Act, 28 U.S.C. § 2201, allows a federal court to declare the rights of a party, even if no additional relief is being requested or granted. However, issuing such a declaration is entirely discretionary. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–87 (1995). Courts are guided by whether the declaration would meaningfully clarify the legal issues at stake and resolve the uncertainty or dispute that led to the lawsuit. *Id*. In the Fourth Circuit, courts also consider broader principles, such as federalism, judicial efficiency, and respect for state authority, when deciding whether it is

31

appropriate to exercise that jurisdiction. *See Aetna Casualty & Surety Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998) (per curiam).

The Court should decline declaratory relief in this case, particularly where CNS seeks to break new constitutional ground by asking this Court to announce and enforce a novel First Amendment standard untethered from existing precedent. CNS does not simply ask the Court to apply established law to a dispute between the parties – it asks to redefine the scope of access rights under the First Amendment and oversee compliance with an arbitrary 90% same-day-access threshold of their own invention. Such a declaration would not clarify settled law, but instead create new uncertainty while requiring this Court to engage in ongoing supervision of state court administration. Federal court monitoring of daily compliance runs contrary to principals of federalism, comity, and judicial restraint, especially without any evidence of ongoing or threatened constitutional infirmities.

### D. CNS' Claims for Injunctive Relief Triggers the *O'Shea* Abstention Doctrine

CNS' request that the Court retain jurisdiction to monitor future compliance with a judicially imposed 90% same-day-access threshold presents a textbook case for abstention under *O'Shea v. Littleton*, 414 U.S. 488 (1974). *O'Shea* forbids federal courts from engaging in ongoing oversight of state judicial operations where the relief sought would require continual supervision of how state officials perform core judicial functions. *Id*. The Defendant Clerks' docketing and review practices fall squarely within that protected space.

Plaintiff's proposal would require the Court to audit access rates, adjudicate alleged shortfalls, and impose continuing obligations—precisely the sort of federal entanglement *O'Shea* prohibits. This request creates an additional abstention barrier that was not present in *Schaefer* or when CNS initially filed their complaint. Plaintiff's request would invite the Court

32

into a constitutional and practical quagmire. The Court should decline the invitation to impose a rigid, judicially created quota or to police the minutiae of state court administration under the guise of declaratory relief.

## VI. This Court Does Not Have Jurisdiction Over Non-Defendant Clerks And Their Access Rates are Irrelevant to the Claims against Defendants.

To the extent Plaintiff relies on statistical data from counties not named as defendants in this case, those allegations are legally irrelevant and cannot support its claims. Moreover, this Court lacks personal jurisdiction over non-party clerks. Nor may this Court issue injunctive relief against them. *Ferraro v. Rodgers*, No. 7:24-CV-833-FL, 2025 U.S. Dist. LEXIS 57571, at *2 (E.D.N.C. Mar. 27, 2025) (finding "injunctive relief may issue only if the court has personal jurisdiction over the enjoined party, or someone in legal privity with that party, and the enjoined party has been served with process.") AOC is not in legal privity with the non-party clerks because it does not exercise supervisory authority or control over them.[66] Each Clerk is an independently elected constitutional officers, responsible for the operations and decisions within their own office.[67] While AOC provides statewide administrative support, it lacks any legal authority to compel a clerk – whether a party to this case or not – to take or refrain from any action.[68]

## CONCLUSION

This case does not present a live constitutional violation. The Clerk Defendants provide contemporaneous access to newly filed civil complaints consistent with, and indeed

---

[66] Def. SOF. ¶¶ 24-32.

[67] *Id.* ¶ 32.

[68] *Id.* ¶¶ 28.

surpassing, the standards set in the Fourth Circuit. CNS's claims are moot, its requested relief barred by the Eleventh Amendment, and its proposed standards unsupported by precedent. The First Amendment does not require courts to abandon orderly administration, forego confidential data protection, or operate at the mercy of a 24/7 news schedule. The Constitution requires timely, practical, and content-neutral access – standards the Clerk Defendants not only meet, but consistently exceed. For these reasons, the Court should deny CNS's Motion for Summary Judgment and dismiss the claims entirely.

Respectfully submitted this the 20th day of June, 2025.

JEFF JACKSON
Attorney General

/s/Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. State Bar No. 28885
E-mail: eobrien@ncdoj.gov
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6800
Fax: (919) 716-6755
*Counsel for Defendants*

34

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day electronically filed the foregoing DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT using the CM/ECF system, which will send notification of such filing to all the counsel of record for the parties who participate in the CM/ECF system.

This the 20th day of June, 2025.

/s/ Elizabeth Curran O'Brien
Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. Department of Justice