**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>                        Plaintiff,<br><br>v.<br><br>RYAN BOYCE, in his official capacity as Director of the North Carolina Administrative Office of the Courts; MICHELLE BALL, in her official capacity as Clerk of Superior Court of Johnston County; RENEE WHITTENTON, in her official capacity as Clerk of Superior Court of Harnett County; and CLAUDIA CROOM, in her official capacity as Clerk of Superior Court of Wake County,<br><br>                        Defendants. | Case No.: 5:23-cv00280-FL<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS** |

NOW COME Defendants, by and through counsel, to respond to Plaintiff's Statement of Material Facts in Support of Its Motion for Summary Judgment. [DE 78] Facts that Defendants do not dispute are undisputed only for purposes of Plaintiff's summary judgment pursuant to Local Civil Rule 56.1(a)(2).

<u>**RESPONSE**</u>

    1.      Undisputed.

    2.      Undisputed.

    3.      Undisputed.

4.      Undisputed.

5.      Undisputed.

6.      Undisputed.

7.      Undisputed.

8.      Undisputed.

9.      Disputed to the extent that CNS implies that it visited North Carolina state court or courts in all states and observed such access uniformly. There is no evidence in the record to support that implication. *See* Def. SOF ¶¶ 106, summarized here. Instead, the record indicates that while CNS visited Wake County, it did not access complaints "as they crossed the intake counter" "on the day they were filed." Instead, CNS reviewed newly filed complaints in Wake County only after they have been docketed and indexed, typically at the end of the business day following the filing. There is no record evidence that CNS historically visited Harnett County or Johnston County to access newly-filed complaints in the manner described in this paragraph.

10.     Disputed. This assertion is a broad generalization unsupported by specific evidence in the record. There is no evidence that any of the Clerk Defendants, or any other North Carolina clerk, provided unprocessed complaints on carts, in bins or boxes, or allowed reporters to go behind the counter to review newly filed civil complaints. *See* Def. SOF ¶¶ 1-6. The statement is conclusory and lacks citation to admissible, specific facts regarding the practices of the Clerk Defendants, or any North Carolina clerk.

11.     Disputed. This assertion is a broad generalization unsupported by specific evidence in the record concerning the practice of all courts or journalists nationwide. CNS cannot reliably generalize the nature or frequency of access nationwide. Moreover, access delays in paper-filing courts may occur for reasons other than pending processing. For example, where a complaint is processed immediately, placed on a shelf, and must later be retrieved by a clerk upon request. This assertion also assumes, without evidence, that journalists are standing at the clerk's counter at the exact moment a complaint is filed. There is no record evidence establishing that delays in access were not caused by the journalists' own conduct, such as not being physically present at the time of filing, reviewing other materials, or simply being unaware of a new filing.

12.     Defendants dispute the assertion that "when this resulted in unconstitutional delays, courts corrected it," as it is a broad generalization unsupported by specific evidence in the record and improperly implies a universal legal or judicial response. Defendants object that Mr. Girdner lacks personal knowledge of the practices of all courts nationwide and that the declaration fails to set forth specific facts that would be admissible at trial. Moreover, the statement improperly conflates the factual experiences of CNS reporters with legal conclusions – namely, that courts "corrected" delays due to constitutional infirmity.

13.     Defendants dispute that Mr. Girdner has the expertise or personal knowledge necessary to testify that providing timely access to new civil complaints in an e-filing court is "easier" than in a paper filing court. This conclusion is speculative, lacks foundation, and does not account for the operational, legal, or administrative realities

involved in e-filing implementation, including the need to review for confidentiality, filing errors, and compliance with court rules. *See* Def. SOF ¶¶ 116-135. Mr. Girdner's statement is not based on firsthand knowledge of the operations of the Clerk Defendant offices and does not present admissible evidence of the broader claims made. *See* Def. SOF ¶¶ 1. Defendants do not dispute that: (1) An e-filed complaint is simply a .pdf document to be viewed or downloaded locally or remotely by whoever has permission; (2) Filers prepare and submit their .pdf documents, which are then received by courts into their e-filing systems; (3) Once received by the courts, the .pdf documents reside in virtual queues or in-boxes.

14. Defendants dispute that "nothing prevents a clerk from processing a complaint at the very moment member of the press or public are reading it." This statement ignores the clerk's statutory and ethical responsibility to prevent the public disclosure of confidential documents and PII that may be mistakenly included in a filing or improperly categorized. Clerk review before public access is essential to protect privacy interests and maintain compliance with North Carolina law and federal confidentiality obligations. *See* Def. SOF ¶¶ 116-124. Additionally, the assertion fails to account for hybrid filing practices in North Carolina, where pro se litigants are still permitted to file paper complaints. *See* Def. SOF ¶ 81. Paper complaints cannot be reviewed by the public simultaneously with clerk processing, and the public does not have access to them until after administrative steps are taken. Defendants further object to Mr. Girdner's assertion to the extent it purports to describe internal court procedures or responsibilities. *See* Def. SOF ¶ 1. Mr. Girdner lacks personal knowledge of the operations of the Defendant Clerks' offices and

his testimony constitutes inadmissible law opinion.

15.     Defendants dispute the implication that filers always accurately enter information into the e-filing interface such that courts can automatically sort and filter new filings into categories based on that information, including the automatic segregation of confidential filings.  *See* Def. SOF ¶¶ 17, 179. For example, in the *Courthouse News Service v. Corsones* 131 F.4th 59, 69 FN 19 (2025), the Court discussed filings that were rejected "because they contained confidential information, which suggests that reliance on filers was not [] successful . . . ." Tyler Technologies also provided the filing system in the *Corsones* case, further highlighting that automated processes are only as reliable as the human data input from filers. *See Courthouse News Serv. v. Gabel*, 2021 U.S. Dist. LEXIS 224271, at *8 (D. Vt. Nov. 19, 2021).

16.     Defendants do not dispute that some states prohibit access to complaints until after court staff complete processing. Defendants dispute that all state courts that transition to e-filing have not always considered how new rules and procedures impact the press' ability to cover courts. Mr. Girdner's testimony is inadmissible to establish the internal decision-making of state courts because he lacks personal knowledge and offers an improper lay opinion. In North Carolina, AOC specifically considered press access during eCourts transition and made choices to promote transparency and facilitate public access. *See* Def. SOF ¶¶ 171-176. Defendants further dispute the claim that "access in e-filing courts is delayed only if courts withhold new civil complaints until after court staff complete clerical processing."  For example, when a complaint is electronically filed after business hours, or on weekends or holidays, it will not be available to the public in the

clerk's office until the next business day. CNS acknowledges that they are not entitled to remote access [DE 79, p 19, n 3], and thus such delays are not attributable solely to processing workflows.

17.     Defendants do not dispute that it may be challenging for a court to consistently process 100% of complaints on the same day that they are electronically filed, especially when they are filed outside of business hours or on non-business days. Defendants dispute the claim that post-processing access policies prevent the press from learning about a substantial percentage of new civil actions until the day after filing is unsupported by admissible evidence. Evidence in the record demonstrates that the vast majority of complaints are made available to the public on Portal on the same business day they are filed. *See* Def. SOF ¶¶ 148-153. This evidence supports that Clerk Defendants are processing new filing very quickly.

18.     Defendants dispute this assertion to the extent it implies that clerk review prior to acceptance into the case management system is inconsistent with judicial norms or causes constitutionally impermissible delays. Defendants also dispute Mr. Girdner's ability to testify about the clerical review procedures of all e-filing courts nationwide. His declaration offers generalizations that lack foundation, are not based on personal knowledge, and are not supported by admissible evidence. Further, the public case locator website maintained by the Administrative Office of the U.S. Courts on behalf of the Federal Judiciary, Public Access to Court Electronic Records (PACER), explicitly states that, "Newly filed cases will typically appear on this system within 24 hours," contradicting the notion that immediate public access upon filing is universal or mandatory. *See* Def.

SOF ¶ 8.

19.     Defendants dispute that auto-accept and pre-acceptance access systems can be designed to reliably ensure both timely access and the protection of confidential documents and PII. These systems lack the safeguards necessary to comply with North Carolina's legal obligations concerning record confidentiality, recordkeeping, lien indexing, and property attachment. *See* Def. SOF ¶¶ 104-135; 194-199. Defendants further dispute the implication that the only relevant consideration in clerk-accept systems is whether new complaints are "kept secret" during processing. This characterization is vague and unsupported. Mr. Girdner fails to articulate what objective this is "key" to, and his statements are conclusory, lack foundation, and do not reflect the operational and legal complexities specific to North Carolina's courts.

20.     Disputed. While many federal courts utilize automated acceptance through CM/ECF, public access through PACER – the platform by which the press and public access those filings – is not instantaneous. The PACER website maintained by the Administrative Office of the U.S. Courts on behalf of the Federal Judiciary, explicitly states, "Newly filed cases will typically appear on this system within 24 hours," confirming that federal courts do not universally or immediately make new complaints publicly accessible upon receipt. *See* Def. SOF ¶ 8. Plaintiffs also conflates internal receipt in CM/ECF with public access via PACER.

21.     Defendants dispute this assertion to the extent that it implies that auto-accept systems implemented by other state courts are functionally or legally equivalent to

7

the requirements imposed by North Carolina law. Specifically, Defendants dispute that these systems can reliably provide public access to new e-filed complaints while simultaneously: (1) protecting confidential documents and PII; (2) ensuring accurate indexing and association with correct parties; (3) complying with North Carolina General Statutes, including those governing lien indexing, judgment enforcement, and official recordkeeping. *See* Def. SOF ¶¶ 104-135; 194-199.

22.     Disputed. The Girdner declaration and attached Exhibit 13 (another Girdner declaration) contain a mixture of factual assertions and editorial commentary. While Exhibit 13 incudes descriptions of practices in certain states, it lacks foundation to demonstrate how those systems function in practice, whether they comply with applicable confidentiality laws, or whether the information remains accurate or complete. The assertion that other courts make unaccepted complaints available to the public lacks evidentiary support showing that those systems meet North Carolina's legal and operational requirements. Moreover, CNS offers no admissible evidence showing these practices are constitutionally required, nor do they show these configurations prevent the improper public disclosure of confidential information or PII.

23.     Defendants dispute that other courts systems offering pre-processing access reliably safeguard confidential documents and PII. CNS has not provided admissible evidence that such systems can adequately prevent the disclosure of sensitive material without prior clerk review. Defendants further dispute the implication that a lawsuit loses its newsworthiness or public interest value if it is not accessible on the same day it is filed. CNS has acknowledged that it historically accessed newly filed civil complaints in North

Carolina, specifically in Wake County, on the next business day, after they had been docketed and indexed, without alleging any constitutional violation. *See* Def. SOF ¶¶ 1-7; 9-10. CNS has never previously sued a North Carolina clerk or demanded faster access prior to this litigation. This historical access model undercuts the suggestion that immediate, same-day access is constitutionally required to preserve newsworthiness.

24.     Undisputed.

25.     Defendants dispute the characterization the e-filing programs were launched only in Superior Court. On February 13, 2023, eCourts launched in the four pilot counties, introducing a comprehensive e-filing system for all divisions of the North Carolina General Courts of Justice in these counties, including Superior Court, District Court, and Superior Court matters heard by the Clerk of Superior Court (Clerk of Superior Court node). *See* Def. SOF ¶ 52; N.C.G.S. §§ 7A-4, -40, -130. CNS's assertion reflects a misunderstanding of the structure of the North Carolina court system and inaccurately narrows the scope of the eCourts launch.

26.     Defendants do not dispute that Tyler provides software products used in the North Carolina General Courts of Justice, which include District Court, Superior Court, and Clerk of Superior Court node, in those counties where eCourts has been implemented. Defendants also do not dispute that Tyler products have some ability to interface. However, Defendants dispute the assertion to the extent it implies that Tyler's role is limited to only three products – namely e-filing system (eFile), case management system (ICMS), and a public access portal (Portal). *See* Def. SOF ¶ 48. CNS's assertion

oversimplifies the scope of Tyler's contracted services and mischaracterizes the broader infrastructure of the eCourts platform.

27. Defendants do not dispute that Tyler's e-filing produce is known as "E-File and Serve" or that it is known as eFile in North Carolina. Otherwise, Defendants dispute the remainder of this statement. The eFile application is only available in counties that have transitioned to eCourts, and it is not available in all 100 counties at this time. *See* Def. SOF ¶ 52. Electronic filing also is not required in counties that have launched eCourts— pro se filers may still file in paper. *See* Def. SOF ¶ 81. Further, the eFile application is not limited to Superior Court filing. Instead, in counties that have implemented eCourts, the system supports electronic filing into the full North Carolina General Courts of Justice, which includes the District Court, Superior Court, and Clerk of Superior Court nodes. *See* Def. SOF ¶ 52; N.C.G.S. §§ 7A-4, -40, -130. CNS's assertion inaccurately narrows both the availability and functional scope of the eFile North Carolina system.

28. Undisputed.

29. Defendants dispute this assertion as it inaccurately suggests that the Enterprise Justice Integrated Case Management System (ICMS) is provided only to the North Carolina Superior Courts. Tyler's case management tool is used in counties that have implemented eCourts to manage filings across the entire North Carolina's General Courts of Justice, which includes the District Court, Superior Court, and Clerk of Superior Court node. *See* Def. SOF ¶ 52; N.C.G.S. §§ 7A-4, -40, -130. CNS's assertion omits this broader context and mischaracterizes the system's implementation scope.

30.     Undisputed.

31.     Disputed.  Tyler provides a Portal application that is used to provide the public with access to filings made in the North Carolina's General Courts of Justice, which includes the District Court, Superior Court, and Clerk of Superior Court nodes. *See* Def. SOF ¶¶ 48(b), 52, 106; N.C.G.S. §§ 7A-4, -40, -130. CNS's characterization is overly narrow and fails to reflect the full scope of Portal's functionality and deployment.

32.     Disputed.  In North Carolina, the Portal application interfaces with the ICMS and will display to the public the docket and non-confidential filings for each case in eCourts counties filed into the North Carolina General Courts of Justice, which includes Superior Court, District Court, and Clerk of Superior Court node. *See* Def. SOF ¶¶ 52, 106-07; N.C.G.S. §§ 7A-4, -40, -130. The Portal does not display confidential case types or documents. *See* Def. SOF ¶ 85.

33.     Undisputed.

34.     Undisputed.

35.     Undisputed.

36.     Undisputed.

37.     Disputed.  First, the auto-redact feature has been known to malfunction *See* Def. SOF ¶ 119. In addition, Defendants dispute that the auto-redact feature operates as simply as "a click of a button," as this oversimplifies the process and overstates its

11

reliability.

38.     Disputed. The auto-redact feature has been known to malfunction and not in fact redact items selected by the user. *See* Def. SOF ¶ 119.

39.     Undisputed.

40.     Undisputed.

41.     Disputed.  The notice, provided in ¶ 42, explains that PII may be included in a filing if required by law or court order.  There are laws that require PII to be in filings, and the filer's acknowledgment reflects this. *See* Def. SOF ¶¶ 116-118. The acknowledgment does not impose an unconditional duty to redact in all cases.

42.     Undisputed.

43.     Undisputed.

44.     Defendants do not dispute that "Some defects in an e-filing, such as insufficient funds to cover the filing fee, will cause the filing to be immediately and automatically rejected, without ever reaching court clerks" or that "once the filer hits the "submit" button, the filing is transmitted to the E-Filing Manager ("EFM"), where it is stored." Otherwise, Defendants dispute this statement. Defendants are aware that filings in the EFM are not immediately available to the Clerk for review in the Clerk Review Tool. *See* Def. SOF ¶ 147(a).

45.     Disputed. Defendants are aware that filings in the EFM are not

immediately available to the Clerk for review in the Clerk Review Tool and are therefore not in the possession of the court. *See* Def. SOF ¶ 147(a).

46. Undisputed

47. Defendants do not dispute that clerks access e-filed documents from the EFM and perform ministerial review through the Clerk Review Tool. Otherwise, Defendants dispute this statement. Defendants dispute the characterization that Clerks, including their assistant and deputy clerks, solely access e-filed document from the EFM "when they choose to work the filings." Clerks, assistant clerks, and deputy clerks, process filings in accordance with office policies and procedures, and under record-keeping rules issued by AOC. *See* Def. SOF ¶¶ 32, 85-92. CNS has not submitted admissible evidence that clerks operate on an entirely discretionary or ad hoc basis.

48. Disputed in part. The cited testimony of former Wake County Clerk Blair Williams does not establish a comprehensive or exclusive list of review steps for newly filed complaints. The discussion regarding whether the defendants resides in the county was given as an example relating to incorrect case node/case category/case type – not as a stand-alone criterion. Mr. Williams was not asked to confirm that the list provided reflects the full scope of his officer's review process, nor was the questioning exhaustive. Additionally, this assertion omits testimony from the other two Clerk Defendants, who are independently elected constitutional officers with discretion to establish their own office policies and review procedures. N.C. Const. art. 4 § 9(3). Clerk Williams' testimony cannot be imputed to the practices of the other Clerk Defendants.

49.     Disputed in part. Defendants do not dispute that a false lien filed against a public official may be permanently rejected, and that a filing submitted in violation of a gatekeeper order may also be permanently rejected. These are distinct categories of filings governed by different legal authorities. *See e.g.* N.C.G.S. § 14-118.6(b1); *Est. of Louis Dalenko v. Monroe*, 2009 N.C. App. LEXIS 807, at *6-7 (2009) (unpublished). Otherwise, Defendants dispute the assertion that filings are returned for correction (or rejected) for any reason. Under Rule 5 of the North Carolina General Rules of Practice, filings may be rejected only for a limited set of specific deficiencies identified in the Rule. *See* Def. SOF ¶¶ 177, 197. CNS has not submitted admissible evidence that clerks reject filings outside the bounds of those enumerated criteria.

50.     Defendants do not dispute that "if there are no issues, the clerk 'accepts' the submission." Otherwise, Defendants dispute this statement. Defendants dispute the implication that a filer may simply correct a defective filing within the same submission, as opposed to submitting a new filing; instead, the evidence is that Clerks—not filers—can correct or reject. *See* Def. SOF ¶¶ 93-103.

51.     Undisputed.

52.     Undisputed.

53.     Defendants dispute that there is a statewide policy or uniform practice in North Carolina that restricts public or press access to new e-filed complaints until after clerk acceptance. Individual clerks, who are independently elected constitutional officers, N.C. Const. art. 4 § 9(3), set policies for their own offices. *See* Def. SOF ¶¶ 32, 85-92. CNS's

assertion inaccurately suggests a collective or uniform policy based upon the deposition testimony of one clerk, former Wake County Clerk Williams. Clerk Defendant Whittenton and Clerk Defendant Ball have posted public notices in their offices advising that members of the public may request access to filing that are not yet processed or available in the Portal. *See* Def. SOF ¶¶ 134-135 and Ex. 6-A, 6-B (Exhibits to Declaration of Renee Whittenton), and Ex. 7-A (Exhibits to Declaration of Michelle Ball).

54.     Disputed. The access rates presented in the Angione declaration do not provide an accurate measure of whether the Clerk Defendants provided timely access consistent with the First Amendment. *See* Def. SOF ¶¶ 153-155, summarized here. Mr. Angione's methodology fails to account for business hours on court business days, and excludes civil complaints filed in District Court and in the Clerk of Superior Court node, both of which are part of the North Carolina General Courts of Justice. Further, Mr. Angione's description of the method used to compile these access rates is inconsistent with the spreadsheets that CNS produced in discovery, casting doubt on the accuracy and reliability of the data. CNS has not laid a sufficient foundation to show that his analysis is based on complete or properly interpreted data.

55.     Disputed. The access rates presented in the Angione declaration do not provide an accurate measure of whether the Clerk Defendants provided timely access consistent with the First Amendment. *See* Def. SOF ¶¶ 153-155, summarized here. Mr. Angione's methodology fails to account for business hours on court business days, and excludes civil complaints filed in District Court and in the Clerk of Superior Court node, both of which are part of the North Carolina General Courts of Justice. Further, Mr.

Angione's description of the method used to compile these access rates is inconsistent with the spreadsheets that CNS produced in discovery, casting doubt on the accuracy and reliability of the data. CNS has not laid a sufficient foundation to show that his analysis is based on complete or properly interpreted data.

56.     Disputed.  The access rates presented in the Angione declaration do not provide an accurate measure of whether the Clerk Defendants provided timely access consistent with the First Amendment. *See* Def. SOF ¶¶ 153-155, summarized here. Mr. Angione's methodology fails to account for business hours on court business days, and excludes civil complaints filed in District Court and in the Clerk of Superior Court node, both of which are part of the North Carolina General Courts of Justice. Further, Mr. Angione's description of the method used to compile these access rates is inconsistent with the spreadsheets that CNS produced in discovery, casting doubt on the accuracy and reliability of the data. CNS has not laid a sufficient foundation to show that his analysis is based on complete or properly interpreted data.

57.     Disputed. While these may be examples of complaints not accessible on the calendar day of filing, they do not demonstrate any constitutional violation under the standard of contemporaneous access set out in *Schaefer*. CNS disregards relevant context, such as weekends, after-hours submissions, and non-court business days, and instead relies on a rigid calendar-day metric that is inconsistent with *Schaefer's* practicability-based framework. *See* Def. SOF ¶¶ 153-155.

a.  Disputed in part. Defendants dispute the implication that this complaint

was not made available on the same business day it was filed. *See* Def. SOF ¶ 157(a), summarized here. The complaint in 24CV039723-910 was submitted through eFile after business hours at 5:09 PM on Thursday, December 12, 2024.   It was made available to the public on Portal at 8:42 AM on Friday, December 13, 2024, which was the next calendar day, but the same business day the filing became available for clerk review.

b. Disputed in part. Defendants dispute the implication that this complaint was not made available on the same business day it was filed. *See* Def. SOF ¶ 157(b). The complaint in 23CV008736-910 was submitted through eFile after business hours at 5:17 PM on Friday, April 14, 2023.  It was made available to the public on Portal at 11:06 AM on Monday, April 17, 2023, which was three calendar days, but the same business day the filing was available for clerk review.

c. Disputed in part.  First, this case is in Mecklenburg County and the Clerk of Superior Court for Mecklenburg County is not a party to this case.  This SOF concerns non-party conduct and should be stricken and disregarded on that basis. Should the Court nevertheless consider this assertion, Defendants dispute it. *See* Def. SOF ¶ 157(c). The complaint in 24CV050336-590 was submitted through eFile at 4:52 PM on October 28, 2024, near the close of business. Due to interface delays between the EFM and the Clerk Review Tool, Defendants cannot confirm that the filing appeared in the Clerk Review Tool before the end of business hours that

day. The complaint was made available to the public on Portal at 9:44 AM on October 29, 2024, which was either the same business day it was available for clerk review, or, at most, the next business day, depending on when it became visible in the Clerk Review Tool following submission.

d. Disputed in part. *See* Def. SOF ¶ 157(d). The complaint in 24CV039915-910 was submitted through eFile at 2:04 PM on a Sunday, December 15, 2024, when the court was closed for business. It was made available to the public on Portal at 8:46 AM on Monday, December 16, 2024, which was one calendar day, but the same business day it was first available for clerk review during business hours.

e. Disputed in part. *See* Def. SOF ¶ 157(e). The complaint in 23CV006379-910 was submitted through eFile at 4:42 PM on March 20, 2023. Due to interface delays between the EFM and the Clerk Review Tool, Defendants cannot confirm that the filing appeared in the Clerk Review Tool before the end of business hours that day. The complaint was made available to the public on Portal at 11:31 AM on March 21, 2023, which was either the same business day it was available for clerk review, or, at most, the next business day, depending on when it became visible in the Clerk Review Tool following submission.

f. Disputed in part. *See* Def. SOF ¶ 157(f). The complaint in 23CV005042-910 was submitted through eFile at 12:25 PM on March 7, 2023, and made

available to the public on Portal at 8:22 AM on March 8, 2023. Defendants dispute the implication that this represents an unreasonable delay. The complaint became publicly available approximately five business hours after it was submitted, as the Clerk's office closes at 5:00 PM and opens (for staff) at 8:00 AM.

g.  Disputed in part. *See* Def. SOF ¶ 157(g). The complaint in 23CV010964-910 was submitted through eFile at 2:54 PM on Friday May 5, 2023, and made available to the public on Portal at 9:11 AM on Monday May 8, 2023. Defendants dispute the implication that this represents an unreasonable delay. The complaint became publicly available 3 hours and 28 minutes of business hours after submission, as the Clerk's office closes at 5:00 PM on Friday and reopens (for staff) at 8:00 AM on Monday.

58.  CNS's claim that it attempted "numerous times to prevent the delays that ensued by encouraging the NCAOC to adopt a press review queue upon learning of its contract with Tyler" is not supported by the record. CNS identifies only two letters from 2019 to support this assertion and Defendants do not dispute these letters. [DE 80-5, pp 75-81] However, these two contacts do not reasonably support the assertion that CNS made contact "numerous" times. In addition, Defendants dispute the implication that there are unconstitutional delays in the current system for providing public access to civil complaints.

59.  Disputed in part. While AOC does not contest that it did not provide a

specific written response to CNS's request to adopt the Press Review Queue, the record reflects communication did occur between CNS's attorney and AOC. It is reasonable to infer from the September 26, 2019 letter – where CNS's attorney states he attended an August 20, 2019 meeting of the eCourts Advisory Committee to view "detailed presentations by the AOC staff" and a Tyler representative – that there was some type of engagement on the issue. [DE 80-5, p 79] The next communication in the record from CNS to AOC were the April 6 and 7, 2023 demand letters sent by CNS to each of the Defendants, requesting confirmation within 30 days whether each will provide public access to newly filed civil complaints immediately upon receipt. [DE 80-5, pp 82-94] The record evidence shows that AOC General Counsel Andrew Brown promptly and thoughtfully responded to the demand letters on April 28, 2023. [DE 80-5, pp 95-96] *See* Def. SOF ¶ 212.

60.      Disputed to the extent CNS's assertion oversimplifies the extensive and deliberate evaluation process undertaken by AOC beginning in 2019 through research, vendor demos, and consultation with the eCourts advisory committee. After considering public access, confidentiality, and clerk responsibilities, AOC decided in 2020 to proceed with Clerk Review and Portal. Continued evaluation in 2021 confirmed this decision. *See* Def. SOF ¶¶ 171-176.

61.      Disputed.  CNS did not request contemporaneous access as described in the *Schaefer* case; rather CNS only sought instantaneous, pre-processing access to newly filed civil complaints. [DE 80-5, pp 75-81, 82-94] Defendants further dispute that no improvements in access occurred prior to the filing of this lawsuit. *See* Def. SOF ¶¶ 148-

152, summarized here. From the time of Go-Live (February 13, 2023), the Clerk Defendants continuously and progressively reduced the time between e-file submission and public access on Portal. This trend of improvement began before the lawsuit was filed and continued thereafter, as each Clerk Defendants' office became more familiar with the new system. Access times stabilized at rates exceeding 90% same business day access.

62.     Disputed. The access rates presented in the Angione declaration do not provide an accurate measure of whether the Clerk Defendants provided timely access consistent with the First Amendment. *See* Def. SOF ¶¶ 153-155, summarized here. Mr. Angione's methodology fails to account for business hours on court days, and excludes civil complaints filed in District Court and in the Clerk of Superior Court node, both of which are part of the North Carolina General Courts of Justice. Further, Mr. Angione's description of the method used to compile these access rates is inconsistent with the spreadsheets that CNS produced in discovery, casting doubt on the accuracy and reliability of the data. CNS has not laid a sufficient foundation to show that his analysis is based on complete or properly interpreted data. Additionally, Defendants dispute the implication that improvements in processing rates were a reaction to this lawsuit. *See* Def. SOF ¶¶ 148-152, summarized here. From the time of Go-Live (February 13, 2023), the Clerk Defendants continuously and progressively reduced decreased the time between e-file submission and public access on Portal. This trend of improvement began before the lawsuit was filed and continued thereafter, as each Clerk Defendants' office became more familiar with the new system. Access times stabilized at rates exceeding 90% same business day access.

63.     First, Defendants dispute the relevance of this assertion because the Clerk of Superior Court for Mecklenburg County is not a party to this case. Because this statement describes conduct by a non-party, it should be stricken or disregarded. Should the Court nevertheless consider this statement, Defendants dispute it in part. Defendants do not dispute that Mecklenburg County was the first county to transition to e-filing after this lawsuit was filed, in October 2023. However, Defendants dispute that the rates presented in the Angione declaration are appropriate for evaluating whether Clerk Defendants provided access consistent with the First Amendment. *See* Def. SOF ¶¶ 153-155, summarized here. Mr. Angione's methodology fails to account for business hours on court days, and excludes civil complaints filed in District Court and in the Clerk of Superior Court node, both of which are part of the North Carolina General Courts of Justice. Further, Mr. Angione's description of the method used to compile these access rates is inconsistent with the spreadsheets that CNS produced in discovery, casting doubt on the accuracy and reliability of the data. CNS has not laid a sufficient foundation to show that his analysis is based on complete or properly interpreted data. Finally, the suggestion that 90% same-day access was achievable on day one disregards the fact that Mecklenburg County was not a pilot county, and therefore benefited from the lessons learned, training improvements, and technical refinements that occurred during the initial rollout in the pilot counties. It also fails to account for the known differences in resources available to individual clerk's offices and differences in local practices that impact operations. *See* Def. SOF ¶¶ 202-203, and Exhibit 3 (Mehta Decl.) ¶¶ 21-23.

64.     First, Defendants object to the inclusion of data from Mecklenburg County

because the Clerk of Superior Court for Mecklenburg County is not a party to this case. Because this statement describes conduct by a non-party, it should be stricken or disregarded. Should the Court nevertheless consider this statement, Defendants dispute it. Defendants dispute that the rates presented in the Angione declaration are appropriate for evaluating whether Clerk Defendants provided access consistent with the First Amendment. *See* Def. SOF ¶¶ 153-155, summarized here. Mr. Angione's methodology fails to account for business hours on court days, and excludes civil complaints filed in District Court and in the Clerk of Superior Court node, both of which are part of the North Carolina General Courts of Justice. Further, Mr. Angione's description of the method used to compile these access rates is inconsistent with the spreadsheets that CNS produced in discovery, casting doubt on the accuracy and reliability of the data. CNS has not laid a sufficient foundation to show that his analysis is based on complete or properly interpreted data. From the time of Go-Live (February 13, 2023), the Clerk Defendants continuously and progressively reduced decreased the time between e-file submission and public access on Portal. *See* Def. SOF ¶¶ 148-152, summarized here. This trend of improvement began before the lawsuit was filed and continued thereafter, as each Clerk Defendants' office became more familiar with the new system. Access times stabilized at rates exceeding 90% same business day access. Further, Defendants dispute that a 90% same-day processing rate constitutes a constitutional benchmark or meaningful legal threshold. The First Amendment standard, as articulated by *Schaefer*, requires access be as expeditiously as practicable, not according to an arbitrary numerical target. CNS has provided no admissible evidence or authority establishing 90% same-day-access as the required metric.

65.     Undisputed. *See* also Def. SOF ¶¶ 38-42 for additional details on this amendment process.

66.     Defendants do not dispute the accuracy of the quoted text of Ms. Lusic's statement. However, Defendants dispute the characterization that they have advanced the argument in this litigation that the qualified First Amendment right of access does not attach until a complaint is accepted for filing by a clerk. CNS cites no evidence that Defendants have ever argued this position to the Court.

67.     Undisputed.

68.     Defendants do not dispute the accuracy of the quoted text of Mr. Brown's statement.

69.     Defendants do not dispute the accuracy of the quoted text of Ms. Lusic's statement.

70.     Undisputed.

71.     Disputed. The standard set out in eRRK 1.5, adopted on October 2, 2024, did not create a new legal or procedural standard for clerks regarding the processing of new complaints. *See* Def. SOF ¶¶ 89-92, summarized here. Rather the rule codified existing constitutional principles and provides guidance to clerks on how to implement those principals. It does not impose any new mandatory duties or alter the framework governing access to filed complaints.

72.     Defendants do not dispute the text of the rule quoted here, nor do they dispute that under eRRK 1.5 if a clerk's office did not reach a 90% or greater same-day acceptance rates, as calculated by AOC, for three consecutive months, then AOC would provide that clerk's office with a computer terminal equipped with the functionality to display non-confidential complaints in civil matters prior to clerk review. Otherwise, Defendants dispute this statement. Defendants dispute the characterization of the 90% rate as a binding standard. The 90% same-day acceptance rate functioned as an aspirational goal and a triggering threshold for operational support – not as a mandatory legal or constitutional standard. [DE 80-21, pp 15-16] CNS's assertion misstates the nature of the rule by suggesting that it imposed a performance requirement rather than identifying a benchmark for potential resource allocation.

73.     Undisputed.

74.     Defendants do not dispute that "[t]he pre-acceptance review terminal would provide the public with access to non-processed, non-confidential complaints" which would potentially "include access to information listed within Rule 1.8 of the eRRK." Otherwise, Defendants dispute this statement. Defendants dispute that eRRK 1.8 alone governs what PII clerks must review and redact. As set forth in Plaintiff's SOF ¶ 75, eRRK 1.8 outlines state and federal law requirements for redacting certain PII prior to public disclosure, but it does not limit clerks to redacting that information only. Each independently elected Clerk of Superior Court has the authority to implement office-specific policies requiring redaction of additional PII, as authorized under N.C.G.S. 132-1.10(f1). Clerk Defendants do require that their staff redact additional PII and AOC is

aware that clerks across the state have similar policies. *See* Def. SOF ¶ 98.

75.     Undisputed.

76.     Undisputed.

77.     Disputed. *See* Plaintiff's SOF ¶ 78, listing other filings that implicate VAWA protections.

78.     Undisputed.

79.     Undisputed.

80.     Undisputed.

81.     Disputed.  While CNS may not specifically target cases involving VAWA, it has admitted that it is interested in civil cases involving celebrities or high-profile individuals, which could include cases with sensitive or private allegations. [DE 1 ¶ 35; DE 80-5 ¶ 18] For example, CNS testified that it would "certainly report" on a case if Elon Musk were sued, underscoring their focus on high-profile litigants regardless of the underlying claims. *See* Def. SOF ¶ 19, and Exhibit 12 at p. 50. The types of cases CNS seeks may therefore include matters implicating privacy protections under VAWA.

82.     Undisputed.

83.     Undisputed.

84.     Defendants dispute the characterization that the October 2024 revision to

eRRK 1.1 created new authority or eliminated a previously binding limitation. The Director has always had statutory authority to unilaterally revise the eRRK. The October 2024 amendment to eRRK 1.1 merely clarifies this preexisting authority within the eRules of Recordkeeping and does not reflect a substantive change in the scope of the Director's authority.  *See* Def. SOF ¶ 39.

85.     Disputed in part.  CNS's assertion does not fully or accurately describe how AOC calculates same-day acceptance rates under the eRules of Recordkeeping. AOC's methodology is fully set out in Def. SOF ¶ 136-147.

86.     Defendants do not dispute that individuals may electronically file documents 24 hours a day, seven days a week, and that AOC calculates "same-day" acceptance based on court "business" days and business hours, consistent with the framework articulated in *Schaefer*. However, Defendants dispute the implication that filings are never processed outside of business hours. The Clerk Defendants have testified that if they or their staff are working after business hours, for example after court recesses late, they may access the queue and process filing during that time. *See* Def. SOF ¶ 88.

87.     First, Defendants object to the inclusion of data from Beaufort County because the Clerk of Superior Court for Beaufort County is not a party to this case.  Because this statement describes conduct by a non-party, it should be stricken or disregarded. Should the Court consider this statement, Defendants do not dispute that Beaufort County Clerk of Superior Court's same business day acceptance rate as calculated by AOC for initial filings made in district and superior court was 81.78% in August 2024 and 85.32%

in September 2024. Defendants dispute that there is any legal requirement to process all newly filed civil matters at a 90% same-business-day rate. Rather, Defendants maintain that what constitutes constitutionally acceptable processing depends on what is practicable in each clerk's office, based on local staffing, workload, and operational considerations, which necessarily vary from office to office. CNS presents no admissible evidence demonstrating that "many North Carolina Superior Courts are not consistently processing at 90%."

88.     First, Defendants object to the inclusion of data from Durham County because the Clerk of Superior Court for Durham County is not a party to this case. Because this statement describes conduct by a non-party, it should be stricken or disregarded. Should the Court consider this statement, Defendants do not dispute that Durham County Clerk of Superior Court's same business day acceptance rate as calculated by AOC for initial filings made in district and superior court was 60.42% in August 2024 and 61.84% in July 2024. Otherwise disputed. Defendants dispute that there is a legal requirement to process all newly filed civil matters at a rate of 90% same business. Rather, Defendants maintain that legally acceptable same business day processing rates will depend on what is practicable in each Clerk's office, which will vary from office to office. Further, the Durham County Clerk of Superior Court's office went live on eCourts on April 29, 2024. *See* Def. SOF ¶ 166. Finally, even if the Court were to consider these acceptance rates, they occurred within the first six-months of implementing eCourts. The Durham County Clerk of Superior Court's office same business day acceptance rates have been above 90% since October 2024. *See* Def. SOF ¶ 167.

89.     Defendants object to the inclusion of information concerning Mecklenburg County because the Clerk of Superior Court for Mecklenburg County is not a party to this case. Because this statement describes conduct by a non-party, it should be stricken or disregarded as irrelevant to the claims against the named Clerk Defendants. Should the Court consider the statement, Defendants do not dispute the factual content regarding use of temporary staff and concerns expressed by the Mecklenburg Clerk.

90.     Defendants object to the inclusion of data concerning Mecklenburg County because the Clerk of Superior Court for Mecklenburg County is not a party to this case. Because this statement describes conduct by a non-party, it should be stricken or disregarded as irrelevant to the claims against the named Clerk Defendants. Should the Court consider this SOF, Defendants dispute it in part. Defendants do not materially dispute the acceptance rates presented, though they note that Plaintiff is only presenting civil acceptance rates, not special proceedings that are civil in nature and also made slight errors in the numbers. Otherwise disputed. The same business day acceptance rates that AOC calculated for Mecklenburg in January 2025 did not account for known snows days when the court was closed for business. *See* Def. SOF ¶ 170. Mecklenburg rates have returned to pre-October 2024 levels and were are follows: March 2025=98.10%, April 2025=98.78%, and May 2025=98.22%. *See* Def. SOF ¶ 169.

91.     Undisputed. *See also* Def. SOF ¶¶ 180-193 for further details, summarized here. In early January 2025, AOC reviewed Mecklenburg County's eFile data and calculated its December 2024 same-business-day acceptance rates. Based on that rate Mecklenburg qualified for a pre-acceptance terminal under eRRK 1.5. However, when

AOC started to implement the terminal, it determined that the terminal could not be configured as anticipated to adequately protect PII and confidential documents. As a result, the Director of AOC amended eRRK 1.5 in April to eliminate the terminal provision and ensure continued protection of sensitive information.

92.     Undisputed. *See also* Def. SOF ¶¶ 180-193 for further details, summarized here. In early 2025 when AOC started to implement the terminal in Mecklenburg, it determined that the terminal could not be configured as anticipated to adequately protect PII and confidential documents.  As a result, the Director of AOC amended eRRK 1.5 in April to eliminate the terminal provision and ensure continued protection of sensitive information.

93.     Disputed.  eRRK 1.5 now states in relevant part:

> "Absent extenuating circumstances and insofar as is practicable, clerks should accept electronically-filed initiating documents for civil matters, foreclosures, guardianships, incompetency proceedings, and non-confidential name changes into the ICMS on the same business day, meaning that such documents filed before 5:00 PM on a day that the clerk's office is open to receive filings are accepted into the ICMS by 11:59pm on the same calendar day ("same day acceptance"), and when not practicable, on the next court date. FN5  NCAOC will provide the clerks with same day acceptance and next court date acceptance rates for all non-confidential, initiating documents in civil matters, foreclosures, guardianships, incompetency proceedings, and non-confidential names changes.

> FN 5 *See Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021), *affirming Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532 (E.D. Va. 2020)."

94.     Defendants dispute the implication that the 90% same business day acceptance rate was ever a binding requirement under eRRK 1.5. It has always been framed as an aspirational goal, not a mandatory standard. [DE 80-21, pp 15-16] AOC

recognized that whether a Clerk's office could meet that rate would depend on available staffing, resources, workload, and the operational realities unique to each office. *See* Def. SOF ¶¶ 202-209.

95.     Undisputed. AOC has never claimed that is has authority to enforce the eRRK. *See* Def. SOF ¶ 37.

96.     Defendants dispute both the characterization of eRRK 1.5 and the suggestion that the NCAOC Director acts arbitrarily. eRRK 1.5 continues to reflect the legal standard set forth in *Schaffer*, just as it did when originally adopted. Defendants further dispute that the Director makes changes to the eRRK "on a whim;" any amendments are made in accordance with the Director's statutory authority and are driven by operational, legal, or policy considerations. The Director has no intention of removing Rule 1.5's reference to the Fourth Circuit's legal standard for making newly filed civil complaints available to the public. *See* Def. SOF ¶ 192.

97.      Defendants dispute the implication that a rule change is likely or imminent. Director Boyce has testified that he has no intent to amend Rule 1.5, and that AOC does not revise the eRRK to eliminate legal standards absent a change in the underlying law. *See* Def. SOF ¶ 192. CNS offer no admissible evidence that any such change is planned or reasonably anticipated.

98.     Disputed. The testimony cited by CNS refers to whether there were changes were made in response to the October 2024 and April 2025 amendments to eRRK 1.5, not whether any changes occurred since the lawsuit was filed in May 2023. CNS

mischaracterizes the testimony, which addresses a narrower timeframe and does not support the broader claim that no changes in personnel, hours, or processing occurred over the full course of the litigation.

99. Defendants dispute that auto-acceptance is a viable option for North Carolina's General Courts of Justice, even if technically available in Tyler's software. While Tyler's products include functionality that allows for auto-acceptance from eFile into the ICMS, that feature does not fit the business needs of the North Carolina court system or the Clerk Defendants. *See* Def. SOF ¶¶ 194-199.

100. Undisputed.

101. Disputed. Since filers often select the wrong case node, case category, case type, and filing type information, Defendants dispute that Tyler's auto-accept allows clerks to accurately select filings for auto-acceptance since the filters are based on the filer's selections. *See* Def. SOF ¶ 17.

102. Disputed. Since filers often select the wrong case node, case category, case type, and filing type information, Defendants dispute that Tyler's auto-accept allows clerks to accurately select filings for auto-acceptance since the filters are based on the filer's selections. *See* Def. SOF ¶¶ 17, 179.Further, eRRK Rule 3.2 specifically recognizes that filers incorrectly file liens through eFile (OFS), specifically *lis pendens,* which would limit the ability to filter these filings out through auto-acceptance settings. *See* Defendants' SOF ¶ 131.

103.     Disputed.  Since filers often select the wrong case node, case category, case type, and filing type information, Defendants dispute that Tyler's auto-accept allows clerks to accurately select filings for auto-acceptance since the filters are based on the filer's selections. *See* Def. SOF ¶¶ 17, 179.

104.     Defendants dispute that changing a case or document's confidentiality designation after acceptance into the ICMS would prevent public disclosure on Portal. *See* Def. SOF ¶ 104, summarized here. Once a filing is accepted into the ICMS, it is immediately published to the public-facing Portal unless the filer correctly designates the case or document as confidential during submission. Retroactive corrections to confidentiality settings do not prevent the initial public disclosure of confidential materials. *See* Def. SOF ¶ 104.

105.     Undisputed.

106.     Undisputed.

107.     Defendants do not dispute that use of the Press Review Queue application would preserve the clerks' ability to manually process filings and that it can be configured to notify users that a document has not yet been formally accepted. Otherwise disputed. Given the frequency with which filers select incorrect case nodes, case categories, case types, and filing type information – all errors that directly affect case security. Defendants dispute that Tyler's Press Review Queue configuration could reliably or accurately identify and limit public access to only non-confidential documents.  *See* Def. SOF ¶¶ 17, 179.

108.    Defendants dispute that a press review tool configured to allow pre-acceptance access to newly filed civil complaints can be made available over the internet in a manner that reliably protects confidential filings and personal identifying information. *See* Def. SOF ¶¶ 17, 179, 189-190. Further, Defendants dispute that making such a tool available at a designated terminal at a physical location is operationally feasible. *Id.*

109.    Undisputed.

110.    Undisputed. AOC evaluated the potential to develop application tool similar to Press Review Queue using available APIs. *See* Def. SOF ¶ 193 summarized here. However, AOC determined it could not develop such a tool at this time due to the agency's current lack of in-house expertise and because a previously developed API had negatively interfered with the functionality of the eCourts system. As a result, AOC concluded that further API development posed an unacceptable risk to system stability.

111.    Defendants dispute the characterization of their rationale for processing documents prior to public access. Protecting personally identifying information and confidential case information is the primary reason for delaying access until after clerk review. *See* Def. SOF ¶¶ 104-124. Defendants further dispute the assertion that their position is based on a mistaken belief. A document that is submitted but not yet accepted is a public record; however, it does not become a court record until the filing is accepted and a case is created in the case management system. *See e.g.* N.C.G.S. § 132-1; 7A-109(a). If the document is rejected, no case is created. This distinction is consistent with the structure of North Carolina's eCourts system and relevant state law. Defendants do not

34

dispute that Court have recognized that a qualified First Amendment right of access attaches to complaints upon submission by the filer, and is not dependent on whether that document ultimately constitutes a court record.

112.    Defendants dispute the characterization of the reasons for returning new complaints as "overwhelmingly minor." *See* Def. SOF ¶ 107-113 summarized here. Errors such as the selection of an incorrect filing code, case node, case category, or case type are not minor clerical issues; they can directly impact the confidentiality designation of a case or document. Mislabeling may result in a confidential matter being made publicly available, or in a public matter being incorrectly restricted.

113.    Defendants dispute the characterization that the reasons for rejection were "overwhelmingly minor clerical issues." *See* Def. SOF ¶ 107-113, summarized here. Errors such as the selection of an incorrect filing code, case node, case category, or case type are not minor clerical issues; they can directly impact the confidentiality designation of a case or document. Mislabeling may result in a confidential matter being made publicly available, or in a public matter being incorrectly restricted. Additionally, the Tyler-generated data cited by CNS does not establish that the 16 rejections issued without comment involved only minor issues. The absence of written comments does not confirm the absence of significant grounds for rejection.

114.    Undisputed.

115.    Undisputed.

116.     Defendants dispute the characterization that the need to prevent the disclosure of PII is merely a "supposed" justification for post-processing access. The protection of PII is a central and legitimate concern. *See* Def. SOF ¶¶ 104-124. When the AOC evaluated Tyler's available configurations, it specifically considered and rejected auto-acceptance and the Press Review Queue options due to risk of exposing unredacted PII to the public. *See* Def. SOF ¶ 175. Each Defendant Clerk has testified their concerns about their office's responsibility and intent to ensure that PII is properly redacted before making records publicly available through Portal. *See* Def. SOF ¶ 196.

117.     Disputed. The cited paragraph from the Girdner declaration does not support the broad assertion that CNS does not seek access to case categories that are confidential by rule or statute or that are likely to include PII. The Girdner declaration contains a broad catch-all that CNS covers "any other civil action likely to be of interest to CNS' subscribers." [DE 80-5 ¶ 18] For example, CNS testified it would report on a case if it involved Elon Musk. Def. SOF ¶19 and Exhibit 12 at p.50. In addition, CNS's verified complaint does not state that CNS avoids all family matters, name changes, probate filings, foreclosures or collections actions – it states that CNS "does not generally cover" such cases "unless the individual is well known or otherwise notable." [DE 1, ¶ 35] This qualification indicates CNS may in fact seek access to those case types under certain circumstances, particularly if a party is a celebrity or public figure. Moreover, the verified complaint and Girdner's declaration only reference "most" foreclosures and collection actions, not all. [Id.; DE 80-5 ¶ 18] CNS also testified that it seeks access to any case involving businesses, public entities, and individuals sued in their professional capacities –

including doctors, lawyers, dentists, accountants, and other professionals – as well as cases involving government entities and celebrities. *See* Def. SOF ¶ 19. Moreover, CNS appears to misunderstand the scope of "special proceedings" in North Carolina. While some special proceedings are confidential, many are not – such as real property disputes, estate matters, foreclosures, and certain name changes. CNS's blanket statement therefore mischaracterizes scope of special proceedings and the extent of its own reporting practices.

118.    Disputed. While Tyler's system is designed to automatically secure certain filings from public view when (1) the document is confidential by rule or statute, (2) the case type is confidential by rule or statute, or (3) the filer affirmatively designates the document as confidential, Defendants dispute that these safeguards function without any risk of error. The confidentiality status of a document on Portal is determined based on data entered by the filer, including the selected case node, case category, case type, and document type. *See* Def. SOF ¶¶ 17, 179. If the filer selects incorrect values – which occurs frequently – then even documents that should be confidential may be publicly displayed. *See* Def. SOF ¶ 111.

119.    Disputed. While Tyler's system is designed to automatically secure certain filings from public view when (1) the document is confidential by rule or statute, (2) the case type is confidential by rule or statute, or (3) the filer affirmatively designates the document as confidential, Defendants dispute that these safeguards function without any risk of error. The confidentiality status of a document on Portal is determined based on metadata entered by the filer, including the selected case node, case category, case type, and document type. *See* Def. SOF ¶¶ 17, 179. If the filer selects incorrect values – which

occurs frequently – then even documents that should be confidential may be publicly displayed. *See* Def. SOF ¶ 111.

120.     Disputed. While N.C.G.S § 132-1.10(d) places the burden to redact certain PII on the filer, this obligation applies only where the PII is not required by law or court order. Some PII must be included in filings under applicable legal requirements, and filers are not responsible for redacting that information. Def. SOF at ¶¶ 116-118. Clerks are not obligated under § 132-1.10(d) to redact the PII; however, each Clerk Defendant has testified that they feel a duty to protect the public from inadvertent disclosure of PII. Def. SOF ¶¶ 98-100, and Exhibit 1 (Croom Decl.) ¶ 3, Exhibit 7 (Ball Decl.) ¶¶ 64-65, and Exhibit 6 (Whittenton Decl.) ¶¶ 52-53. In addition, certain federal laws impose redaction requirements before records can be made publicly available. *See* Def. SOF ¶ 34, 96, 116.

121.     Disputed in part. Defendants do not dispute that the Clerk Defendant post notices regarding filer obligations to redact PII, as required by N.C.G.S. § 132-1.10(h). However, Defendants dispute CNS's characterization of the nature and scope of those obligations in Plaintiff's SOF ¶ 120.

122.     Disputed in part. First, Defendants dispute the assertion that there is "no statutory or other legal mandate that they perform redactions before making filings available to the public." As acknowledged in this paragraph, eRRK 1.8 requires clerks to redact PII when mandated by state or federal law before providing a copy to the public. *See* Def. SOF ¶ 96. Defendants further dispute the characterization that AOC's position is disingenuous. The pre-acceptance terminals contemplated under the October 2024 version

of eRRK 1.5 would have allowed public viewing only, not copying of unprocessed documents. *See* Def. SOF ¶ 181. To obtain a copy, the member of the public would still need to go through the clerk, who would then redact the PII in accordance with Rule 1.8. *Id.*

123.    Undisputed.

124.    Disputed. The cited testimony does not support the assertion that the Clerk Defendants are unaware of instances where filers have submitted complaints containing unredacted PII. Clerk Williams specifically testified that such instances do occur, although not in a large percentage. Clerk Whittenton acknowledge it can occur, and Clerk Ball testified that while she does not know how often it happens, she did not deny that it occurs.

125.    Defendants dispute the implication that lack of documented instances of identity theft or fraud resulting from publicly available PII means there is no risk. The absence of reported harm does not negate the need for preventative measures. Moreover, the very nature of identity theft and cybercrimes makes it difficult, if not impossible, to trace the exact source of the compromised information.   In addition, while CNS asserts that the Servicemembers' Civil Relief Act (SCRA) document is not the complaint itself, Defendants are aware of instances where it was filed as a civil complaint or within the same PDF as the complaint. *See* Def. SOF ¶ 122. This is because the SCRA, 50 U.S.C. §§ 501 et seq., requires the filing of an affidavit in all civil cases to protect service member defendants from default judgments. These affidavits often contain social security numbers (*See* Def. SOF ¶ 122) because that is the main way military service is confirmed. *See generally*

https://scra.dmdc.osd.mil/scra/#/home. In addition, while CNS claims it does not seek documents related to domestic matters, it has stated that it covers cases involving high-profile individuals which could include filings that contain PII. *See* Def. SOF ¶ 19.

## DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 56.1(a)(2), Defendants respectfully submit their additional statements of undisputed material facts in support of their opposition to Plaintiff's Motion for Summary Judgment.

## Table of Contents

I. **Background On CNS And Historic Access To North Carolina's Court Records.** 43

II. **AOC's Role In The Judicial Branch And Relationship To Clerks.** ..................... 46

III. **AOC's Has A Limited Role In The Managing Court Records.** .......................... 48

IV. **Clerks Play A Prominent Role In The North Carolina Court System.** ................ 49

V. **North Carolina Courts Transitioned To eCourts To Improve The Administration Of Justice.** ........................................................................................................... 52

VI. **The First Six Months That A County Implements eCourts Are Extraordinary Circumstances.** ................................................................................................... 56

    *A.  eCourts is a fundamental and transformational change for Clerks' offices.* ........................ 56

    *B.  eCourts was a fundamental and transformational change for the public.* ........................... 57

    *C.  During the initial months of eCourts, Clerks must perform time consuming scanning to ensure that courts continue to operate.* ........................................................................... 57

    *D.  During the pilot stage, AOC and the Clerk Defendants identified necessary software refinements that impacted operations.* .................................................................................... 58

    *E.  Harnett County experience internet outages and latency during the initial months of eCourts.* 59

    *F.  Collectively the toll of these fundamental changes and the technological issues with implementation present an extraordinary circumstance.* ........................................................ 59

VII. **Defendants' Rules And Policies Governing The Timing And Process Of Accepting Newly Filed Civil Complaints And Making Them Available To The Public.** 60

    *A.  AOC's eRRK and the Clerk Defendants' policies ensure that newly filed civil complaints are available in a timely manner.* .................................................................................. 61

    *B.  Steps in processing newly filed civil complaints.* ............................................................ 63

    *C.  Processing is critical to ensuring confidentiality, protecting PII, amd providing meaningful public access.* ............................................................................................................ 65

        *i.  Pre-acceptance processing ensures confidential documents are not provided to the public.* .. 66

        *ii.  Pre-acceptance processing ensures that PII is protected from public disclosure on the internet.* 68

*iii.*    *Correcting party names ensures that the public has meaningful access in Portal.* .......... 70

*iv.*    *Pre-acceptance procesing ensures false liens are not filed and gatekeeper orders are followed.* 71

*D.*    *Clerk Defendants will provide pre-processing inspection, but not copies, of newly filed civil complaints.* .................................................................................................................. 71

**VIII.    AOC's Calculation Of Acceptance Rates Under Rule 1.5.** ................................. 72

**IX.    The Clerk Defendants' Process Newly Filed Civil Complaints on the Same Business Day That They are Filed At Rates Well Above 90%.** ....................................... 77

**X.    This Court Should Not Rely On CNS' Proposed Acceptance Rates Because They Do Not Account For All Civil Filings Or Business Days And Hours.** ........................... 85

**XI.    The Complaints Identified By Plaintiff Demonstrate That The Clerk Defendants Are Timely Accepting Newly Filed Civil Complaints During Business Days And Hours.** 86

**XII.    Beaufort, Durham, or Mecklenburg County's Acceptance Rates Do Not Demonstrate That Clerk Defendants Violate The First Amendment.** ........................... 88

**XIII.    AOC Carefully Considered Whether To Implement The Press Review Queue And/Or Auto-Acceptance.** .............................................................................................. 91

*A.*    *AOC initially considered and rejected the PRQ and Auto-Accept when it first implemented eCourts.* ............................................................................................................................. 91

*B.*    *AOC subsequently consider a version of the PRQ, but abandoned that option when it proved contrary to its interests and business needs.* ......................................................................... 95

**C.    Clerk Defendants Agree that the Press Review Queue technology and Auto-Acceptance Does Not Meet Their Business Needs and Interests.** ............................... 99

**XIV.    AOC's Interpretation Of eRRK Rule 1.5.** ........................................................ 100

**XV.    AOC's Communications with CNS** ................................................................. 102

## I. Background On CNS And Historic Access To North Carolina's Court Records.

1. CNS has no knowledge of the tradition of access to paper filings in North Carolina's courts. Ex. 12, Excerpts of Deposition of William Girdner (hereinafter, "Girdner Depo.") at 18:6-20.

2. CNS' knowledge of access to civil complaints in North Carolina only goes back to 2014 (based on Mr. Girdner's knowledge) and to 2007 as to Mr. Rich Ivey's knowledge. Girdner Depo. at 13:10-17. Rich Ivey's knowledge of access to civil complaints is limited to filings in the Wake County Clerk of Superior Court's office since he is the Wake County reporter. Girdner Depo. at 7:10-11.

3. CNS admits that it has no knowledge of whether North Carolina courts ever provided on-receipt access to civil complaints. Girdner Depo. at 19:6-13.

4. CNS admits it has no knowledge of North Carolina courts ever providing a box on the clerk's counter for public review of new civil complaints. Girdner Depo. at 21:11-22:8.

5. There is no evidence that North Carolina courts provided access to civil complaints on-receipt.

6. Instead, CNS acknowledges that its reporters were provided access to newly filed civil complaints after the clerk docketed them, which involved inputting information about the case into a computer system. Docketing information includes: "plaintiff, defendants, nature of the case, the address of the plaintiff lawyer, how to reach them, the phone number usually, email address nowadays, that kind of thing." Girdner Depo. at 19:14-20:9; 22:16-20.

7. In North Carolina, prior to eCourts launch, CNS reporters first had access to newly filed civil complaints at the end of the day, on the business day after they were filed. Girdner Depo. at 28:5-15.

8. In the federal PACER system, new civil complaints are not always available on-receipt or even same day, but "will typically appear on th[e] [PACER] system within 24 hours." Ex. 3, Declaration of Emily Mehta (hereinafter, "Mehta Decl.") ¶ 73 and Exhibit E.

9. Prior to eCourts, CNS staff "would have to go to the courthouse itself to see the document itself" for North Carolina court filings. Girdner Depo. at 20:10-16.

10. CNS admits that access to civil complaints is faster in eCourts than prior to eCourts. Girdner Depo. at 25:18-26:2.

11. CNS has four researchers that it sends to courthouses in North Carolina to obtain documents and three to four reporters that analyze cases in North Carolina. Girdner Depo. at 22:21-23:18.

12. CNS does not send its researchers or reporters to all 100 North Carolina counties. Girdner Depo. at 23:23-25. CNS does not send staff to a North Carolina county once it launches on eCourts. Girdner Depo. at 25:3-6.

13. Instead, as of June 2024, it sends them to: Buncombe, Henderson, Brunswick, Cabarrus, Caldwell, Carteret, Catawba, Columbus, Craven, Cumberland, Moore, New Hanover, Onslow, Pitt, Robeson, Rockingham, Rowan, Sampson, Union, Wayne, and Wilson. Girdner Depo. at 24:1-9.

14. CNS does not send its staff to these counties every day. Girdner Depo. at 24:16-25.

15. CNS admits that it can cover more North Carolina counties that are on eCourts as compared to covering counties that are not on eCourts. Girdner Depo. at 26:3-7.

16. CNS admits that even if it agreed not to publish personally identifying information ("PII") available in a Press Review Queue, that it could make a mistake and publish it anyway. Girdner Depo. at 35:19-36:2.

17. CNS admits that efilers can make mistakes, such as selecting the wrong case type and filing a juvenile matter as a general civil matter. Girdner Depo. at 41:19-24; 43:2-6.

18. The CNS Daily Reports Style Manual "tells the reporters how they're to do their reporting, basically." Girdner Depo. at 47:24 (introducing Exhibit 29), 48:1-13 (discussing Exhibit 29).

19. CNS reports on more than general civil actions filed in North Carolina Superior Court. CNS reports on: "any case where a business, public, entity or other non-individuals, including among the defendants, he's including businesses, federal and state agencies, cities, municipalities, school districts, individuals doing business as a corporation, trusts, estates, trustees and estate holders or representatives, also called estates, doctors, lawyers, dentists, accountants or other professionals being sued for actions stemming from their work." Girdner Depo. at 49:10-25. They also report on any cases involving famous people or unusually wealthy people. Girdner Depo. at 50:4-12.

20. CNS states that it reports on courts that are of general jurisdiction. Girdner Dep. at 90:8-10.

21. In North Carolina, "[t]he district court division is the proper division for the trial of all civil actions in which the amount in controversy is twenty-five thousand dollars ($25,000) or less; and the superior court division is the proper division for the trial of

all civil actions in which the amount in controversy exceeds twenty-five thousand dollars ($25,000)." N.C.G.S. § 7A-243.

22. CNS acknowledges that accuracy of the information presented in its reports is important. For example, it acknowledges that spelling a person's name correctly is important. Girdner Depo. at 51:6-9, 52:25-53:11.

23. Plaintiff and Defendants agree that the accuracy of the records that the court publishes on the internet is important to the court's credibility. Girdner Depo. at 57:13-58:3; Ex. 4, Declaration of Bradley Dean Fowler (hereinafter, "Fowler Decl.") ¶ 44.

## II. AOC's Role In The Judicial Branch And Relationship To Clerks.

24. The North Carolina General Statutes defines AOC's limited authority and duties consistent with the North Carolina Constitution. Fowler Decl. ¶ 4.

25. Pursuant to these statutes, AOC's role in the court system is to provide administrative support to the independently elected and appointed Judicial Branch Constitutional officers, including judges, magistrates, clerks of superior court ("Clerks"), and district attorneys. *See* N.C.G.S. 7A-343 (Duties of Director); Fowler Decl. ¶ 5.

26. Clerks, like judges, are not AOC employees but are independently elected Constitutional officers. N.C. Const. Art. IV, § 9(3); Fowler Decl. ¶ 6. If an elected Clerk vacates the office before the end of their term, the Senior Resident Superior Court Judge appoints a new Clerk "until an election can be regularly held." N.C.G.S. 7A-100(a).

   a. The Wake County Clerk of Court, Blair Williams, left office at the end of December 2024. Claudia Croom was appointed to serve as Clerk effective January 1, 2025. Ex. 10, Excerpts of Deposition of Claudia Croom

(hereinafter, "Croom Depo.") at 7:7-10; Ex. 1, Declaration of Claudia Croom (hereinafter, "Croom Decl.") ¶ 2.

27. The Chief District Court Judge "[s]upervis[es] the [C]lerk of superior court in the discharge of the clerical functions of the district court," N.C.G.S. § 7A-146(3), and the Senior Resident Superior Court Judge plays a similar role in supervising the Clerk's clerical functions for the superior court. N.C.G.S. § 7A-41.1(c); Fowler Decl. ¶ 8.

28. AOC does not have authority to hire, supervise, discipline, or fire Clerks. Clerks may only be removed from office for misconduct or mental or physical incapacity by the Senior Resident Superior Court Judge serving the county in which the Clerk serves. N.C. Const. Art. IV, § 17(4); N.C.G.S. § 7A-105; Fowler Decl. ¶ 9.

29. AOC makes recommendations to the North Carolina General Assembly ("General Assembly") for the number of Deputy and Assistant clerk positions that the General Assembly funds through appropriations for each Clerk's office based on workload formulas that AOC developed in conjunction with the National Center for State Courts. Fowler Decl. ¶ 10; Mehta Decl. ¶ 23.

30. The General Assembly sets the Clerk's salary, the number of Assistant and Deputy Clerks for each Clerk's office (through appropriation bills), and the minimum and maximum salary of those employees. G.S. 7A-101; Fowler Decl. ¶ 11. AOC has authority to provide additional temporary or emergency personnel, so long as the General Assembly has appropriated sufficient funding. Fowler Decl. ¶ 11.

31. The General Assembly prescribes the Clerks' jurisdiction and duties. N.C. Const. Art. IV, § 12(3); Fowler Decl. ¶ 12.

32. Each independently elected Clerk supervises their employees and sets policies and procedures for his or her office.  Fowler Decl. ¶ 13.

### III.  AOC's Has A Limited Role In The Managing Court Records.

33. Pursuant to N.C.G.S. § 7A-109(d), the Director of AOC establishes rules for how the Clerks maintain court records.  Fowler Decl. ¶ 14.  In conjunction with the launch of eCourts, the Director promulgated the eCourts Rules of Recordkeeping ("eRRK") to establish how court records would be maintained in the integrated case management system.  *Id.*  The current eRRK is attached as Exhibit A to the Declaration of Brad Fowler.

34. The eRRK are fundamentally driven by the state and federal law governing court records in the North Carolina's General Courts of Justice. Ex. 5, Declaration of Ryan S. Boyce (hereinafter, "Boyce Decl.") ¶ 4.  In addition to providing uniformity in recordkeeping, the eRRK provide a reference for Clerks to understand the legal requirements that govern them. The eRRK frequently cite state and federal law for this reason.

35. Clerk Defendants follow the eRRK.  Ex. 6, Declaration of Renee Whittenton (hereinafter, "Whittenton Decl.") ¶ 31; Croom Decl. ¶ 16; Ex. 7, Declaration of Michelle Ball (Hereinafter, "Ball Decl.") ¶ 40.

36. However, the Clerks remain the custodian of the court records pursuant to 7A-109(d), which provides that "[n]either the Director nor the Administrative Office of the Courts is the custodian of the records of the [C]lerks of superior court or of the electronic data processing records or any compilation of electronic court records or data of the [C]lerks of superior court."  Fowler Decl. ¶ 15.

48

37. While AOC does have the authority to prescribe rules for the Clerks' recordkeeping to promote uniformity across the State, N.C.G.S. §7A-109, it does not have any authority to enforce those rules against the Clerks. Fowler Decl. ¶ 7. Pursuant to statute, the Clerks are supposed to follow the rules. *Id.*

38. The eRRK are amended periodically by the Director, who has the authority, pursuant to N.C.G.S. 7A-109(a), to revise the eRRK unilaterally. Mehta Decl. ¶¶ 4-5.

39. In October 2024, Rule 1.1 of the eRRK was amended to clarify the Rule by acknowledging the Director's statutory authority to amend the eRRK unilaterally. Mehta Decl. ¶ 6.

40. Typically, the Director amends the eRRK upon a recommendation of the Rules of Recordkeeping Committee. The Committee is comprised of nine Clerks of Superior Court ("Clerks") appointed by the Director after consultation with leadership of the Conference of Clerks of Superior Court. Mehta Decl. ¶ 7.

41. Usually, Clerks or AOC staff propose amendments to the Rules of Recordkeeping Committee. Mehta Decl. ¶ 8.

42. Most amendments to the Rules come from a recommendation of the Rules of Recordkeeping Committee; however, the Director has periodically unilaterally amended a Rule, particularly when the current rule is revealed to be inconsistent with the eCourts technology provided by AOC's vendor, Tyler Technologies, Inc. Mehta Decl. ¶ 9.

## IV.     Clerks Play A Prominent Role In The North Carolina Court System.

43. In North Carolina, Clerks have extensive duties that are set by statute and include, but are not limited to, the following:

a. Serving as the ex officio judge of probate and judicial officer presiding over various special proceedings (e.g., foreclosures, judicial sales, partitions), guardianships and trusts. *See, e.g.*, N.C.G.S. §§ 7A-40, 7A-103(16); Whittenton Decl. ¶ 4; Ex. 9, Excerpts of Deposition of Blair Williams (hereinafter, Williams Depo.") 9:18-23; Ball Decl. ¶ 5.

b. Maintaining the records of the district and superior courts in their respective county. *See, e.g.*, N.C.G.S. §§ 7A-103(6); 7A-109(a); Whittenton Decl. ¶ 4; Williams Depo. 9:18-23; Ball Decl. ¶ 5.

c. Serving as a comptroller of monies receipted by the Clerk's office to administer, invest, and disburse sums of money as required by law. *See, e.g.*, N.C.G.S. §§ 1-239(a)(1), 1-339.70(a), 7A-108, 7A-111, 35A-1294(b), 44A-5, 45-21.31, 58-75-1, 65-91, 90-210.64(d), 93A-12, 105-374(q); Whittenton Decl. ¶ 4; Williams Depo. 9:18-23; Ball Decl. ¶ 5.

d. Providing clerical support for the Jury Commission and assisting with the drawing and summoning of jurors. *See e.g.*, N.C.G.S. §§ 9-1, 9-5; Whittenton Decl. ¶ 4; Ball Decl. ¶ 5.

e. Providing clerical support for the superior and district courts, including staffing courtrooms. *See, e.g.*, N.C.G.S. 7A-146(3); Whittenton Decl. ¶ 4; Ball Decl. ¶ 5.

f. Acting as the hiring authority and manager of employees in their office, who assist them in carrying out their statutory duties. N.C.G.S. § 7A-102(a); Whittenton Decl. ¶ 4; Ball Decl. ¶ 5.

44. Clerks' offices are typically open to the public Monday through Friday except State holidays from 8:00 AM to 5:00 PM, though business hours vary by office.

    a. The Harnett County Clerk's office is open to the public Monday through Friday, except on North Carolina State holidays and emergency closures, from 8:30 a.m. to 12:30 p.m. and 1:30 p.m. to 5:00 p.m. Whittenton Decl. ¶ 6.

    b. The Johnston County Clerk's office is open to the public Monday through Friday, except on North Carolina State holidays and emergency closures, from 8:00 a.m. to 5:00 p.m. Ball Decl. ¶ 15.

    c. The Wake County Clerk's office is open to the public from 8:30 AM to 5:00 PM, Monday through Friday except on North Carolina State holidays and emergency closures. Ex. 2, Declaration of Tasha O'Neal (hereinafter, "O'Neal Decl.") ¶ 6.

45. Staff in each Clerk's office (deputy and assistant clerks) work 8 hours a day. And typically work during public hours, though sometimes they may work slightly earlier or slightly later shifts as compared to public hours. Whittenton Decl. ¶¶ 7-10; O'Neal Decl. ¶ 6;.

46. The civil division of a Clerk's office has numerous responsibilities that are critical to ensuring that the public has timely access to justice. These include: accepting documents (paper and electronically filed) for filing into civil cases from parties (G.S. 1A-1, Rule 5(e1)); filing orders of the court in civil cases (G.S. 1A, Rule 58); tasking proposed orders to the judge for review; issuing and docketing summons and alias and pluries (G.S. 1A-1, Rule 4); issuing writs of possession; entering default and default judgment (G.S. 1A-1, Rule 55(a), (b)); setting aside an entry of default (G.S. 1A-1,

Rule 55(a),(d)); docketing, crediting, and canceling judgments from Harnett County court cases and from other jurisdictions (*see, e.g.*, G.S. §§ 1-233, -234, -237, -239, 239.1, 1C-1701 et seq., 95-141, 96-4(s), 97-87); transcripting judgments to other counties (G.S. 1-234); reviewing affidavits in support of attachment and where appropriate issuing orders of attachment and setting appropriate bonds for same (G.S. Chapter 1, Article 35); presiding over hearings for the prejudgment remedy of claim and delivery (G.S. § 1-474.1), presiding over supplemental proceedings to enforce money judgement (see G.S. §§ 1-353, -360); issuing writs of executions and writs of possession (G.S. § 1-305); processing returns of service; presiding over requests for statutory exemptions to a judgement (G.S. 1C-1603); staffing civil courtrooms (*see, e.g.*, G.S. §7A-146(3)); setting reviews for entry of orders; acceptance, maintenance, storage, and return of exhibits and medical records; set hearings for child support enforcement cases; work with local SAFE victim services agency as well as law enforcement to ensure orders are received to assist victims; perform court session recording functions and notes in the digital recording system; answering the phone for calls directed to the civil division; responding to questions from the members of the public that come to the civil division counter and via email; providing notices to the Chief District Court Judge's office as required by local rules; perform quality assurance; work ICMS generated reports and perform daily audits of the cases created and disposed. *See* Whittenton Decl. ¶ 11; O'Neal Decl. ¶ 8; Ball Decl. ¶ 17.

## V. North Carolina Courts Transitioned To eCourts To Improve The Administration Of Justice.

47. In September 2015, North Carolina Supreme Court's Chief Justice convened the North Carolina Commission on the Administration of Law and Justice ("NCCALJ")—a sixty-five-member, multidisciplinary commission that undertook a comprehensive and independent review of North Carolina's court system to make recommendations for improving the administration of justice in North Carolina. Fowler Decl. ¶ 17. The NCCALJ's 2017 Final Report recommended transitioning to electronic filing and an electronic integrated case management system to improve the administration of, and access to, justice. Fowler Decl. ¶ 17 and Exhibit F (NCCALJ Final Report excerpts).

48. Pursuant to statute, N.C.G.S. 7A-343(6), (9a), AOC is responsible for providing efiling and electronic case management systems for the Judicial Branch. Fowler Decl. ¶ 16. To fulfill this duty, AOC contracted with Tyler Technologies, Inc. ("Tyler") to provide a suite of software applications to transition the North Carolina court system from a paper-based system to digital-based system (the "eCourts" or "Enterprise Justice" system). *Id.* The Enterprise Justice system includes the following primary components:

    a. Integrated Case Management System (hereinafter, "ICMS"): a cloud based, integrated case management system that replaces AOC's legacy criminal, civil, and juvenile mainframe hosted indexes and the court system's paper-based records management processes, *id.*;

    b. Portal: a publicly-accessible, browser-based internet application for viewing records and making payments, which also serves as the official court record

indexes and judgment index, as required under G.S. § 7A-109 and G.S. § 1-233, respectively (see eRRK Rules 1.12 and 14.1), *id.*;

c. Guide & File: a publicly-accessible, browser-based internet application that assists users in creating basic legal documents, *id.*;

d. eFile: a publicly-accessible, browser-based internet application that assists users in filing and serving legal documents and Clerks in reviewing and accepting filings into the ICMS, *id.*;

e. Attorney Manager: a digital case management platform for district attorneys and public defenders, *id.*;

f. eWarrants: an electronic warrant repository, *id.*;

g. Brazos: electronic citation platform, *id.*; and

h. Financial Manager: a financial management system for the Clerks. *Id.*

49. The Enterprise Justice applications have some ability to interface with each other. Fowler Decl. ¶ 16.

50. AOC launched the eWarrants applications in all 100 North Carolina Counties in July of 2022. Fowler Decl. ¶ 18.

51. AOC launched the Brazos applications in all 100 North Carolina Counties from December 2020 – April 2021. Fowler Decl. ¶ 18.

52. AOC is launching the other Enterprise Justice applications in Tracks of individual counties on a rolling basis throughout the state. Fowler Decl. ¶ 19. The first counties to launch were Harnett, Johnston, Lee, and Wake Counties ("Pilot Counties"), which launched on February 13, 2023. *Id.* At the time of this filing, eCourts has fully

launched in 73 counties.  *Id.*  AOC expects to launch the remaining counties by the end of October 2025.  *Id.*

53. Prior to launching eCourts in any North Carolina County, AOC's Business Analysis and Process Management ("BAPM") team provides training to judicial branch employees and officials in the county, including: the Clerks and their staff, district and superior court judges and their staff, magistrates, the district attorneys and their staff, and the public defenders and their staff (collectively, "Judicial Branch Users").  Fowler Decl. ¶¶ 20, 22.

54. AOC's training is focused on teaching the Judicial Branch Users how to use the system (i.e., its functionality) and adapt its corresponding business processes. Fowler Decl. ¶ 21.

55. For Clerks' offices, the training would also rely on the eRRK to ensure that the functionality taught was consistent with the eRRK. Fowler Decl. ¶ 21.  The eRRK were initially published on February 7, 2023.  Mehta Decl. ¶ 5.  Since then, the rule set has been revised 22 times, resulting in 97 individual rule changes or new rules added. AOC anticipated a steep learning curve for formalizing these rules due to adapting clerk business processes to an entirely new system.  *Id.*  For the first 16 months, AOC held monthly meetings to ensure that the rule set reflected the most up-to-date knowledge of the new system requirements, capabilities, and configurations, and provided a necessary venue to discuss whether new rules were needed or existing rules needed to be amended because of our evolving understanding.  *Id.*  Since September 2024, we have held quarterly Rules of Recordkeeping meetings.  *Id.*

56. Independently elected officials and appointed officials (e.g, Clerks, district and superior court judges, magistrates, district attorneys, and public defenders) govern how their staff ultimately use the system and apply the functionality taught by AOC. Fowler Decl. ¶ 21. AOC does not supervise these officials or their employees—for example AOC has no ability to hire or fire these officials or their employees. *Id.*

57. AOC also offers free training to attorneys regarding the basic features of the eFile system. Fowler Decl. ¶ 23. However, AOC does not regulate attorneys or promulgate policy that is binding on attorneys. *Id.* AOC cannot mandate that attorneys take the eFile training, and attorneys are not otherwise required to take the training. *Id.*

## VI. The First Six Months That A County Implements eCourts Are Extraordinary Circumstances.

58. Despite additional staff resources, AOC training, and on-site AOC support staff, the initial launch of eCourts in the Pilot Counties encountered issues that impacted the Clerk's ability to carry out their duties in Clerk Review Queue in the eFile system and in the ICMS. Fowler Decl. ¶ 51.

### A. *eCourts is a fundamental and transformational change for Clerks' offices.*

59. First, there is a significant learning curve for Clerks adopting the new system. Fowler Decl. ¶ 52.

60. eCourts fundamentally changed the functioning of the offices and the functioning of the District and Superior Courts that those offices support clerically. Whittenton Decl. ¶ 14; O'Neal Decl. ¶ 28; Ball Decl. ¶ 25.

61. Every single system, process, and task that the Clerk's office is responsible for carrying out changed with the implementation of eCourts. *See* Whittenton Decl. ¶ 15; O'Neal

¶ 29; Ball Decl. ¶27. Clerks and their staff had to learn their jobs all over again, ranging from new computer systems and processes to new rules of recordkeeping. *Id.*

62. Overall, the Clerks' work takes longer to accomplish in eCourts as compared to prior to eCourts. *See, e.g.,* Whittenton Decl. ¶¶ 15(a)-(n) (giving examples of the fundamental changes, new work, and the increased time new processes take); Mehta Decl. ¶ 23; O'Neal Decl. ¶ 29; Ball Decl. ¶¶ 26-27.

### B. *eCourts was a fundamental and transformational change for the public.*

63. Second, during the first six months of eCourts, Clerks and their staff had to spend a significant amount of time speaking with attorneys and the public that had questions about the new system or were experiencing difficulties filing things into the new system. Whittenton Decl. ¶¶ 22, 25; O'Neal Decl. ¶ 33; Ball Decl. ¶¶ 24-32.

### C. *During the initial months of eCourts, Clerks must perform time consuming scanning to ensure that courts continue to operate.*

64. Third, Clerks have significant scanning work during the first few months of eCourts to transition existing paper files into the ICMS where Judicial Branch Users and the public through Portal can access those records. Whittenton Decl. ¶ 16; O'Neal ¶ 30; Ball Decl. ¶ 22. Previously, for all cases scheduled for a court session, the paper files were pulled from the shelves by courtroom clerks and brought to the courtroom for the attorneys, GAL's, DA's, judge and clerk to review and access, as needed. Whittenton Decl. ¶ 16; O'Neal ¶ 30. Once eCourts went live all paper files had to be scanned into the eCourts system for use in the court session. Whittenton Decl. ¶ 16; O'Neal ¶ 30; Ball Decl. ¶ 22. These files had to be reviewed for PII and redacted where needed, an

event created in the system, and the scanned documents related to that event. Whittenton Decl. ¶ 16; O'Neal ¶ 30; Ball Decl. ¶ 22.

65. At the beginning of eCourts, the Clerk Defendants and/or their staff spent countless hours each day scanning cases into the eCourts system and redacting PII from those cases to ensure that the files were available for a court session the next day. Whittenton Decl. ¶ 16; O'Neal ¶ 30. This work had to be prioritized each day because the court sessions would be delayed if the cases were not available in the system. Whittenton Decl. ¶ 16; O'Neal ¶ 30.

> D. *During the pilot stage, AOC and the Clerk Defendants identified necessary software refinements that impacted operations.*

66. Fourth, issues arose during the pilot stage (which is when the Clerk Defendants went live) that required additional software configuration and/or programming refinements, especially during the first few months of utilization. Fowler Decl. ¶ 52.

67. The eCourts system experienced errors, burdensome performance latency, and complete system outages during the initial launch of eCourts. Whittenton Decl. ¶¶ 19, 23-24; O'Neal ¶ 31.

68. When the eCourts system first launched, the system (including eFile), was subject to significant "downtime" when it was off-line and not accessible by the clerks during working hours. This delayed the clerk's ability to complete their work, including accepting electronic files into the case management system. Whittenton Decl. ¶ 24; O'Neal ¶ 35.

69. There were delays in system processing whereby Clerks were waiting for the system to process an action before they could move on to the next action. Fowler Decl. ¶ 53; *see also* Whittenton Decl. ¶¶ 19, 23; O'Neal ¶ 34.

70. For example, in the 14 weeks from April 3, 2023, to July 10, 2023, Harnett County reported 683 errors or issues with the eFile Clerk Review Queue and ICMS. Whittenton Decl. ¶ 18.

71. Many of the errors increased the amount of time required for a task or prevented a task from being completed. Whittenton Decl. ¶ 21(a) through (c); O'Neal ¶ 32(a)-(b).

72. Separate and apart from the underlying issue, which itself may cause delays in the clerk's work, the process of halting work to report issues took significant time. Whittenton Decl. ¶ 20.

73. The biggest issues with software refinements and system configurations were resolved within the first 6 months of eCourts in additional to increased system familiarity by the Clerks. Fowler Decl. ¶ 55.

   E. *Harnett County experience internet outages and latency during the initial months of eCourts.*

74. In addition, the Harnett County Courthouse experienced outages and latency with their internet service that prevented the Harnett Clerk's office from consistently utilizing eCourts as effectively as planned during those periods. Fowler Decl. ¶ 54.

   F. *Collectively the toll of these fundamental changes and the technological issues with implementation present an extraordinary circumstance.*

75. The transition to eCourts was very trying on Clerks and their staff who take great pride in their work and service to the public and judiciary. Whittenton Decl. ¶ 29; Ball Decl. ¶¶ 32-33, 36. Staff worked extremely long overtime hours, to meet the increased

workload, including nights and weekends. Whittenton Decl. ¶ 29; O'Neal Decl. ¶ 14; Ball Decl. ¶¶ 34, 36.

76. Staff in the Harnett County Clerk's office collectively worked 2573.87 hours of overtime in the first six months of eCourts. Whittenton Decl. ¶ 28. Staff in the Johnston County Clerk's office collectively worked 1,127 hours of overtime in the first six months of eCourts. Ball Decl. ¶ 35.

77. The Wake County Clerk's office had to deputize judges' staff to assist its Civil Division with the workload, including to process and accept filings. O'Neal Decl. ¶ 15.

78. Clerk staff were brought to tears and considered quitting because of the difficulty in learning the new system. Whittenton Decl. ¶ 29; Ball Decl. ¶36.

79. The amount of time that was involved in training, the necessary requirements of learning an entirely new system, of completely reworking their existing business processes, of restructuring their offices to accommodate those new electronic business processes would be an extenuating circumstance. Mehta Decl. ¶¶ 26-27.

80. At the 6 month to 12 year post-implementation mark, as programing refinements and configuration changes were made – and after Clerks became more proficient with the electronic case management system – clerks' offices demonstrated significant improvements. Fowler Decl. ¶ 53; O'Neal ¶¶ 16, 36; Ball Decl. ¶ 39.

**VII.** **Defendants' Rules And Policies Governing The Timing And Process Of Accepting Newly Filed Civil Complaints And Making Them Available To The Public.**

81. In North Carolina, pro se filers are allowed to file documents in paper while attorneys must electronically file through the eFile application. Mehta Decl. ¶ 32.

82. AOC trains Clerks and their staff on the functionality of reviewing filings in the eFile application and accepting them into the ICMS. Fowler Decl. ¶ 24.

83. Independently elected Clerks also provide directives to their staff on their process for reviewing and accepting documents from eFile into the ICMS. Fowler Decl. ¶ 32.

84. Various eRRK rules govern the timing and process of accepting electronically filed documents from eFile into the ICMS. Fowler Decl. ¶ 28.

   A. _AOC's eRRK and the Clerk Defendants' policies ensure that newly filed civil complaints are available in a timely manner._

85. Once a document is processed and accepted into the ICMS, it is available to the public on the internet Portal application unless it is protected as a confidential document (i.e., confidential pursuant to law or court order). Fowler Decl. ¶ 26.

86. AOC's training instructs Clerks' offices as a best practice to process all electronically filed documents from the eFile application into the ICMS application within 24 hours of filing on business days when possible and that accepting them sooner is preferred. Fowler Decl. ¶ 25; Whitten Decl. ¶ 32; Ball Decl. ¶ 42. Processing all documents that are electronically filed as soon as possible is important because it ensures that the documents are available in the ICMS to judicial officials who may need to address the matter. Ball Decl. ¶ 47; Whittenton Decl. ¶ 35.

87. Prior to providing this best practice, AOC modeled this guidance on the legal standard set forth by the Fourth Circuit's opinion in _Courthouse News Serv. v. Schaefer_, 2 F.4th 318 (4th Cir. 2021), specifically that "'contemporaneous' [access] in this context means 'the same day on which the complaint is filed, insofar as is practicable;' and when not practicable, on the next court date." Fowler Decl. ¶ 27.

88. Each Clerk Defendant sets their own policy for accepting new civil documents pursuant to the standards.

    a. The Harnett Clerk's policy is that all documents (not just civil complaints) electronically filed by 5:00 p.m. should be processed into the ICMS by 5:00 p.m. that same day, including civil complaints. Whittenton Decl. ¶¶ 34-35. Electronically filed documents may be accepted into the ICMS after 5:00 p.m. if a clerk is working after 5:00 p.m. and has an opportunity to check the eFile queues. *Id.*

    b. The Johnston County Clerk's policy is that all documents electronically filed by 5:00 p.m should be processed into the ICMS by 5:00 p.m. that same day and staff must remain to process those documents. Ball Decl. ¶¶ 44, 56. If staff is working after 5:00 p.m. they may accept documents into the ICMS after 5:00 p.m. Ball Decl. ¶ 46.

    c. The Wake County Clerk's policy is to ensure that any newly filed civil document (i.e., civil documents that did not have a case number assigned) that were filed by 5:00 PM on a business day, are accepted into the ICMS before staff leaves for the day. O'Neal ¶ 17; Williams Depo. 57:15-58:2; Croom Decl. ¶¶ 14-15. Staff also will process documents filed after 5:00 PM if they are working late and have the opportunity to review. O'Neal ¶ 18.

89. As explained more fully in Section XIII.B below, eRRK Rule 1.5 was amended in October 2024 to clarify the timing of accepting newly filed civil complaints. It provides in relevant part:

        Absent extenuating circumstances and insofar as is practicable,

clerks should accept electronically-filed initiating documents for civil matters, foreclosures, guardianships, incompetency proceedings, and non-confidential name changes into the ICMS on the same business day, meaning that such documents filed before 5:00 PM on a day that the clerk's office is open to receive filings are accepted into the ICMS by 11:59pm on the same calendar day ("same day acceptance"), and when not practicable, on the next court date. FN5

> FN 5 *See Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021), *affirming Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532 (E.D. Va. 2020).

Mehta Decl. ¶ 36.

90. The first sentence of the new language was intended to capture AOC's understanding of what the First Amendment required under the *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021) case. Mehta Decl. ¶ 18.

91. Accordingly, the October 2024 amendment to Rule 1.5 did not change Clerk's responsibility for accepting filings but provided clarification around those responsibilities. Mehta Decl. ¶ 19.

92. Indeed, the Clerk Defendants did not change how they processed newly filed civil complaints based on Rule 1.5. Whittenton Decl. ¶ 36.; Ball Decl. ¶ 45; O'Neal Decl. ¶ 17.

B. *Steps in processing newly filed civil complaints.*

93. Two eRRK Rules provide the required steps for processing newly filed civil complaints into the ICMS: Rule 1.4 and Rule 1.8. Fowler Decl. ¶¶ 29-31; Mehta Decl. ¶ 10.

94. Consistent with eRRK Rule 1.4 Clerks will correct these fields at the time of acceptance into the ICMS:

- Party names;

- The case-node, case-category, and case-type; and

- The document security.

Fowler Decl. ¶ 30; Whittenton Decl. ¶ 38(a), (d), (e); Ball Decl. ¶ 49(a), (c), (d), (e); O'Neal Decl. ¶ 22.

95. The document security review includes a review for PII as a Clerk must set the document security to the "Public Not Portal" security setting if a public document contains unredacted PII. Whittenton Decl. ¶ 38(b); Ball Decl. ¶ 49(b); see also O'Neal Decl. ¶ 22. The Clerk then accepts the document into the ICMS where they can create a redacted copy for the public. Whittenton Decl. ¶ 38(b); Ball Decl. ¶ 49(b). The Clerk Review Queue does not have the functionality to redact a document prior to accepting it into the ICMS. Whittenton Decl. ¶ 38(b); Ball Decl. ¶ 49(b).

96. eRRK Rule 1.8 sets forth what state and federal law require to be redacted before providing a copy of a court record to the public. Mehta Decl. ¶ 10.

97. Each individually elected Clerk of Superior Court has the authority to require their staff to redact additional types of PII as authorized under N.C.G.S. 132-1.10(f1). Mehta Decl. ¶ 11.

98. Clerk Defendants do require that their staff redact additional PII and AOC is aware that Clerks across the state have similar policies. *See* Mehta Decl. ¶ 12; Williams Depo. 94:18-95:18; Whittenton Decl. ¶ 38(b); O'Neal Decl. ¶ 22.

99. Best practices suggest redacting PII prior to providing a copy of a record to the public to protect against identity theft. Mehta Decl. ¶ 12.

100. The Clerk Defendants agree that PII should be redacted to protect the public from its disclosure. Croom Decl. ¶ 3; Ball Decl. ¶¶64-65; Whittenton Decl. ¶¶ 52-53.

101.    Consistent with Rule 5(b)(7) of the General Rules of Practice for District and Superior Courts (promulgated by the North Carolina Supreme Court) and eRRK Rule 1.4, Clerks also will review a document to determine whether it should be rejected for one of the following reasons: (1) the document is barred by a gatekeeper order, includes a false lien, or otherwise is prohibited from being filed; (2) the document cannot be opened due to corruption or otherwise; (3) or the filer requests that the document be withdrawn.  Fowler Decl. ¶ 31 and Exhibit B; *see also* Whittenton Decl. ¶ 38(h), (i); O'Neal Decl. ¶ 22.; Ball Decl. ¶ 49(i).

102.    While the eRRK do not require it, each of the Clerk Defendants review various other fields for errors and corrects them. Whittenton Decl. ¶¶ 38(c), (f), (g) (reviewing filing fees, other party names, case description, and document names); O'Neal Decl. ¶ 22 (reviewing filing fees); Ball Decl. ¶ 49 (c), (f), (g), (h) (case description, document name, filing fees, other party names).  These additional corrections are important to maintaining an accurate court record for the public and for Judicial Branch users accessing document in the ICMS, such as judges. The Clerk Defendants chose to correct errors in eFile because correcting them in the ICMS is much more time intensive.  Whittenton Decl. ¶¶ 38(c), (f), (g).

103.    The bulk of the Clerk review time is devoted to reviewing each document for PII and ensuring appropriate document security and party naming.  O'Neal Decl. ¶ 22; Whittenton Decl. ¶ 39; Ball Decl. ¶ 50.  Other aspects of the review only take a few minutes on average. O'Neal Decl. ¶ 22.

*C.  Processing is critical to ensuring confidentiality, protecting PII, amd providing meaningful public access.*

104.     The ICMS does not have the flexibility to change certain fields after acceptance from eFile.  Fowler Decl. ¶ 33; Ball Decl. ¶ 69.  If a change in the ICMS is possible, it is more cumbersome and time intensive for the Clerk than fixing the error in eFile and can result in confusion of the official court record that is immediately available on Portal.  *Id.*

        i.    *Pre-acceptance processing ensures confidential documents are not provided to the public.*

105.     When a Clerk accepts a document from the eFile system, it is ingested into the ICMS.  Fowler Decl. ¶ 35.

106.     Once a document is in the ICMS, it is automatically available to the public for viewing through Portal, unless it has a non-public security designation placed on it. Fowler Decl. ¶ 36.

107.     Security settings in the ICMS are case-based or document-based.  Fowler Decl. ¶ 37. Case-based security settings apply to case types that are confidential by law (e.g., juvenile cases, *see* N.C.G.S. § 7B-2901(a)), and the security settings are applied to documents automatically. *Id.*  Document-based security settings apply on a document-by-document basis and can be applied automatically through filing codes or manually as circumstances require (e.g., a sealed document). *Id.* Security settings dictate whether documents are visible on Portal, and even which officials and personnel within the Judicial Branch can see a document in the ICMS.  *Id.*

108.     The Clerk ensures that case-based security settings are applied to documents by confirming that the appropriate case-node, case-category, and case-type are selected in the eFile system.  Fowler Decl. ¶ 38.

109.     Once ingested into the ICMS, the case-node, case-category, and case-type selections either cannot be changed or are difficult to change.  Fowler Decl. ¶¶ 45-47.

110.     The Clerks ensures that document-based security settings are applied to documents by confirming that the appropriate document filing code is selected in the eFile system.  Fowler Decl. ¶ 39. Document-based security settings can be changed in the ICMS.  Fowler Decl. ¶ 37.

111.     Filers frequently misfile documents through eFile.  Mehta Decl. ¶ 63; O'Neal Decl. ¶ 24; Ball Decl. ¶ 70.  This includes misfiling documents that are confidential into public case types and filing documents as complaints that are not, in fact, complaints.  Mehta Decl. ¶ 63.

112.     For example, a confidential adoption filing was filed as initiating document into a civil public case type, Mehta Decl. ¶ 64(b), and a Servicemember affidavit was filed as a civil complaint. Mehta Decl. ¶ 64(a).

113.     Filers are also known to combine documents into one electronic filing rather than separating out individual documents, including with complaints.  *See* Mehta Decl. ¶ 65(a).

114.     A comprehensive list of all misfilings is not available because neither the Clerks nor AOC track these misfilings.  Mehta Decl. ¶ 64.

115.     Accordingly, to ensure that confidential documents are not available to on Portal, Clerks must review electronically submitted documents to ensure that the correct case-node, case-category, and case-type selections have been made and that the document security it correctly selected.

ii.  *Pre-acceptance processing ensures that PII is protected from public disclosure on the internet.*

116.     While federal and state law requires filers to redact categories of PII such as social security, employer taxpayer identification, drivers license, state identification, passport, checking account, savings account, credit card, or debit card number, or personal identification (PIN) code or passwords, unless otherwise expressly required by law or court order, *see e.g.*, N.C.G.S. 132-1.10(d), AOC knows that attorneys and pro se filers routinely do not redact PII that should be redacted.  Fowler Decl. ¶ 64; Mehta Decl. ¶¶ 63-66.

117.     Further, an attorney or pro se filer might determine that, in their opinion, the PII is required by law to be on the court filing, and therefore, does not need to be redacted under N.C.G.S. 132-1.10(d).  Fowler Decl. ¶ 65.  For example, in a credit card collection case, an attorney may determine that to state a claim the credit card account numbers must be included in the civil complaint.  *Id.*  The attorney would then have no requirement to redact the numbers.  *Id.*

118.     As another example, civil cases to establish paternity require that the social security number be in the file and may be included in the complaint. *See* N.C.G.S. 49-14(a) ("A copy of a certificate of birth of the child shall be attached to the complaint. … The social security numbers, if known, of the minor child's parents shall be placed in the record of the proceeding.").  Fowler Decl. ¶ 66.

119.     Further, AOC has experienced issue with Tyler's autoredaction tool in eFile not correctly working.  Fowler Decl. ¶ 67.  This resulted in PII that the efiler attempted to redact with the autoredaction tool, not in fact being redacted once submitted

through eFile.  *Id.*  The Clerk would then need to redact this PII to prevent it from being available to the public on Portal once accepted into the ICMS.  *Id.*

120.     Neither the Clerks nor AOC track filings that include unredacted PII.  Mehta Decl. ¶¶ 64, 66.

121.     Ms. Mehta provides ten (10) examples of unredacted PII included initial filings, including social security numbers, driver's license numbers, and bank account numbers.  Mehta Decl. ¶¶ 64(c), 65(a) through 65(i).

122.     Clerks have also observed have observed that PII is filed and not redacted by the filer.  O'Neal Decl. ¶ 25; Ball Decl. ¶¶ 28-29.  This is particularly true in collections cases where filers include bank account information in initial filings, including in the complaint or in exhibits to the complaint that are included in the same PDF electronic.  O'Neal Decl. ¶ 25; Ball Decl. ¶ 29.  In addition, social security numbers are often on Servicemember Civil Relief Act forms that are included with initial filings and sometimes included in the same PDF as the complaint.  Ball Decl. ¶ 29; O'Neal Decl. ¶ 25; Exhibit 11, Excerpts of Deposition of Terry Derrick (hereinafter, "Derrick Depo") at 151:12-152:6.

123.     The Press Review Queue has less "safety safeguards against screen scrapers and bots" as compared to Portal.  Derrick Depo. at 163:6-7.

124.     Accordingly, to ensure that PII is not available to the public on the internet through Portal, Clerks must review electronically submitted documents to ensure that any documents with PII are set with a "Public Not Portal" security setting before accepting into the ICMS for redaction.

   *iii.*   <u>*Correcting party names ensures that the public has meaningful access in Portal.*</u>

125.   The party name typed into the eFile field is ingested into the ICMS and will be used to create the statutorily required case indexes (*see* G.S. 7A-109) that are available to the public on Portal. Fowler Decl. ¶ 40. The public can search the indexed cases by party name in addition to case number. *Id.*

126.   The Clerk must ensure that the party name in the eFile fields matches the party name listed on the documents and correct it to match the name on the documents if it does not match. *See* eRule 1.4.A.1 (referencing eCourts Name Indexing Standards which include this requirement); Fowler Decl. ¶ 41.

127.   If the party name does not match, then the case indexes will be inaccurate and the public may not be able to locate the record on Portal. Fowler Decl. ¶ 42. Non-parties rarely know the case number to search. *Id.* Sometimes a party cannot locate their case number and the only way to find their own case is to search by their name. *Id.*

128.   In addition, should a money judgment subsequently issue in that case, the judgement index, which is generated from the party name information in the ICMS, will not accurately reflect the party's names and this may affect title to real property. *See* N.C.G.S.§ 1-234; Fowler Decl. ¶ 43.

129.   The public is accessing Portal at extremely high rates. Currently, there are 4.9 million hits per month. Fowler Decl. ¶ 44. A "hit" includes looking up case information, accessing documents on cases, making payments, and doing judgment searches. *Id.*

130.     Accordingly, to ensure that the public can meaningfully access the court record, the Clerks must correct the party names before accepting the initiating document into the ICMS.

> iv.    *Pre-acceptance procesing ensures false liens are not filed and gatekeeper orders are followed.*

131.     Clerks should reject filings that constitute false liens, or are subject to a gatekeeper order. Fowler Decl. ¶ 31 and Exhibit B; *see also* Whittenton Decl. ¶¶ 38(h), (i), 54; O'Neal Decl. ¶ 22.  Pre-acceptance processing ensures that these documents do not become a court record. Derrick Depo. at 157:1-15. Lis Pendens, a form of lien, are known to be filed with civil complaints. Mehta Decl. ¶ 39.

132.     Allowing access to documents that are false liens, subject to a gatekeeper order, or otherwise do not become part of the court, prior to rejecting them may confuse the public.  Whittenton Decl. ¶ 56; Ball Decl. ¶ 68.  The public is better served by post-processing access in Portal, which provides access to the actual court record. *Id.*

D.  *Clerk Defendants will provide pre-processing inspection, but not copies, of newly filed civil complaints.*

133.     AOC's eRRK Rules do not prohibit a Clerk from providing pre-processing access, Fowler Decl. ¶ 34; however, at this time, AOC does not provide any additional technology to facilitate pre-processing access.

134.     Since March 9, 2023, the Harnett County Clerk has provided access to documents in the eFile Clerk Review Queue to the public upon request at the Courthouse.  Whittenton Decl. ¶ 59 and Exhibits A and B. While PII is viewable in the Clerk Review Queue, a clerk would be present with the member of the public to ensure PII and confidential documents were not viewed. Accordingly, this alternative

protects confidential documents and the public's PII while providing access prior to acceptance into the ICMS.

135.     Since February 13, 2023, the Johnston County Clerk has provided access to documents in the eFile Clerk Review Queue to the public upon request at the Courthouse. Ball Decl. ¶ 71 and Exhibits A. When such requests are made, a clerk is present to ensure PII is not copied and confidential documents were not viewed. Ball Decl. ¶ 71. Accordingly, this alternative protects confidential documents and the public's PII while providing access prior to acceptance into the ICMS.

## VIII.    AOC's Calculation Of Acceptance Rates Under Rule 1.5.

136.     AOC monitors Clerks' acceptance rates under Rule 1.5 and provides those rates to Clerks. Initially, the rates were provided on monthly excel spreadsheets that were emailed to the Clerks. Mehta Decl. ¶ 40. Starting in March 2025, AOC provides acceptance rate statistics to the Clerks through a dashboard available on the Judicial Branch's intranet (JUNO), which is updated monthly. *Id.*

137.     To calculate acceptance rates under Rule 1.5, AOC first receives eFile application data from Tyler providing, inter alia: the county of filing; whether the filing was an initial or subsequent filing; the case node, case category, and case type; the day and time a filing was submitted to the eFile application; and the day and time a clerk accepted the filing into the ICMS making it available to the public on Portal. Mehta Decl. ¶ 41.

138.     Typically, a filing that initiates a civil case is submitted to eFile in the same electronic envelope as related filings (e.g., summons). Mehta Decl. ¶ 42. All of these

documents would be labeled as "initial filings" since they are not being filed into an existing case. *Id.*

139. AOC calculates acceptance rates for initial envelopes and initial filings. Mehta Decl. ¶ 43. The rates presented below are for initial envelopes because each initial envelope should have one document that initiates a case. *Id.* Further, a clerk should not accept a document that is labeled as an initial filing unless the clerk was also accepting the underlying document that initiated the case. *Id.*

140. In calculating acceptance rates, AOC accounts for the Clerks' business hours when the Clerk's office is open to the public and when staff is scheduled to work. Mehta Decl. ¶ 44. This is intended to capture how the district court reviewed filings in *Schaefer*, which the Fourth Circuit upheld. *Id.* It also accounts for the historic access to court filings, which was limited to when a Clerk's office was open to the public. *Id.*

141. Because documents can be electronically submitted to the Clerk for filing after hours and on weekends and holidays, AOC first calculates a "submitted workday" based on the submitted day/time and the clerk's business hours as follows:

- If a filer submits a document before 5:00 PM on a business day, the submitted workday is the submitted day.

- If a filer submits a document after 5:00 on a non-business day, the submitted workday is next business day after the submitted day.

- If a document is submitted on a weekend or holiday, the submitted workday is the next business day after the submitted day.

Mehta Decl. ¶ 45.

73

142.    Essentially, the submitted workday represents the first business day that an electronically filed document would be available to the Clerk for review during business hours.

143.    AOC then calculates the acceptance rate using a formula that works as follows:

- If a Clerk accepts a document on the same calendar day that it is submitted, it will be considered accepted on the same business day even if it is not submitted on a business day.

- If a Clerk accepts a document anytime before midnight on or before its submitted workday, it will be considered accepted on the same business day. Note: a document could be accepted before its submitted workday if a clerk worked afterhours or on a weekend or holiday to accept the filing.

- If a Clerk accepts a document before midnight one business day after its submitted workday, it will be considered accepted within 1 business day (i.e., the next court day).

- If a Clerk accepts a document before midnight two business days after its submitted workday, it will be considered accepted within 2 business days.

- If a Clerk accepts a document before midnight three business days after its submitted workday, it will be considered accepted within 3 business days.

Mehta Decl. ¶ 46.

144.    The following examples illustrate how AOC's calculation operates:

### a.  Monday Submission, No Holiday

| | Submitted Monday at 4:59 PM | Submitted Monday at 5:01 PM |
|---|---|---|
| Accepted Monday 5:30 PM | Same Day | Same Day |
| Accepted Monday 11:59 PM | Same Day | Same Day |
| Accepted Tuesday 12:01 AM | Next Day | Same Day |
| Accepted Tuesday 8:30 AM | Next Day | Same Day |
| Accepted Tuesday 11:59 PM | Next Day | Same Day |
| Accepted Wednesday 12:01 AM | Two Days | Next Day |
| Accepted Wednesday 8:30 AM | Two Days | Next Day |
| Accepted Wednesday 11:59 PM | Two Days | Next Day |

### b.  Friday Submission, No Holiday

| | Submitted Friday at 4:59 PM | Submitted Friday at 5:01 PM |
|---|---|---|
| Accepted Friday 5:30 PM | Same Day | Same Day |
| Accepted Friday 11:59 PM | Same Day | Same Day |
| Accepted Saturday 12:01 AM | Next Day | Same Day |
| Accepted Monday 8:30 AM | Next Day | Same Day |
| Accepted Monday 11:59 PM | Next Day | Same Day |
| Accepted Tuesday 12:01 AM | Two Days | Next Day |
| Accepted Tuesday 8:30 AM | Two Days | Next Day |
| Accepted Tuesday 11:59 PM | Two Days | Next Day |

### c.  Friday Submission, Monday Holiday (Clerk's Office Closed)

| | Submitted Friday at 4:59 PM | Submitted Friday at 5:01 PM |
|---|---|---|
| Accepted Friday 5:30 PM | Same Day | Same Day |
| Accepted Friday 11:59 PM | Same Day | Same Day |
| Accepted Saturday 12:01 AM | Next Day | Same Day |
| Accepted Monday 8:30 AM | Next Day | Same Day |
| Accepted Monday 11:59 PM | Next Day | Same Day |
| Accepted Tuesday 12:01 AM | Next Day | Same Day |
| Accepted Tuesday 8:30 AM | Next Day | Same Day |
| Accepted Tuesday 11:59 PM | Next Day | Same Day |
| Accepted Wednesday 12:01 AM | Two Days | Next Day |

| Accepted Wednesday 8:30 AM | Two Days | Next Day |
|---|---|---|
| Accepted Wednesday 11:59 PM | Two Days | Next Day |

Mehta Decl. ¶ 47.

145.    Under Rule 1.5, AOC calculates acceptances rates for:

- initial filings in civil cases filed in superior and district court; and

- initial filings in foreclosures, guardianships, incompetency proceedings, and nonconfidential name changes, which are deemed "special proceedings" under North Carolina law.

Mehta Decl. ¶¶ 49-50.

146.    The special proceedings included under Rule 1.5 are civil in nature and generally subject to the Rules of Civil Procedure. Mehta Decl. ¶ 48.

147.    AOC's calculation of Clerks' acceptance rates underestimates the number of newly filed civil complaints that are accepted on the same business day because the calculation does not account for the following:

a.    AOC's calculation does not factor in delays between when a document is submitted through the eFile application and when it is available to the Clerk for review in the Clerk Review Queue (which is when it would be available in any Press Review Queue, too). Mehta ¶¶ 57, 59. These delays have been documented to be up to 30 minutes and may prevent the Clerks' from accepting a document before the close of business for the day if the document is submitted at the end of the day. Mehta ¶¶ 57,

59; Whittenton Decl. ¶ 37; Ball Decl. ¶ 48. Approximately 11% of filings that are submitted between 4:00 PM and 5:00 PM. Mehta ¶ 58.

b. AOC's calculation does not factor in weather events that close the courthouse, such as winter weather or hurricanes. Mehta ¶ 60. AOC is aware that many Clerks' offices experienced weather closures in January and February of 2025. *Id.* Weather closures artificially decrease the acceptance rates making them appear lower than they actually are based on when the Clerk's office is open to the public. *Id.*

c. AOC's calculation of acceptance rates does not account for filings that have "errored." Mehta ¶ 61. These are filings that the Clerk's office is unable to accept into the ICMS from the eFile application due to a technological malfunction. *Id.*; Whittenton Decl. ¶ 41; O'Neal Decl. ¶ 27; Ball Decl. ¶ 52. A Clerk's office must contact Tyler support staff to assist in processing these documents and it can take days, weeks, or even months to correct, or Tyler may not be able to correct the issue. Mehta ¶ 61; O'Neal Decl. ¶ 27; Ball Decl. ¶ 52. Errored filings artificially decrease the acceptance rates making them appear lower than they actually are based on when the Clerk's office is technologically able to accept the document into the ICMS. Mehta ¶ 61; Ball Decl. ¶ 52.

## IX. The Clerk Defendants' Process Newly Filed Civil Complaints on the Same Business Day That They are Filed At Rates Well Above 90%.

148. The Clerk Defendants' acceptance rates are calculated in Mehta Exhibits B and C. Mehta Decl. ¶ 51

149.    The same business day acceptance rates and with/in one business day acceptance rates (which adds the same business day and one business day acceptance rates) rates are provided below:

**a. Table 1: 2023 Acceptance Rates for Clerk Defendants**

| Month | Acceptance Rate | Harnett | Johnston | Wake |
|---|---|---|---|---|
| February | Same Business Day | 28.57 | 37.8 | 12.51 |
| | W/in 1 Business Day | 70 | 69.3 | 33.36 |
| March | Same Business Day | 54.14 | 41.32 | 62.7 |
| | W/in 1 Business Day | 84.53 | 64.84 | 94.68 |
| April | Same Business Day | 58.42 | 45.94 | 69.18 |
| | W/in 1 Business Day | 87.89 | 66.95 | 99.51 |
| May | Same Business Day | 51.49 | 64.43 | 70.44 |
| | W/in 1 Business Day | 80.7 | 91.75 | 99.32 |
| June | Same Business Day | 71.92 | 66.75 | 67.98 |
| | W/in 1 Business Day | 95.07 | 91.25 | 99.02 |
| July | Same Day | 71.84 | 68.06 | 74.8 |
| | W/in 1 Business Day | 96.11 | 93.06 | 99.48 |
| August | Same Day | 92.5 | 91.72 | 96.04 |
| | W/in 1 Business Day | 99 | 97.54 | 100 |
| September | Same Day | 98.65 | 99.76 | 99.79 |
| | W/in 1 Business Day | 99.55 | 100 | 99.97 |
| October | Same Day | 97.96 | 97.64 | 99.78 |
| | W/in 1 Business Day | 99.59 | 99.57 | 99.97 |
| November | Same Day | 94.98 | 93.63 | 98.28 |
| | W/in 1 Business Day | 100 | 100 | 99.86 |
| December | Same Day | 98.28 | 98.82 | 99.36 |
| | W/in 1 Business Day | 100 | 100 | 99.73 |

Mehta Decl. ¶ 53.

**b.  Table 2: 2024 Acceptance Rates for Clerk Defendants**

| Month | Acceptance Rate | Harnett | Johnston | Wake |
|---|---|---|---|---|
| January | Same Business Day | 97.84 | 98.23 | 99.56 |
| | W/in 1 Business Day | 99.57 | 100 | 99.77 |
| February | Same Business Day | 100 | 97.75 | 99.58 |
| | W/in 1 Business Day | 100 | 99.77 | 99.91 |
| March | Same Business Day | 99.51 | 99.05 | 99.72 |
| | W/in 1 Business Day | 100 | 100 | 99.96 |
| April | Same Business Day | 99.02 | 99.04 | 99.25 |
| | W/in 1 Business Day | 100 | 100 | 99.94 |
| May | Same Business Day | 99.6 | 99.15 | 99.71 |
| | W/in 1 Business Day | 99.6 | 100 | 100 |
| June | Same Business Day | 100 | 98.67 | 99.56 |
| | W/in 1 Business Day | 100 | 100 | 99.9 |
| July | Same Business Day | 100 | 98.78 | 99.46 |
| | W/in 1 Business Day | 100 | 100 | 99.91 |
| August | Same Business Day | 100 | 99.19 | 99.7 |
| | W/in 1 Business Day | 100 | 99.39 | 99.94 |
| September | Same Business Day | 100 | 99.32 | 99.85 |
| | W/in 1 Business Day | 100 | 100 | 100 |
| October | Same Business Day | 100 | 100 | 99.58 |
| | W/in 1 Business Day | 100 | 100 | 99.97 |
| November | Same Business Day | 100 | 99.78 | 99.77 |
| | W/in 1 Business Day | 100 | 100 | 99.96 |
| December | Same Business Day | 100 | 99.8 | 98.48 |
| | W/in 1 Business Day | 100 | 100 | 100 |

Mehta Decl. ¶ 54.

**c. Table 3: 2025 Acceptance Rates for Clerk Defendants**

| Month | Acceptance Rate | Harnett | Johnston | Wake |
|---|---|---|---|---|
| January | **Same Business Day** | 99.38 | 95.06 | 98.85 |
| | **W/in 1 Business Day** | 100 | 100 | 99.81 |
| February | **Same Business Day** | 99.67 | 99.2 | 99.33 |
| | **W/in 1 Business Day** | 100 | 100 | 99.97 |
| March | **Same Business Day** | 100 | 99.46 | 98.9 |
| | **W/in 1 Business Day** | 100 | 100 | 100 |
| April | **Same Business Day** | 99.63 | 98.8 | 99.72 |
| | **W/in 1 Business Day** | 100 | 100 | 99.97 |
| May | **Same Business Day** | 100 | 99.2 | 99.4 |
| | **W/in 1 Business Day** | 100 | 99.8 | 100 |

Mehta Decl. ¶ 55.

150.     The Clerk Defendants' Acceptances Rate for 2023 through present are also shown on the following graphs:

a. Figure 1: Harnett County Acceptance Rates: February 13, 2023 through May 2025



Harnett County File and Serve Acceptance Rates Within One Business Day
February 2023 through May 2025

| | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Same Business Day | 28.6% | 54.1% | 58.4% | 51.5% | 71.9% | 71.8% | 92.5% | 98.7% | 98.0% | 95.0% | 98.3% | 97.8% | 100.0% | 99.5% | 99.0% | 99.6% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 99.4% | 99.7% | 100.0% | 99.6% | 100.0% |
| Within One Business Day | 70.0% | 84.5% | 87.9% | 80.7% | 95.1% | 96.1% | 99.0% | 99.6% | 99.6% | 100.0% | 100.0% | 99.6% | 100.0% | 100.0% | 100.0% | 99.6% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

b. Figure 2: Johnston County Acceptance Rates: February 13, 2023 through May 2025



Johnston County File and Serve Acceptance Rates Within One Business Day
February 2023 through May 2025

| | Feb 2023 | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan 2024 | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan 2025 | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Same Business Day | 37.8% | 41.3% | 45.9% | 64.4% | 66.8% | 68.1% | 91.7% | 99.8% | 97.6% | 93.6% | 98.8% | 98.2% | 97.8% | 99.1% | 99.0% | 99.2% | 100.0% | 98.8% | 98.7% | 99.2% | 99.3% | 100.0% | 99.8% | 95.1% | 99.2% | 99.5% | 98.8% | 99.2% |
| Within One Business Day | 69.3% | 64.8% | 67.0% | 91.8% | 91.3% | 93.1% | 97.5% | 100.0% | 99.6% | 100.0% | 100.0% | 100.0% | 99.8% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 99.4% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 99.8% |

c. Figure 3: Wake County Acceptance Rates: February 13, 2023 through August 2023



Harnett County File and Serve Acceptence Rates Within One Business Day
February 2023 through May 2025

| | Feb 2023 | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan 2024 | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan 2025 | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Same Business Day | 28.6% | 54.1% | 58.4% | 51.5% | 71.9% | 71.8% | 92.5% | 98.7% | 98.0% | 95.0% | 98.3% | 97.8% | 100.0% | 99.5% | 99.0% | 99.6% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 99.4% | 99.7% | 100.0% | 99.6% | 100.0% |
| Within One Business Day | 70.0% | 84.5% | 87.9% | 80.7% | 95.1% | 96.1% | 99.0% | 99.6% | 99.6% | 100.0% | 100.0% | 99.6% | 100.0% | 100.0% | 99.6% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

151.     The data shows that the Clerks Defendants have been accepting newly filed civil complaints on the same business day at a rate of 90% or greater since August 2023.  Mehta Decl. ¶¶ 52-55.

152.     The data shows that the Clerk Defendants were regularly increasing their same business day acceptance and within one business day acceptance, from go-live during the first six months of go-live.  Mehta Decl. ¶¶ 56, 56 (a)-(c).

**X.     This Court Should Not Rely On CNS' Proposed Acceptance Rates Because They Do Not Account For All Civil Filings Or Business Days And Hours.**

153.     The acceptance rates calculated by Mr. Angione do not account for all civil filings submitted to the North Carolina General Courts of Justice; the rates exclude:

a.  District court filings, including: general civil claims, domestic violence protection cases, divorce, and custody; and

b.  Superior court filings for which the Clerk has initial jurisdiction, including: foreclosure, guardianships, and name changes (e.g., special proceedings).

Mehta Decl. ¶¶ 68-69.

154.     Mr. Angione's calculations also failed to account for when a Clerk's office would be open for business and instead are based on calendar days and 24 hours operations.  Accordingly, these calculations ignore when filings were historically available for review in a Clerk's office. Mehta Decl. ¶ 72.

155.     Mr. Angione's calculations are also not consistent with his presentation of the data because he included some, but not all, of the case types that he purported to exclude in his calculations. Mehta Decl. ¶¶ 70-71.

**XI.** **The Complaints Identified By Plaintiff Demonstrate That The Clerk Defendants Are Timely Accepting Newly Filed Civil Complaints During Business Days And Hours.**

156.     Plaintiff identifies seven Complaints that were not available to the public on the same calendar say that they were submitted through eFile.  Plaintiff's SOF ¶ 57.

157.     Of these seven, three were available on the same business day that they were first available for clerk review during business hours.  Mehta Decl. ¶¶ 62(a), (b), (d). Specifically:

    a.   The Complaint in 24CV039723-910 was submitted through eFile after business hours at 5:09 PM 12/12/24 and made available to the public on Portal on the same business day that it was first available for clerk review during business hours, specifically on 12/13/24 at 8:42 AM. Mehta Decl. ¶ 62(a). This was twelve (12) business minutes after submission.  *See* O'Neal Decl. ¶ 6. (providing Wake County Clerk's business hours).

    b.  The Complaint in 23CV008736-910 was submitted through eFile after business hours at 5:17 PM 4/14/23.  It was made available to the public on Portal the same business day that it was first available for clerk review during business hours, specifically on 4/17/23 at 11:06 AM. Mehta Decl. ¶ 62(b). This was three (2) business hours and thirty-six (36) business minutes after submission. *See* O'Neal Decl. ¶ 6. (providing Wake County Clerk's business hours).

    c.  The Complaint in 24CV039915-910 was submitted through eFile on a Sunday (12/15/24) at 2:04 PM when the court was closed for business.  It was made available to the public on Portal the same business day that it was first available for Clerk review during business hours, specifically on 12/16/24 at 8:46 AM.

Mehta Decl. ¶ 62(d). This was sixteen (16) business minutes after submission. *See* O'Neal Decl. ¶ 6. (providing Wake County Clerk's business hours).

158.    For two of the seven, due to the known delays described in Defendants SOF ¶ 147(a), AOC cannot confirm whether the document was available to the Clerk during business hours on the day it was filed.  Regardless, each document was available on the next business day after it was filed. Further, one of the documents was not filed with the Clerk Defendants but was filed in Mecklenburg County. Specifically:

    a.  The Complaint in 24CV050336-590 was submitted through eFile at 4:52 PM on 10/28/2024, and made available to the public on Portal on 10/29/24 at 9:44 AM.  Due to the known delays between submission in eFile and availability in the Clerk Reviewer Queue, AOC cannot confirm whether this filing was available in the Clerk Reviewer Queue prior to the close of business on the day that it was filed 10/28/2024. Mehta Decl. ¶ 62(c).

    b.  The Complaint in 23CV006379-910 was submitted through eFile at 4:42 PM on 3/20/23 and made available to the public on Portal on 3/21/23 at 11:31 AM. Due to the known delays between submission in eFile and availability in the Clerk Reviewer Queue, AOC cannot confirm whether this filing was available in the Clerk Reviewer Queue prior to the close of business on 3/20/23. Mehta Decl. ¶ 62(e).

159.    The remaining two Complaints referenced in Plaintiff's SOF ¶ 57 were available the next business day after they were filed.  One of them was available to the public less than 24 hours after it was filed.  Both were made available to the public first thing in the morning on the next business day.  Specifically:

a. The Complaint in 23CV005042-910 was submitted through eFile on 3/7/2023 at 12:25 PM and made available to the public on Portal on 3/8/23 at 8:22 AM. Mehta Decl. ¶ 62(f). This was four (4) business hours and thirty-five (35) business minutes after submission. *See* O'Neal Decl. ¶ 6 (providing Wake County Clerk's business hours).

b. The Complaint in 23CV010964-910 was submitted through eFile on Friday 5/5/2023 at 2:54 PM and made available to the public on Portal on Monday 5/8/23 at 9:11 AM. Mehta Decl. ¶ 62(g). This was two (2) business hours and forty-seven (47) business minutes after submission. *See* O'Neal Decl. ¶ 6. (providing Wake County Clerk's business hours). This was also filed early in eCourts implementation before the Wake Clerk directed staff to accept civil complaints filed by 5:00 PM before leaving for the day. *See* SOF ¶ 88(c).

## XII. Beaufort, Durham, or Mecklenburg County's Acceptance Rates Do Not Demonstrate That Clerk Defendants Violate The First Amendment.

160.    AOC reviewed the Beaufort County Clerk of Superior Court's office calculated acceptance rates for August and September 2024 and the data used to support those calculations, which are available in Exhibit F to Docket Entry 80-8 (Brennan Decl. ¶ 7, Exh. F (AOC-066742)); Mehta Decl. ¶ 74. The same business day rates for these months likely undercalculate same day acceptance based on when a filing was first made available to the Clerk for review in the Clerk Review Queue. *Id.*

161.    In August, there were seventy-nine (79) initial civil filing envelopes submitted to the Beaufort Clerk's office. Mehta Decl. ¶ 75. Sixty-five (65) of those were accepted the same business day under AOC's calculations. *Id.* Eight (8) were accepted one

business day later.  *Id.*  However, of the eight (8) accepted one business day later, four (4) were submitted between 4:31 PM and 4:58 PM (envelope #s: 1048637, 1066579, 1123432, 1123507).  *Id.*

162.    Due to the known delay in the Clerk Review Queue, these four (4) envelopes may not have been available in the Clerk Review Queue before 5:00 PM on the business day that they were submitted.  Mehta Decl. ¶ 76.  Accordingly, these envelopes may be more appropriately considered to be accepted on the same business day.  *Id.*  These envelopes represent five percent (5%) of Beaufort's civil initial envelopes for the month of August, and therefore, Beaufort same business day acceptance may have been five percent (5%) higher after accounting for delays.  *Id.*

163.    In September, there were sixty-three (63) initial civil filing envelopes submitted to the Beaufort Clerk's office.  Mehta Decl. ¶ 77.  Fifty-two (52) of those were accepted the same business day under AOC's calculations.  *Id.*  Eleven (11) of the envelopes were accepted one business day later.  *Id.*  However, five (5) of the eleven (11) were submitted between 4:42 and 4:58 (envelope #s: 1229919, 1275759, 1287394. 1287428, 1287509).  *Id.*

164.    Due to the known delay in the Clerk Review Queue, these five (5) envelopes may not have been available in the Clerk Review Queue before 5:00 PM on the business day that they were submitted.  Mehta Decl. ¶ 78.  Accordingly, these envelopes may be more appropriately considered to be accepted on the same business day.  *Id.*  These envelopes represent seven percent (7%) of Beaufort's civil initial envelopes for the month of September, and therefore, Beaufort same business day acceptance may have been seven percent (7%) higher after accounting for delays.  *Id.*

165.    In addition, AOC does not currently have knowledge of circumstances that affected the Beaufort County Clerk's office in these months that may have made same business day acceptance not practicable.  Mehta Decl. ¶ 79.  For example, court sessions may have run late certain days impacting the office ability to accept filings late in the day.  *Id.*  Or there may have been clerk vacancies in the civil division, staff turnover, or staff illness or vacation.  *Id.*  The Beaufort County Clerk of Superior Court, who is not a defendant in this case, would have knowledge of the office's unique circumstances.

166.    The Durham County Clerk of Superior Court's office went live on eCourts on April 29, 2024.  Mehta Decl. ¶ 80.  The first six-months of eCourts for the Durham office essentially ran through the end of October 2024.  *Id.*

167.    The Durham County Clerk of Superior Court's office same business day acceptance rates have been above 90% since October 2024, and are provided below.  Mehta Decl. ¶ 81.

| Year | Month | Acceptance Rate | |
|------|-------|-----------------|---|
| 2023 | October | Same Business Day | 93.94 |
| | | Next Business Day | 6.06 |
| 2023 | November | Same Business Day | 94.84 |
| | | Next Business Day | 6.32 |
| 2023 | December | Same Day | 93.87 |
| | | Next Business Day | 6.03 |
| 2024 | January | Same Day | 91.77 |
| | | Next Business Day | 8.14 |
| 2024 | February | Same Day | 91.01 |
| | | Next Business Day | 8.70 |

| 2024 | March | Same Day | 98.57 |
| | | Next Business Day | 1.43 |
| 2024 | April | Same Day | 96.39 |
| | | Next Business Day | 3.61 |
| 2024 | May | Same Day | 98.14 |
| | | Next Business Day | 1.75 |

168.     The Mecklenburg County Clerk's acceptance rates decreased in the immediate aftermath of that office losing temporary staff and overtime authorization, which occurred at the end of June 2024.  Mehta Decl. ¶ 83.

169.     However, the Mecklenburg Clerk has been able to increase her office's acceptance numbers since that time.  Mehta Decl. ¶ 84.  That office's same business day acceptance rates have been above 98% for the last three months (March, April, and May 2025).  *Id.*

170.     Further, the Mecklenburg County Clerk's office reported to AOC that it was closed for weather events in January (two business days) and February 2025 (one business day).  Mehta Decl. ¶ 85.  Accordingly, the same business day statistics that AOC calculated for those offices will underreport same business day acceptance.  *Id.*

**XIII.  AOC Carefully Considered Whether To Implement The Press Review Queue And/Or Auto-Acceptance.**

*A.  AOC initially considered and rejected the PRQ and Auto-Accept when it first implemented eCourts.*

171.     Plaintiff first contacted AOC in 2019 to inquire about the Press Review Queue and access to newly filed civil complaints.  Fowler Decl. ¶ 56.  AOC researched the Press Review Queue by contacting Tyler to learn about its functionality and by

contacting other states that have implemented Tyler products to determine if they use the Press Review Queue and their experiences with it. *Id.*

172.    AOC established an eCourts Advisory Committee to provide feedback on potential eCourts configuration options.  Fowler Decl. ¶ 57.  The Committee consisted of two Clerks, two district court judges, two superior court judges, two judicial support staff, two district attorneys, one public defender, one magistrate, one additional individual each from Wake and Mecklenburg Counties.  *Id.*  AOC solicited nominations for membership from the presidents of the conferences and associations of each of these constituencies (e.g., the Conference of Clerks of Superior Court).  *Id.*

173.    The eCourts Advisory Committee considered whether to implement the Clerk Review Queue in eFile (versus auto-acceptance) and whether to implement the Press Review Queue.  Fowler Decl. ¶ 58.  For example:

   a.   AOC disseminated to Committee members written materials provided by Courthouse News Service's attorney regarding why AOC should implement the Press Review Queue.  Fowler Decl. ¶ 58.

   b.   Committee members Todd Tilley (a Clerk representative) and Lorrin Freeman (District Attorney representative and former Clerk) were aware of Courthouse New Service's prior litigation and discussed with AOC the district court's opinion in the *Schaefer* case and access standards.  Fowler Decl. ¶ 58; Fowler Decl. at Exhibit C.

   c.   At its February and May 2020 meetings, the Committee considered the Press Review Queue, Clerk Review Queue, and Portal.  Fowler Decl. ¶ 58; Fowler Decl. at Exhibit D. Tyler provided a demo of the Press Review Queue and

Portal for the Committee's consideration. *Id.* AOC's Office of General Counsel presented on, *inter alia*, First Amendment rights of access and the Clerk's duty regarding docketing false liens and protecting PII. *Id.*

174. At the end of its May 21, 2020, meeting the eCourts Advisory Committee acknowledged that AOC planned to move forward with Portal and the Clerk Review Queue, but would not move forward with the Press Review Queue unless the Committee recommended it. Fowler Decl. ¶ 59. The Committee never recommended it. *Id.*

175. In 2020, AOC decided not to implement the Press Review Queue or auto-accept because:

   a. Portal provides free public access on the internet access to non-confidential documents that are both efiled and submitted in paper and helps ensures that confidential and sensitive information is not available to the public. Fowler Decl. ¶ 60.

   b. The Press Review Queue and auto-acceptance do not ensure that appropriate document security can be applied (e.g., confidential case types and redaction of PII included in filings), while the Clerk Review Queue does. Fowler Decl. ¶ 60.

   c. The Clerk Reviewer Queue honors the Clerk's statutory and historical role in reviewing documents before filing (e.g., rejecting filings based on Gatekeeper orders, false liens, providing non-legal guidance to filers at the counter so that filers could correct filings before filing). Fowler Decl. ¶ 60.

d. The Clerk Reviewer Queue allows filing errors to be addressed before acceptance and creation of the official court record. Fowler Decl. ¶ 60. It also helps prevents mistakes and ensure correct filing fees –it is more difficult to correct filings and back out filing fees after acceptance. Fowler Decl. ¶ 60.

e. Tyler recommended the Clerk Review Queue. Fowler Decl. ¶ 60.

176. In 2021, AOC continued to investigate the Press Review Queue by researching how other states and counties were implementing it. AOC did not learn anything that changed its decision not to implement the Press Review Queue and the reasons it chose not to implement it. Fowler Decl. ¶ 61.

177. The North Carolina Supreme Court amended Rule 5 of the General Rules of Practice in February 2023 to include bases for a Clerk to reject a filing. Fowler Decl. ¶ 62. This amendment led AOC to another reason that the Auto Acceptance and Press Review Queue should not be implemented. Specifically, a Clerk now has authority to reject a submission upon a filer's request, and therefore, the public (including CNS) may be confused if a submission was in the Press Review Queue but subsequently rejected and never became a case filing. *Id.*

178. AOC is aware that the Press Review Queue can be configured to limit which submissions populate it, including based on: the case-node, case-category, and case-type, the document type, and the security setting chosen by the individual that submitted it. Fowler Decl. ¶ 63.

179. These configuration changes do not address the policy concerns that informed AOC's decision not to implement the Press Review Queue because filers, even attorney filers, make mistakes and can select the wrong case-node/category/type,

document type, or security code. Fowler Decl. ¶ 63; Whittenton Decl. ¶ 58. This would result in confidential case documents and/or PII being disclosed to the public in the Press Review Queue. Fowler Decl. ¶ 63.

B. *AOC subsequently consider a version of the PRQ, but abandoned that option when it proved contrary to its interests and business needs.*

180. In August 2024, the Director decided to provide the Clerks with technology to allow the public to view new electronically filed civil complaints prior to acceptance (a "pre-acceptance terminal") at the respective courthouse, if the Clerk's office was unable to accept filings on the same day at a 90% or greater rate six months after implementation of eCourts. Tyler Technologies was to provide the software application for this technology through its Press Review Queue application and AOC was to assist in configuring that application and providing a laptop for its use. Mehta Decl. ¶ 13.

181. For example, the pre-acceptance terminals would only allow a member of the public to view the document but not obtain a copy of it. To obtain a copy of any document available for viewing on the terminal, the member of the public would have to request it from the Clerk who could then redact the PII in accordance with Rule 1.8 of the eRRK. Mehta Decl. ¶ 14.

182. This decision was made based on new information about configuration options obtained from Tyler for purposes of settlement negotiations (which occurred in June 2024) and feedback from some Clerks that their offices were having trouble accepting filings on the same day they were submitted due to staffing shortages and the phasing out of temporary staff which had been funded for the eCourts launch and transition

period but were discontinued in July 2024 for Track 1 and 2 counties. Mehta Decl. ¶ 15.

183. Staffing shortages were known to be particularly difficult on small offices that only had 5-6 clerks total, which includes much of the Track 3 counties that launched eCourts in February 2024. Mehta Decl. ¶ 15.

184. The Director determined that offering a public terminal in these limited circumstances and with the anticipated configuration options (i.e., only newly filed civil complaints would be available, no subsequent filings; attorney only filings would be available, no pro se filings; and the filings would only be available at a terminal at the courthouse and not on the internet subject to screen scraping, etc.) would sufficiently balance the protection of confidential information, including PII, from dissemination while also providing the Clerks' office with a resource to allow additional public access in circumstances where the Clerk's staffing and other resources issues limited same- or next-day acceptance capabilities. Mehta Decl. ¶ 16.

185. The Director memorialized this decision in Rule 1.5 of the eRRK. The Director approved the amendment in early October 2024 after it was presented at the September 2024 Rules of Recordkeeping Committee meeting. Mehta Decl. ¶ 17.

186. The following language was added to Rule 1.5 in the October 2024 Amendment:

> Absent extenuating circumstances and insofar as is practicable, clerks should accept electronically-filed initiating documents for civil matters, foreclosures, guardianships, incompetency proceedings, and non-confidential name changes into the ICMS on the same business day, meaning that such documents filed before 5:00 PM on a day that the clerk's office is open to receive filings are accepted into the ICMS by 11:59pm on the same calendar day ("same day acceptance"), and when

not practicable, on the next court date. If a clerk's office is at least six months post-ICMS implementation and exhibits same day acceptance rates below 90% for three consecutive months, NCAOC will provide that clerk's office with a computer terminal equipped with functionality to display all non-confidential, initiating documents in civil matters, foreclosures, guardianships, incompetency proceedings, and non-confidential name changes that have been filed in that county but not yet accepted by the clerk's office ("pre-acceptance terminal"); cases will only display on this pre-acceptance terminal until accepted into the ICMS by the clerk's office. NCAOC will remove a pre-acceptance terminal upon request of the clerk, so long as that county has exhibited three consecutive months of at least 90% same day acceptance.

Mehta Decl. ¶ 17.

187.    Following the Amendment, AOC staff immediately began work with Tyler to configure the computer terminal for implementation in the event a Clerk's office qualified. Mehta Decl. ¶ 33.

188.    When Rule 1.5 initially passed, no clerk's office would have qualified for a pre-acceptance terminal based on the Rule 1.5 standard.  Mehta Decl. ¶ 33.  Subsequently, in early January 2025 when the December acceptance rates became available, it appeared that the Mecklenburg County Clerk of Superior Court's office would qualify for a terminal under Rule 1.5. Mehta Decl. ¶ 34.   AOC staff worked to finish implementation. *Id.*

189.    In early February to March 2025, AOC learned that the pre-acceptance terminals could not be configured as anticipated. Specifically:

- The terminals "could not be configured to be limited to newly filed complaints only."  This limitation was concerning because PII and confidential documents are much more prevalent in subsequent filings than initial filings.

- The terminals "could not be limited by IP address, meaning that they could not be limited to a single laptop that was housed locally in a clerk's office," and "the URL would be shown" on the terminal which would allow someone to know the address and access it from outside a Clerk's office.

- The terminal could not be configured to show only attorney filings and not pro se filings, which presents a greater risk to the release of confidential documents and PII as pro se filers are understood not to have as great an understanding of how or why to protect this information when filing.

Mehta Decl. ¶ 35; Mehta Exhibit A.

190.    AOC determined that that the available configuration options failed to sufficiently protect confidential information and PII from public disclosure. Mehta Decl. ¶ 35

191.    On April 11, 2025, the Director amended Rule 1.5 to remove the terminal provision because it could not meet the business needs as described above.  Mehta Decl. ¶ 36; Mehta Exhibit A.

192.    The Director did not remove, and has no intention of removing, the Rule 1.5's reference to the Fourth Circuit's legal standard for making newly filed civil complaints available to the public. Boyce Decl. ¶ 4.

193.    Subsequently, AOC investigated the ability to provide a pre-acceptance terminal under Rule 1.5 through Application Programming Interface (API) technology instead of Tyler's Press Review Queue application.  Mehta Decl. ¶ 38. AOC determined that this was not feasible because: (1) AOC does not have staff that could support the development of an application using the API technology; and (2)

AOC is concerned that integrating an API solution with the Tyler system will slow down the eCourts system because a past API integration has historically slowed the system down and made it more difficult for Judicial Branch users to perform core duties and processes in the system. *Id.*

### C. Clerk Defendants Agree that the Press Review Queue technology and Auto-Acceptance Does Not Meet Their Business Needs and Interests.

194.     Clerk of Superior Court do not have the authority or budget to implement CNS' requested technologies—they are not appropriated any monies and, without such funds, cannot pay for the requested technologies.  Whittenton Decl. ¶¶ 47-48; Ball Decl. ¶¶ 59-60.  Even if Clerk Defendants had funding, they all agree that the Press Review Queue and Auto-Acceptance technologies would not meet their business needs.

195.     Neither technology would allow their offices to review filings for the correct security settings prior to making them available to the public in Press Review Queue or Portal, which could result in a confidential document being available to the public on those applications.  Whittenton Decl. ¶ 50; Croom Decl. ¶¶ 6-7, 10; Ball Decl. ¶ 62.

196.     Neither technology would allow their offices to review filings for PII and redact PII prior to the document being available to the public in the Press Review Queue or Portal.  Whittenton Decl. ¶¶ 51-53; Croom Decl. ¶¶ 4-5, 9; Ball Decl. ¶ 63.

197.     Auto-acceptance would not allow their office to review filings for rejection pursuant to the General Rules of Practice, Rule 5.  Whittenton Decl. ¶ 54; Ball Decl. ¶ 66.  This could result in a false lien being filed or allow an individual subject to a

Gatekeeper order filing a new case or document in violation of a court order prohibiting that action. Whittenton Decl. ¶ 54; Croom Decl. ¶ 11-12; Ball Decl. ¶ 66.

198. While Clerks do not track the number of false liens filed, they are known to occur. Williams Depo. at 123:22-124:13.

199. Auto-acceptance also would not allow Clerks Defendants offices to provide the public with the customer service that they have historically provided in reviewing documents and notifying the filer of potential issues prior to filing so that it can be corrected. Whittenton Decl. ¶ 55; Croom Decl. ¶ 13; Ball Decl. ¶ 67. This public service is important because, among other things, it prevents unnecessarily duplicative case filings, identifies errors early thereby eliminating unnecessary use of court time, reduced attorney fees to clients to correct errors and will ensure that the public does not have to pay the duplicative filing fees and preventable attorney fees. Whittenton Decl. ¶ 55; Ball Decl. ¶ 67. .

**XIV.** **AOC's Interpretation Of eRRK Rule 1.5.**

200. Rule 1.5 of the eRRK currently provides as follows:

> Absent extenuating circumstances and insofar as is practicable, clerks should accept electronically-filed initiating documents for civil matters, foreclosures, guardianships, incompetency proceedings, and non-confidential name changes into the ICMS on the same business day, meaning that such documents filed before 5:00 PM on a day that the clerk's office is open to receive filings are accepted into the ICMS by 11:59pm on the same calendar day ("same day acceptance"), and when not practicable, on the next court date. FN5  NCAOC will provide the clerks with same day acceptance and next court date acceptance rates for all non-confidential, initiating documents in civil matters, foreclosures, guardianships, incompetency proceedings, and non-confidential names changes.

> FN 5 *See Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021), *affirming Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d

532 (E.D. Va. 2020).

Mehta Decl. ¶ 36.

201.     AOC does not have a written or documented definition for what extenuating circumstances are.  Mehta Decl. ¶ 20.

202.     It is AOC's position that extenuating circumstances must be evaluated on a case-by-case basis.  That is because North Carolina is a state with 100 counties that are vastly different in their size, in their staffing in clerk's office, in their existing staffing relative to their workload. Mehta Decl. ¶ 21.

203.     AOC is aware that Clerk's office staffing levels vary relative to their workloads and that not all Clerk's office are fully staffed compared to workload.  Mehta Decl. ¶¶ 22-23.

204.     A weather event (e.g., snow, hurricanes, flooding, etc.) that closes a Clerk's office entirely or early may constitute an extenuating circumstance.  Mehta Decl. ¶ 24.

205.     eCourts service outages or interruptions that prevent a Clerk from reviewing and accepting filings may constitute an extenuating circumstance.  Mehta Decl. ¶ 25. Unexpected service outages and interruptions can and do occur during a Clerk's business hours.  *Id.* To be clear, AOC would not consider routine and planned maintenance outages of the eCourts system as an extenuating circumstance, and in any event are planned for periods of time when the Clerks' offices are closed (i.e., nights and weekends).  *Id.*

206.     As provided in more detail below, AOC considers the first six months of the eCourts transition process, in and of itself, to be an extenuating circumstance because

101

it was a transformational change, particularly for clerks, elected clerks, and for assistant and deputy clerks in our state. Mehta Decl. ¶ 26.

207.    AOC also does not have a universally applied definition of what is practicable. Mehta Decl. ¶ 29.  What is practicable for one clerk's office might not be practicable for another clerk's office.  *Id*.

208.    In AOC's opinion, what is practicable will depend on each office's resources and the unique operations of the district and superior courts and public in their county. Mehta Decl. ¶ 30. This will include considerations such as: the staffing levels (ultimately set by the General Assembly and sometimes supplemented by the County); the administrative orders that the Clerk must follow (which are issued by the Senior Resident Superior Court Judge and Chief District Court Judge in their district); the number and types of cases that are filed in the Clerk's office; the number and types of cases calendared for hearing or trial each day by the judges (and district attorney for criminal district court matters); and the foot, phone and email traffic coming into the Clerk's office including inquiries from the general public and attorneys seeking information and asking questions.  *Id.*

209.    None of these factors are controlled by AOC; these are factors that are outside the control of the Clerk's office and vary greatly from county to county. Mehta Decl. ¶ 31.

**XV.    AOC's Communications with CNS**

210.    In April 2023, AOC received a letter from Courthouse News Service dated April 6, 2023, requesting "on-receipt" access to newly filed civil complaints through either a Press Review Queue or an auto-accept feature. D.E. 80-5 at 83-85.  The Clerks

of Superior Court for Wake County, Harnett County, and Johnston County received similar letters around the same time. *Id.* 86-91. The letters requested a response within 30 days.

211. In analyzing CNS' request to develop a response, AOC determined that expected technological improvements, additional training and lived experience for clerks, and further refined business practices would significantly improve the speed at which clerks were able to accept filings within a few months. Ex. 8, Declaration of Andrew Brown ("Brown Decl.") ¶¶ 4-5. AOC assessed that its understanding of the speed at which pilot county clerks could accept filings would be much clearer by early July. *Id.*

212. On April 28, 2023, AOC's General Counsel responded to Courthouse New Service on behalf of AOC and the Clerks. D.E. 80-5 at 92. The letter attempted to convey a transparent, reasonable, and collaborative approach. Brown Decl. ¶ 6. It did not foreclose future conversation with CNS about the Press Review Queue or other possible technology solutions, but rather explained that AOC was "working closely with Tyler Technologies to remedy important technological concerns and remains deeply engaged in training and assisting judicial officials, court personnel, and the public in adapting to this fundamental change in how North Carolina's courts operate." D.E. 80-5 at 92. The letter respectfully requested 60 additional days to respond and promised a follow up response by July 6, 2024. *Id.*

213. AOC received a letter from CNS dated May 8, 2023, that declined AOC's reasonable request for an additional 60 days to respond. The letter represented that its counsel, Carol LoCicero with Thomas & LoCicero, would call AOC's counsel to

103

speak about AOC's April 28th letter. Brown Decl. ¶ 7 and Exhibit A (Letter from Bill Girdner to Andrew Brown, May 8, 2023).

214.     AOC did not hear from Ms. LoCicero or anyone else representing CNS until May 26, 2023, after this lawsuit was already filed. Brown Decl. ¶ 8 and Exhibit B (Email correspondence from Andrew Brown to Ms. LoCicero, June 2, 2023).


Respectfully submitted this the 20th day of June, 2025.

JEFF JACKSON
Attorney General


/s/Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. State Bar No. 28885
E-mail: eobrien@ncdoj.gov
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6800
Fax: (919) 716-6755
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day electronically filed the foregoing DEFENDANTS' STATEMENT OF MATERIAL FACTS using the CM/ECF system, which will send notification of such filing to all the counsel of record for the parties who participate in the CM/ECF system.

This the 20th day of June, 2025.

/s/ Elizabeth Curran O'Brien
Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. Department of Justice

Respectfully submitted this the 20th day of June, 2025.

JEFF JACKSON
Attorney General


/s/Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. State Bar No. 28885
E-mail: eobrien@ncdoj.gov
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6800
Fax: (919) 716-6755
*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned has this day electronically filed the foregoing DEFENDANTS RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS using the CM/ECF system, which will send notification of such filing to all the counsel of record for the parties who participate in the CM/ECF system.

This the 20th day of June, 2025.

/s/ Elizabeth Curran O'Brien
Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. Department of Justice