IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CV-280-FL

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RYAN BOYCE in his official capacity as | ) | |
| Director of the North Carolina | ) | |
| Administrative Office of the Courts; | ) | |
| MICHELLE BALL in her official capacity | ) | ORDER |
| as Clerk of Superior Court of Johnston | ) | |
| County; RENEE WHITTENTON in her | ) | |
| official capacity as Clerk of Superior Court | ) | |
| of Harnett County; and CLAUDIA | ) | |
| CROOM, in her official capacity as Clerk of | ) | |
| Superior Court of Wake County,[1] | ) | |
| | ) | |
| Defendants. | ) | |

This matter, wherein plaintiff complains for declaratory and injunctive relief, is before the

court upon plaintiff's motion for summary judgment (DE 77). The motion has been briefed fully,

and in this posture the issues raised are ripe for ruling. For the following reasons plaintiff's motion

is denied.

## STATEMENT OF THE CASE

Plaintiff commenced this action May 25, 2023, asserting a violation of its First Amendment

rights, pursuant to 42 U.S.C. § 1983, based upon an alleged denial of contemporaneous access to

---

[1]    In accordance with Federal Rule of Civil Procedure 25(d), the court has updated to the case caption to reflect
automatic substitution of defendant Claudia Croom in place of Blair Williams in the position of clerk of Superior
Court of Wake County.  See https://www.nccourts.gov/judicial-directory/claudia-croom.

new civil complaints upon their receipt for filing in superior courts of Johnston, Harnett, and Wake counties, in North Carolina. Defendants include the clerks of each such court (the "defendant clerks") and the director of the North Carolina Administrative Office of the Courts ("NCAOC"). Plaintiff seeks declaratory judgment that defendants' "policies and practices that knowingly withhold access to newly filed civil complaints, including, inter alia, their policies and practices of denying access to complaints until after administrative processing, are unconstitutional." (Compl. (DE 1) at 19). Plaintiff also seeks a permanent injunction prohibiting defendants from continuing such policies and practices, as well as an award of costs and fees. The court denied defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted, November 3, 2023.

After a period of discovery, plaintiff filed the instant motion seeking the following "declaratory relief":

1. "[F]inding that [d]efendants violated [plaintiff's] First Amendment rights by not providing [plaintiff] access to newly electronically-filed, nonconfidential Superior Court civil complaints 'as expeditiously as possible,' as controlling law requires." (Pl's Mot. (DE 77) at 1).

2. "[D]eclaring that in order to meet First Amendment access mandates, a same day processing rate for newly electronically-filed, nonconfidential civil complaints of no less than 90% is what is required to pass minimum First Amendment requirements." (Id. at 1-2).

Plaintiff also seeks order upon granting such judgment that will "require Defendants to report back to this Court six months post-judgment on whether they have been meeting this minimum standard." (Id. at 2). "If [d]efendants fail to do so, [plaintiff] asks this Court . . . to reserve jurisdiction to consider imposition of an injunction forbidding withholding of complaints to conduct processing given the technical solutions [plaintiff] has shown are available that permit

public access and clerk processing to occur concurrently." (Id.). Finally, plaintiff "moves for an award of its attorneys' fees and costs pursuant to 42 U.S.C. § 1988." (Id.).

In support of its motion, plaintiff relies upon a statement of facts and appendix of exhibits comprising: 1) declarations of plaintiff's founder, editor, and publisher, William Girdner ("Girdner"); plaintiff's employees, Adam Angione ("Angione") and Rich Ivey ("Ivey"); and paralegal Bernie Brennan ("Brennan"); 2) deposition testimony of Girdner; employees of the NCAOC, Bradley Fowler ("Fowler") and Emily Mehta ("Mehta"); former defendant Blair Williams ("Williams"); defendants Renee Whittenton ("Whittenton"), Michelle Ball ("Ball"), and Claudia Croom ("Croom"); and employee of Tyler Technologies, Terry Derrick ("Derrick"); and 3) exhibits to the foregoing, including defendants' websites screenshots, individual case dockets and filings, manually filed Excel spreadsheets produced by defendants, defendants' procedural rules, correspondence between the parties and internally by defendants.

In opposition, defendants rely upon a statement of facts and appendix of exhibits comprising 1) declarations of defendants Croom, Whittenton, Ball, and Ryan S. Boyce ("Boyce"); former defendant Williams; as well as Fowler, Mehta, Tasha O'Neal ("O'Neal"), assistant clerk for Wake County Superior Court, and Andrew Brown ("Brown"), general counsel for NCAOC; 2) deposition testimony of Derrick, Croom, and Girdner; and 3) exhibits to the foregoing.

In reply, plaintiff relies upon a response to defendants' statement of facts, an additional statement of facts and appendix of exhibits, comprising second declarations of Girdner and Angione, as well as exhibits thereto comprising a compilation of statistics and screenshots of federal court websites.

## STATEMENT OF FACTS

The undisputed facts and facts viewed in the light most favorable to defendants may be

3

summarized as follows.

Plaintiff "is a nationwide news service founded more than 30 years ago to cover civil litigation." (Defs' Stmt. (DE 87) ¶ 1).[2]  Plaintiff has approximately 2,750 subscribers for its subscription-based publications," including "law firms, news media, libraries, non-profits, government entities, businesses, and universities." (Id. ¶ 4).  Plaintiff's "subscription-based publications include its New Litigation Reports," which "cover civil complaints, focusing on actions brought against business institutions and public entities." (Id. ¶¶ 5, 8).  Plaintiff "does not report on civil complaints that are statutorily confidential or accompanied by a motion to seal." (Id. ¶ 8).

On June 7, 2019, "NCAOC contracted with Tyler Technologies ('Tyler') to provide Software-as-a-Service (SaaS) consisting of system administration, system management, and system monitoring activities, including the capability to use Tyler's suite of software applications," (Id. ¶ 24), in order to "transition the North Carolina court system from a paper-based system to digital based system." (Fowler Decl. (DE 88-4) ¶ 16).  "NCAOC agreed to pay Tyler approximately $85 million over ten years." (Defs' Stmt. (DE 87) ¶ 24).

"[T]he Superior Courts in Wake, Johnston, Harnett and Lee Counties," which include the three defendant clerks in the instant case, "launched e-fil[i]ng programs on February 13, 2023." (Answer (DE 4) ¶ 6).  Tyler currently provides "three interconnected products" to the North Carolina General Courts of Justice, including North Carolina Superior Courts: "the e-filing system,

---

[2]     Where a fact asserted in a movant's statement of material fact is undisputed, the court cites to the opposing party's responsive statement, where the fact is not "specifically controverted by a correspondingly numbered paragraph in the opposing statement." Local Civil Rule 56.1(a)(2).  In addition, unless otherwise specified, page numbers in citations to the record in this order refer to the page number of the document designated in the court's case management and electronic case filing (CM/ECF) system, and not to page numbering, if any specified on the face of the underlying document.

the case management system, and a public access portal." (Defs' Stmt. (DE 87) ¶ 26).

"The e-filing system provided by Tyler is known as 'E-File and Serve.'" (Id. ¶ 27). All "e-filings are made through a single online site knows as eFile North Carolina." (Answer (DE 4) ¶ 7). "An e-filed complaint is simply a .pdf document to be viewed or downloaded locally or remotely by whoever has permission." (Defs' Stmt. (DE 87) ¶ 13). "Filers prepare and submit their .pdf documents, which are then received by courts into their e-filing systems." (Id.). "Once received by the courts, the .pdf documents reside in virtual queues or in-boxes." (Id.).

The e-filing system "has three components: the online electronic service provider solution ["EFSP"], where filers upload and submit filings; the electronic filing manager ["EFM"], where documents and information are stored; and the clerk review tool, which displays documents and information stored in the EFM for clerks to review and process." (Id. ¶ 28). "Tyler also provides a case management system to the North Carolina [General Courts of Justice] called Enterprise Justice Case Management" or "EJCM." (Id. ¶ 29).

"Once filings through the e-filing system are 'accepted,' they go to the case management system." (Id. ¶ 30). "While Tyler's software can be configured as either an auto-accept or manual-accept system, North Carolina's system is currently configured for manual acceptance, meaning documents are not added to the case management system until they have been reviewed and processed by an employee in the clerk's office." (Id.). The public access "portal is connected to the case management system and displays certain" non-confidential "information from the case management system in read-only format on a platform that is available to the public." (Id. ¶ 32).

"After registering for an e-filing account, an e-filer logs into North Carolina's File & Serve system." (Id. ¶ 33). When filing a complaint, an e-filer is "presented with a drop-down menu to select the document security level, which allows the filer to choose what they believe the

document's security level should be, i.e. 'Confidential' or 'Public.'" (<u>Id.</u> ¶ 39). "Before the submission button is enabled, the filer must then click and accept two boxes," (<u>Id.</u> ¶ 41), the first of which requires acknowledgment of the following notice regarding personal identifying information ("PII"):

> IMPORTANT NOTICE: It is prohibited for any person preparing or filing a document in the official records of the North Carolina courts to include any . . . personal identifying information (PII) in that document unless expressly required by law or court order or redacted….

(<u>Id.</u> ¶ 42). "The second box requires filers to again affirmatively acknowledge that they have read the above notice and have a duty to comply with the filing and redaction requirements" set forth in the notice. (<u>Id.</u> ¶ 43). "Some defects in an e-filing, such as insufficient funds to cover the filing fee, will cause the filing to be immediately and automatically rejected, without ever reaching court clerks." (<u>Id.</u> ¶ 44). "Otherwise, once the filer hits the 'submit' button, the filing is transmitted to the E-Filing Manager ('EFM')." (<u>Id.</u>).

"On submission, the e-filer can choose to receive an email notification that the document has been submitted, which would advise the filer to 'allow up to one business day for clerk office processing,' and another once it is accepted by the clerk." (<u>Id.</u> ¶ 46). "North Carolina Superior Court clerks access e-filed documents from the EFM . . . and perform a ministerial review of them through the Clerk Review Tool." (<u>Id.</u> ¶ 47).

For a new complaint, this review may include "checking for the following: (1) mislabeling documents as a complaint; (2) personally identifying information ('PII'); (3) the defendant resides in the county; (4) the document has a proper name; and (5) filing fees are paid and paid in the correct amount." (<u>Id.</u> ¶ 48). "If a filing is a 'false lien' against a public official [or if] prohibited by a gatekeeper order, the filing [may] be permanently rejected." (<u>Id.</u> ¶ 49). "[I]f there are no issues, the clerk 'accepts' the submission." (<u>Id.</u> ¶ 50).

6

"Once 'accepted,' the complaint is file stamped, a copy is sent back to the filer, and another copy is sent to the case management system for docketing." (Id. ¶ 51). "The file stamp that appears on the complaint reflects the time the court received the filing in the EFM, not the time it was processed." (Id. ¶ 52). "The filing date, which is the date of receipt, appears on the docket; [t]he 'created' time and date, which corresponds to the time processing was completed, also appears on the docket." (Id.).

"Following the launch of eCourts in Harnett, Johnston and Wake counties [hereinafter, the "Pilot Counties"], the [NC]AOC provided dedicated on-staff support in each county to assist with questions and to report any software defects or procedural issues." (Fowler Decl. (DE 88-4) ¶ 49). "Despite additional staff resources and [NC]AOC training and on-site support staff, the initial launch of eCourts in the Pilot Counties encountered issues that impacted the [defendant] Clerk's ability to carry out their duties in Clerk Review Queue in the eFile system and in the [Integrated Case Management System]." (Id. ¶ 51). "Since the implementation of this system was a transformation from a paper-based system to an electronic one, there was a significant learning curve as [defendant] Clerks adopted the new electronic system." (Id. ¶ 52). "Despite extensive preparation work, since this was a pilot, there were issues that arose that required additional software configuration and/or programming refinements, especially during the first few months of utilization." (Id.). "For example, there were some delays in system processing whereby [defendant] Clerks were waiting for the system to process an action before they could move on to the next action." (Id. ¶ 53). "As programing refinements and configuration changes were made - and after [defendant] Clerks became more proficient with the electronic case management system - significant improvements were experienced." (Id.). "Major issues with software refinements and system configurations were resolved within the first 6 months of eCourts in additional to

7

increased system familiarity by the [defendant] Clerks." (Id. ¶ 55).

Acceptance rate data maintained by NCAOC "shows that the [defendant clerks] were regularly increasing their same business day acceptance, and within one business day acceptance, throughout the first six months of eCourts and have maintained high acceptance rates since that time." (Mehta Decl. (DE 88-3) ¶ 56). For example, the following table shows acceptance rates during the first six months of eCourts and two months thereafter:

53. **Table 1: 2023 Acceptance Rates for Clerk Defendants**

| Month | Acceptance Rate | Harnett | Johnston | Wake |
|---|---|---|---|---|
| January | Same Business Day | | | |
| | W/in 1 Business Day | | | |
| February | Same Business Day | 28.57 | 37.8 | 12.51 |
| | W/in 1 Business Day | 70 | 69.3 | 33.36 |
| March | Same Business Day | 54.14 | 41.32 | 62.7 |
| | W/in 1 Business Day | 84.53 | 64.84 | 94.68 |
| April | Same Business Day | 58.42 | 45.94 | 69.18 |
| | W/in 1 Business Day | 87.89 | 66.95 | 99.51 |
| May | Same Business Day | 51.49 | 64.43 | 70.44 |
| | W/in 1 Business Day | 80.7 | 91.75 | 99.32 |
| June | Same Business Day | 71.92 | 66.75 | 67.98 |
| | W/in 1 Business Day | 95.07 | 91.25 | 99.02 |
| July | Same Day | 71.84 | 68.06 | 74.8 |
| | W/in 1 Business Day | 96.11 | 93.06 | 99.48 |
| August | Same Day | 92.5 | 91.72 | 96.04 |
| | W/in 1 Business Day | 99 | 97.54 | 100 |
| September | Same Day | 98.65 | 99.76 | 99.79 |
| | W/in 1 Business Day | 99.55 | 100 | 99.97 |

(Id. ¶ 53).

The NCAOC "consider[s] the first six months of the eCourts transition process, in and of itself, to be . . . a transformational change, particularly for clerks, elected clerks, and for assistant and deputy clerks in [the] state." (Id. ¶ 26). During that time period, "[t]he amount of time that

8

was involved in training, the necessary requirements of learning an entirely new system, of completely reworking their existing business processes, of restructuring their offices to accommodate those new electronic business processes [were] an extenuating circumstance." (Id.). (Mehta Decl. (DE 88-3) ¶ 26).

Following that initial six month transitionary time period, "[t]he data shows that the Defendant Clerks have been accepting newly filed civil complaints on the same business day at a rate of 90% or greater since August 2023." (Id. ¶ 52). Tables illustrating the defendant clerks' "same business day acceptance rates and with/in one business day acceptance rates (which adds the same business day and one business day acceptance rates) are provided below." (Id.).



(Id. (DE 88-3) 20).



(Id.).



(Id.).

Additional facts pertinent to the instant motion will be set forth in the court's analysis herein.

**DISCUSSION**

A.      Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[3]

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor."  Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the

---

[3]      Throughout this order, internal citations and quotation marks are omitted from citations, unless otherwise specified.

motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

B.     Analysis

In opposing the instant motion, defendants raise a threshold issue of mootness, which the court turns to first because it impacts the court's subject matter jurisdiction. Determining that there are genuine issues of material fact concerning mootness, the court necessarily must deny plaintiff's motion on that basis. These genuine issues of material fact as to mootness also interrelate with issues going to the substance of plaintiff's claims, some of which are noted herein, which further preclude summary judgment in plaintiff's favor.

"To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Arizonans for Off. Eng. v. Arizona, 520 U.S. 43, 67 (1997). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013).

12

"The mootness doctrine ordinarily does not extend to situations where a party quits its offending conduct partway through litigation." 6th Cong. Dist. Republican Comm. v. Alcorn, 913 F.3d 393, 407 (4th Cir. 2019). "Pursuant to the voluntary cessation exception" to mootness, "a civil action does not become moot when a defendant voluntarily ceases its allegedly improper behavior, if there is a reasonable chance that the behavior will resume." Lighthouse Fellowship Church v. Northam, 20 F.4th 157, 162 (4th Cir. 2021). "[T]he standard for determining whether a pending case 'has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Id. (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189 (2000)).

For example, "a governmental entity's change of policy renders a challenge moot when the governmental entity has not asserted its right to enforce the challenged policy at any future time." Porter v. Clarke, 852 F.3d 358, 364 (4th Cir. 2017). "It is entirely proper for a governmental entity to attempt to conform its policies to the demands of the First Amendment," and "if a revised policy passes constitutional muster, a court will not penalize the government for transgressions under an earlier policy." Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch., 457 F.3d 376, 386 (4th Cir. 2006). Likewise, a government's "mere ability to reimpose challenged [practices] is not enough to show a reasonable chance of recurrence." Eden, LLC v. Justice, 36 F.4th 166, 172 (4th Cir. 2022). "[T]he voluntary cessation analysis always requires a factual inquiry into the actual likelihood of recurrence of the offending behavior." Id.

In addition, "the voluntary cessation doctrine does not apply when the voluntary cessation of the challenged activity occurs because of reasons unrelated to the litigation." Wall v. Wade, 741 F.3d 492, 498 n. 8 (4th Cir. 2014). Further, some courts have "treat[ed] a voluntary

13

governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity." Id. at 497-498 (quoting Sossamon v. Texas, 560 F.3d 316, 325 (5th Cir.2009)).

Here, the record reflects at least a genuine issue of fact regarding whether "there is a reasonable chance that the [challenged] behavior will resume" that was taking place at the time of the commencement of this action. Lighthouse Fellowship Church, 20 F.4th at 162. There is a clear and marked demarcation between the rates of acceptance during the first six months of the transition to e-filing and the rates of acceptance thereafter. Defendants have brought forth substantial evidence that the conditions in effect during this transition time "could not reasonably be expected to recur," Friends of the Earth, Inc., 528 U.S. at 189, because they were tied so particularly to the challenges of the transition to e-filing.

For example, Fowler states "there was a significant learning curve as Clerks adopted the new electronic system." (Fowler Decl. (DE 88-4) ¶ 52). According to Mehta, NCAOC "consider[s] the first six months of the eCourts transition process, in and of itself, to be . . . a transformational change." (Mehta Decl. (DE 88-3) ¶ 26). Notablly, O'Neal reports "the initial months of eCourts were overwhelming to the Wake County Clerk's office, especially the Civil Division, as it learned a new system and dealt with implementation issues." (O'Neal Decl. (DE 88-2) ¶ 13). "Towards the six-month post-implementation mark, staff in the Civil Division caught up on processing electronic filings and had a good handle on performing their work in the new eCourts system." (Id. ¶ 16). Harnett County and Johnston County experienced similar marked differences between the transitionary period and after. (Wittington Decl. (DE 88-6) ¶¶ 13-29 (transition) ¶ 30-37 (after); Ball Decl. (DE 88-7) ¶¶ 21-38 (transition) ¶¶ 39-48 (after)).

14

In addition, defendants have demonstrated that their practices in place after that transitionary period, and even more at present, are consistently exceeding the constitutional threshold plaintiff seeks in the instant motion. In particular, plaintiff seeks a declaration that "a same day processing rate for newly electronically-filed, nonconfidential civil complaints of no less than 90% of what is required to pass minimum First Amendment requirements." (Pl's Mot. (DE 77) at 2). That is, indeed, what defendants have demonstrated they have accomplished over the course of the last several years. For example, for the first five months of 2025, the NCAOC demonstrated rates for the defendant clerks surpassing that threshold, without exception:

| Month | Acceptance Rate | Harnett | Johnston | Wake |
|---|---|---|---|---|
| January | Same Business Day | 99.38 | 95.06 | 98.85 |
| | W/in 1 Business Day | 100 | 100 | 99.81 |
| February | Same Business Day | 99.67 | 99.2 | 99.33 |
| | W/in 1 Business Day | 100 | 100 | 99.97 |
| March | Same Business Day | 100 | 99.46 | 98.9 |
| | W/in 1 Business Day | 100 | 100 | 100 |
| April | Same Business Day | 99.63 | 98.8 | 99.72 |
| | W/in 1 Business Day | 100 | 100 | 99.97 |
| May | Same Business Day | 100 | 99.2 | 99.4 |
| | W/in 1 Business Day | 100 | 99.8 | 100 |

(Mehta Decl. (DE 88-3) ¶ 55).

Accordingly, viewing the evidence in the light most favorable to defendants, it is "unreasonable to expect a recurrence" of the challenged practices existing at the commencement of the litigation. Lighthouse Fellowship Church, 20 F.4th at 164. From this perspective, the conditions that were in place during the six-month transitionary period in 2023 simply are no longer in place, and cannot plausibly be expected to recur. It is, moreover, reasonable to infer that defendants improved their acceptance rates above the standard plaintiff now seeks "because of

reasons unrelated to the litigation," that is, entirely because those transitionary conditions have ceased to exist. Wall, 741 F.3d at 498 n. 8.

Plaintiff suggests that defendants waived their mootness argument by not raising it either by motion or by affirmative defense in their answer. (See Reply (DE 95) at 12). However, "the question whether there remains a live case or controversy with respect to [a plaintiff's] claim . . . goes to the Article III jurisdiction of this [c]ourt." Arizonans for Off. Eng., 520 U.S. at 67. "[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006). As such, mootness cannot be waived, and this court has an "independent obligation" to address mootness as a threshold matter. Id.

Plaintiff argues the case is not moot on the basis of Courthouse News Serv. v. Schaefer, 2 F.4th 318, 323–24 (4th Cir. 2021). There, in a case also involving a First Amendment challenge to court access rates in Virginia, the United States Court of Appeals for the Fourth Circuit reasoned:

> While the Clerks' improvements in rates of access are commendable, absent the relief Courthouse News sought, "nothing bars [them] from reverting" to the allegedly unconstitutional rates of access in the future. Porter v. Clarke, 852 F.3d 358, 365 (4th Cir. 2017). The case is thus not moot.

2 F.4th at 323-24.

Schaefer's analysis of mootness, however, is inapposite and instructively distinguishable for two significant reasons. First, Schaefer's analysis of mootness followed a bench trial, and thus, unlike here, the district court had made a mootness determination based upon findings of fact and conclusions of law, thereby satisfying the necessary "factual inquiry into the actual likelihood of recurrence of the offending behavior." Eden, LLC, 36 F.4th at 172; see also Courthouse News

16

Serv. v. Corsones, 131 F.4th 59, 63, 79 (2d Cir. 2025) (addressing mootness following district court bench trial).

Second, the material facts in Schaefer are much different from those presented here, when viewed in the light most favorable to defendants. In particular, Schaefer did not involve any transitionary period from paper filings to electronic filings, which transitionary period is a substantial fact underpinning the court's instant mootness determination. This transitionary period also supports an inference that "cessation of the challenged activity occur[red] because of reasons unrelated to the litigation" in the instant case, Wall, 741 F.3d at 498 n. 8, in contrast to Schaefer, where there was no reason for the change other than the litigation. See 2 F.4th at 322-23.

Furthermore, Schaefer presented circumstances where the Virginia state court "Clerks had fallen far short of [a same day of filing] standard without any justification for the delays," whereas defendants here present multiple justifications for delays during the transitionary period. (See, e.g., O'Neal Decl. (DE 88-2) ¶¶ 13-16, 30-31, 33-36). Finally, the Virginia state court clerks in Schaefer had achieved at best only 92.3% and 88.1% "day of filing" access rates, 2 F.4th at 323, whereas defendants here present rates all exceeding 95% and many at 100%. (Mehta Decl. (DE 88-3) ¶ 55). In sum, Schaefer does not foreclose a mootness determination under the circumstances of this case.

Plaintiff argues that the defendants' justifications for delays during the six-month transitionary period are easily refuted, and that defendants could have prepared more diligently for the challenges they faced. (See Reply (DE 95) at 12 (noting plaintiff "warned of the potential for access delays years before any North Carolina court transitioned to e-filing"). This argument fails on two levels. First it invites the court to weigh the evidence in plaintiff's favor, which the court cannot do in adjudicating plaintiff's motion for summary judgment. See Diebold, Inc., 369 U.S.

at 655. Second, in the context of the instant mootness determination, plaintiff's argument is beside the point. Whatever the reason for defendants' allegedly deficient practices during the six-month transitionary period, which itself is an issue that "the parties vehemently . . . continue to dispute," that period now is over, never to return. Already, LLC, 568 U.S. at 91. Thus, the case still may be declared moot in light of the present circumstances and practices exceeding constitutional thresholds, notwithstanding factual disputes over alleged justifications for prior practices. See id.; see also Alvarez v. Smith, 558 U.S. 87, 92 (2009) (noting "[t]he parties, of course, continue to dispute the lawfulness of the State's [prior] hearing procedures," but nonetheless holding moot "a complaint that seeks only declaratory and injunctive relief, not damages"); Lighthouse Fellowship Church, 20 F.4th at 164 (finding moot case challenging prior restrictions on religious services where "current circumstances are materially different from those present at the outset of the pandemic"); Child Evangelism Fellowship of MD, Inc., 457 F.3d at 386 ("[A] court will not penalize the government for transgressions under an earlier policy.").

Plaintiff argues that the court should apply a different benchmark for determining present same day acceptance rates than defendants set forth in their materials, thus implying defendants are not as compliant presently as their statistics purport to show. For example, plaintiff claims that same day acceptance should not include a scenario in which a complaint is filed 5:02 on a Friday before a Monday court holiday, and then only processed on the next court date, a Tuesday. (Pl's Mem. (DE 79) at 31). Plaintiff also claims that performance by other county clerks, such as Mecklenburg and Beaufort county show that defendant Boyce is not committed to enforcing constitutional requirements.

These arguments fail on multiple levels. As an initial matter, the Fourth Circuit held in Schaefer that same day filings shall be measured by court business days and not calendar days.

See 2 F.4th at 322.  The Fourth Circuit, like the Second Circuit, has suggested no basis for departing from this rule in an e-filing environment.  See Courthouse News Service v. Smith, 126 F.4th 899, 907 n.6 (4th Cir. 2025) (rejecting argument that e-filing "creates a 'virtual courthouse' that is 'always open,'" noting "[t]here is no evidence that any court business occurs outside of business hours"); see Corsones, 131 F.4th at 65 (evaluating e-filing rates by "business day").  As for statistics from other counties, they are inapposite because the clerks in those counties are not defendants here, and they transitioned to e-filing at different times from Wake, Johnston, and Harnett counties.  (See Defs' Stmt. (DE 87) ¶¶ 88-90).  Moreover, plaintiff's argument again seeks to have the court draw inferences in its favor.  As such plaintiff's factual dispute regarding present acceptance rates is not determinative of mootness.

Plaintiff also suggests that defendants' history of rule changes demonstrates that defendants are not committed to meeting the constitutional standard of access set forth in Schaefer.  For example, plaintiff points to an October 2024 version of Rule 1.5 of the eRRK that states:

> If a clerk's office is at least six months post-ICMS implementation and exhibits same day acceptance rates below 90% for three consecutive months, NCAOC will provide that clerk's office with a computer terminal equipped with functionality to display all non-confidential, initiating documents in civil matters…that have been filed in that county but not yet accepted by the clerk's office ("pre-acceptance terminal")

(Pl's Stmt. (DE 78) ¶ 72).  Plaintiff notes that "[i]n April 2025, NCAOC Director [defendant] Boyce unilaterally amended Rule 1.5, eliminating the 90% acceptance benchmark and pre-acceptance review terminal remedy if the rate wasn't met." (Id. ¶ 92).  Such rule changes, however, are not determinative of mootness, which is grounded here in the temporary deficiencies present during the six-month transitionary period and the high rate of same day access to complaints maintained after the six-month transitionary period.  Moreover, in such circumstances, the rule changes do not show there "is a reasonable chance that the [challenged behavior] will resume."

19

Lighthouse Fellowship Church, 20 F.4th at 162. Rather, viewing inferences in the light most favorable to defendants, they confirm defendants' commitment to maintaining constitutional standards in access to newly filed complaints, regardless of rule changes.

In sum, defendants have demonstrated at least a genuine issue of material fact as to mootness. It remains for future proceedings to conduct th requisite "factual inquiry into the actual likelihood of recurrence of the offending behavior." Eden, LLC, 36 F.4th at 172. Therefore, plaintiff's motion is without merit.[4]

## CONCLUSION

Based on the foregoing, plaintiff's motion for summary judgment (DE 77) is DENIED. In accordance with case management order entered January 25, 2024, this case now is ripe for entry of an order governing deadlines and procedures for bench trial. The parties are DIRECTED to confer and file within 21 days from the date of this order a joint status report informing of:

1. Estimated trial length;

2. Pretrial and/or trial issues concerning, which if addressed on some suggested schedule in advance of trial, may promote efficiencies;

3. Three suggested alternative trial dates; and

4. Whether any party would seek conference with the court, be it in person or by telephone, in advance of its entry of the trial scheduling order.

In addition, where mediation previously was completed July 1, 2024, the parties shall specify if they wish to schedule a court-hosted settlement conference or additional alternative dispute

---

[4]     Defendants suggest in opposition to plaintiff's motion that, as a result of defendants' arguments, the court should "dismiss the claims entirely." (Defs' Opp. (DE 86) at 34). Defendants, however, did not file a cross-motion for summary judgment or for dismissal as a matter of law. Moreover, given that "the voluntary cessation analysis always requires a factual inquiry into the actual likelihood of recurrence of the offending behavior," Eden, LLC, 36 F.4th at 172 (emphasis added), and given that issues going to the merits of plaintiff's claims are equally fact intensive, summary judgment in favor of defendants on the present record is not warranted.

resolution procedures in advance of trial, and if so suggested date for completion of such.

SO ORDERED, this the 5th day of January, 2026.

LOUISE W. FLANAGAN
United States District Judge